**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| In re: ) | Case No. 21-40834-DRD |
| ) | Chapter 11 |
| INTERSTATE UNDERGROUND ) | |
| WAREHOUSE AND INDUSTRIAL PARK, ) | |
| INC. ) | |
| ) | |
| Debtor. ) | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING DEBTOR TO PAY PREPETITION WAGES AND WORKFORCE OBLIGATIONS, (B) AUTHORIZING DEBTOR TO MAINTAIN WORKFORCE PROGRAMS AND PAY RELATED OBLIGATIONS, AND (C) GRANTING RELATED RELIEF**

Interstate Underground Warehouse & Industrial Park Inc. ("IUW" or the "Debtor") respectfully states as follows in support of this motion (this "Motion"):

**Relief Requested**

1. By this Motion, the Debtor seeks entry of interim and final orders (the "Proposed Orders"), pursuant to sections 105(a), 363, and 507 of title 11 of the United States Code (the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) authorizing, but not directing, the Debtor in its discretion to pay and honor its prepetition employee obligations relating to wages and workforce obligations, (b) authorizing, but not directing, the Debtor in its discretion to maintain workforce benefit programs and pay prepetition amounts related thereto, and (c) granting related relief.

**Jurisdiction and Venue**

2. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order Regarding Reference of Bankruptcy Matters to United States Bankruptcy Judges by the United States District Court for the Western District of Missouri. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. The statutory and legal predicates for the relief requested herein are sections 105(a), 363, and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

**Background**

4. On July 1, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. IUW operates a network of underground storage facilities within a single location in Kansas City, Missouri. IUW houses approximately 3 million square feet of dry storage, 250,000 square feet of cooler space, and 500,000 square feet of freezer space for the storage of a variety of customer goods.

5. The Debtor continues to manage and operate its business as debtor in possession under sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or official committee has been appointed in this chapter 11 case.

6. Information regarding the Debtor's business, its capital and debt structure, the events leading to the filing of this case, and the terms and structure of the proposed restructuring transaction is set forth in the Declaration of Leslie Reeder (the "First Day Declaration")[1], filed contemporaneously herewith.

---

[1] The First Day Declaration is being filed in support of this Motion and is incorporated herein by reference. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

**The Debtor's Workforce**

7.      As of the Petition Date, the Debtor has a workforce of approximately 18 total employees (collectively, the "Workforce" or the "Workers").  Approximately 13 are full time, and approximately five (5) are part time employees.  Approximately six (6) are salaried, and approximately 12 are hourly.  The Workers are leased by the Debtor from E3 HR, Inc. ("E3").

8.      The Workforce forms the backbone of the Debtor's enterprise, and accordingly performs a wide variety of functions critical to the administration of this chapter 11 case and the Debtor's overall restructuring.  The Workers' skills, knowledge, and understanding of the Debtor's operations and infrastructure are essential to preserving operational stability, efficiency, safety, and value.  In many instances, the Workers include specially trained personnel who cannot be easily replaced during this chapter 11 case and without whom the Debtor's reorganizational efforts will likely be jeopardized.

**The Debtor's Workforce Obligations and Programs**

9.      The Debtor seeks to minimize the impact of this chapter 11 case on the Workforce, and for such reason, seeks authority to pay and honor its prepetition employee-related obligations and to continue its ordinary course programs related thereto, including by: (a) paying outstanding prepetition wages and other compensation-related obligations; (b) paying employee withholding taxes and employer taxes; (c) paying certain payroll deductions; (d) paying reimbursable expenses; (e) maintaining the workers' compensation policy and honoring obligations related thereto; (f) paying and maintaining the variable wage programs; (g) continuing the Debtor's employee benefit programs and honoring obligations related thereto; and (h) paying prepetition amounts owed to third-party service providers (the foregoing obligations,

the "Workforce Obligations" and their related programs, the "Workforce Programs"). Subject to the Court's approval of the relief requested herein, the Debtor intends to continue its prepetition Workforce Programs in the ordinary course of business. The Debtor requests the right to modify, change, and discontinue any of its Workforce Programs and to implement new programs, policies, and benefits in the ordinary course of business during this chapter 11 case and without the need for further Court approval, subject to applicable law.

10. As of the Petition Date, and as discussed below, the Debtor estimates that it owes Workers four business days' worth of Workforce Obligations. The Debtor does not believe any Worker is owed prepetition amounts in excess of the $13,650 priority wage cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, and the Debtor seeks approval to pay such amounts, if any, pursuant to a final order.

A. **Compensation and Compensation-Related Obligations**

i. Wages

11. The Debtor seeks authority to pay the Workers' net prepetition wages (the "Prepetition Wages") and to continue to pay the Workers' post-petition compensation in the ordinary course of business. The Debtor's payroll is disbursed by E3 (from whom the Debtor leases its employees), runs every two weeks on Friday (or the preceding business day if the Friday falls on a holiday), and represents pay performed for the two-week period ending on the preceding Tuesday. The Debtor's Prepetition Wages average approximately $53,000 per month and $13,250 per week. To administer payroll and perform other services provided below, E3 charges an administrative fee in the amount of $716.58 every pay period.

12. The Debtor's last payroll disbursed on Friday June 25th. Accordingly, Prepetition Wages and certain other Workforce Obligations included in payroll accrued between

June 25th and the Petition Date, and the Debtor requests the Court's authority to pay such prepetition amounts.

    ii.    <u>Employer-Paid Payroll-Related Taxes and Government Fees</u>

13. Related to the Workers' payroll, E3 pays certain employer-funded payroll taxes and obligations (collectively, the "<u>Payroll Taxes</u>") for the Workers leased to the Debtor. The Payroll Taxes include federal Medicare and Social Security taxes, as well as federal and state unemployment taxes. E3 remits these amounts directly to the applicable government authority. The Debtor requests authority to maintain its arrangement with E3 with respect to the Payroll Taxes in the ordinary course of business.

    iii.    <u>Payroll Garnishments and Other Payroll Deductions</u>

14. In administering payroll, E3 deducts from Workers' paychecks certain taxes, such as payroll and Social Security taxes, that must be withheld under certain federal, state, and local tax laws. E3 and the Debtor, as applicable, must also comply with occasional garnishment or child support orders requiring the withholding of a Worker's wages. As discussed below, certain Workers have voluntary deductions for contributions to the 401(k) Plan (as defined below) and certain insurance premiums (collectively with the foregoing deductions, the "<u>Payroll Deductions</u>"). Payroll Deductions are taken from a Worker's gross payroll, are not an incremental cost obligation for the Debtor, and are often required by law. The Debtor's monthly Payroll Deductions (excluding 401(k) Plan contributions) average approximately $1,100. The Debtor seeks authority to continue making Payroll Deductions and to remit such amounts to third parties in the ordinary course of business as requested or required by law.

    iv.    <u>Workforce Benefit Programs</u>

15. The Debtor has established Workforce Programs through various plans and policies to provide the Workforce with medical, dental, prescription drug, vision, life insurance, retirement savings, vacation, holiday pay, other paid time off, and other benefits (collectively, the "Workforce Benefits," and amounts owed thereunder, the "Workforce Benefit Obligations"), which are administered by the Debtor. The Debtor seeks the authority, but not the direction, to continue the below Workforce Benefits and to satisfy or remit the Workforce Benefit Obligations, including those that were accrued and unpaid as of the Petition Date, in the ordinary course of business during this chapter 11 case. Except as otherwise noted, the Workforce Benefits apply equally throughout the Workforce.

  i.  Health Programs

16. The Debtor offers several health coverage benefit programs to the Workers and their families, including medical, dental, vision, and prescription drugs (collectively, the "Health and Welfare Programs" and amounts owed thereunder, the "Health and Welfare Obligations"). The Debtor carries third-party insurance to provide the Health and Welfare Programs. The Debtor provides medical insurance to approximately 7 employees through a PPO plan administered by Humana Insurance, at a monthly cost to the Debtor of approximately $6,000. The Debtor provides dental insurance to approximately 6 employees through a plan administered by Delta Dental, at a monthly cost to the Debtor of approximately $60. The Debtor also provides vision insurance to approximately 7 employees at a monthly cost to the Debtor of approximately $20.00.

  ii.  Life Insurance and Long-Term Disability Insurance

17. The Debtor offers life insurance to the Workforce (the "Life Insurance Program") through Aflac Inc. ("Aflac"). Eligible Workers may also, at their election and

through their voluntary contribution, select additional supplemental life insurance and life insurance for their dependents, which is also offered by Aflac. In addition, the Workforce may, at their election and through their voluntary contribution, select long-term disability insurance, which is provided by Aflac. The annual cost to the Debtor associated with the Life Insurance Program totaled approximately $500 for the calendar year 2020.

    iii.    401(k) Plan

18. Currently, the Debtor offers Workers a savings plan (the "401(k) Plan") that meets the requirements of section 401(k) of the Internal Revenue Code of 1986, which is administered by Employee Fiduciary LLC ("Employee Fiduciary"). Pursuant to the 401(k) Plan, the Debtor matches 100% of the first 3% of a Worker's contributed compensation. Contributions from participating Workers are withheld from such Worker's gross pay during each payroll cycle and transferred to Employee Fiduciary for deposit into the 401(k) Plan as directed by the participating Worker. The Debtor's monthly matching contributions to the 401(k) Plan total approximately $275. Employee Fiduciary manages Worker contributions and otherwise administers the 401(k) Plan.

    iv.    Paid Time Off

19. Workers generally receive ten (10) days per year of paid-time off after three (3) years of service (up from an initial five (5) days of paid-time off), plus any days designated as a holiday ("PTO"). Two Workers receive fifteen (15) days of paid-time off who were grandfathered in prior to a policy change. In addition, Workers are allowed three (3) days per year of sick time.

20. The Debtor requires Workers to use their PTO each year or the time is forfeited. The Debtor anticipates that the Workers will utilize any accrued PTO in the ordinary

course of business. The Debtor estimates that Workers have accrued approximately 624 hours of PTO as of the Petition Date.

### B. Workers' Compensation Programs and Benefits

21. The Debtor is not required to maintain workers' compensation liability insurance and to provide Workers with workers' compensation coverage for claims arising from or related to their employment, because the Workers are leased from E3. The Workforce is covered under a single workers' compensation policy (the "Workers' Compensation Program") with Arch Insurance Company ("Arch") maintained by E3. E3 pays premiums to Arch directly. The Debtor relies on E3 and Arch to process and administer claims under the Workers' Compensation Program. When a claim is filed with Arch, Arch will send an invoice directly to E3, and will administer any payments on account of those claims.

### C. Workforce-Related Service Providers

22. As discussed herein, the Debtor has engaged certain third-party service providers (the "Service Providers") to assist with or administer its Workforce Programs. The Service Providers perform a wide range of services for such programs, including: (a) E3 (leased employees); (b) Employee Union (401(k) Plan administration); (c) Humana Insurance (health insurance administration); (d) Arch Insurance Company (workers' compensation claims administration); (e) Aflac (life insurance administration). As of the Petition Date, upon information and belief, the Debtor does not owe any amount to the Service Providers. Failure to pay any of these Service Providers could result in substantial interruption of the Debtor's Workforce Programs and harm the Workers' morale or the Debtor's efforts to retain necessary Workers during its chapter 11 case. As a result, the Debtor seeks authorization, but not direction,

to continue to honor all obligations to the Service Providers in the ordinary course of business as such obligations become due.

**D.      Other Benefit Programs**

23.     In addition to the Workforce Programs discussed above, the Debtor may maintain or establish from time to time other benefit programs for the Workforce or agree on a case-by-case basis to provide additional benefits to Workers.  To the extent that any such programs are not mentioned herein or are later implemented by the Debtor in its reasonable business judgment, the Debtor seeks authorization to honor or incur such obligations to the non-insider Workers in the ordinary course of business.  Furthermore, the Debtor hereby reserves its right to modify or terminate any of the Workforce Programs discussed herein as permitted by law.

## Basis for Relief Requested

24.     The Debtor requests authority to satisfy the Workforce Obligations and maintain the Workforce Programs in the ordinary course of its business during the pendency of this chapter 11 case.  Operation of the Debtor's warehouse facility and equipment requires skilled laborers with experience and proficiency, as well as qualified managers and supervisors. The Workforce's knowledge and understanding of the Debtor's products, operations, and infrastructure is essential to preserving the value of the Debtor's business.

25.     Given that preserving and maximizing the value of the Debtor's estate depends upon a stable and skilled workforce, any significant number of Worker departures or deterioration in morale at this time may substantially and adversely impact the Debtor's efforts in chapter 11, causing immediate and irreparable harm to the Debtor's estate and its creditors. There is a real, immediate risk that if the Debtor is not authorized to continue to satisfy the

Workforce Obligations and to maintain the Workforce Programs in the ordinary course, Workers will no longer support and maintain the operations of the Debtor, thereby crippling the Debtor's ability to successfully maximize the value of its assets. Accordingly, the Debtor must be authorized to continue, in the ordinary course, the Workforce Programs that were in effect before the Petition Date for the entire Workforce.

A. **The Court Should Authorize the Debtor to Pay the Workforce Obligations**

26. Sections 105(a) and 363(b) of the Bankruptcy Code authorize the requested relief. Section 363(b)(1) of the Bankruptcy Code authorizes a debtor to use property of the estate other than in the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1); *see also In re Apex Oil Co.*, 92 B.R. 847, 866 (Bankr. E.D. Mo. 1988). Similarly, Section 105(a) of the Bankruptcy Code allows the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code.]" 11 U.S.C. § 105(a). It permits a bankruptcy court to take whatever action "is appropriate or necessary in aid of the exercise of its jurisdiction." 2 COLLIER ON BANKRUPTCY ¶ 105.01. This doctrine of necessity functions in a chapter 11 reorganization as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Wehrenberg, Inc.*, 260 B.R. 468, 469 (Bankr. E.D. Mo. 2001) ("Pursuant to 11 U.S.C. § 105(a) the Court may authorize the payment of prepetition claims when such payments are necessary to the continued operation of the Debtor"); *see also In re Bos. & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary to the debtor's continued operation).

27. The Debtor's ability to satisfy its Workforce Obligations and to maintain its Workforce Programs is necessary to its continued and uninterrupted operations during this

chapter 11 case. Any delay in paying any of the Workforce Obligations could jeopardize the Debtor's relationship with the Workforce and irreparably harm the Workers' finances and morale at the very time that the Workforce's dedication, confidence, support, and cooperation are most critical. Thus, if the Debtor does not obtain immediate authority to pay the Workforce Obligations, the Debtor's operations may be severely impaired. Most importantly, absent payment of the outstanding Prepetition Wages, and satisfaction of the Workforce Obligations overall, Workers will suffer hardship and, in many instances, financial duress.

28. Moreover, it is necessary and appropriate under the circumstances to permit the Debtor to continue to honor its Workforce Obligations during the pendency of this chapter 11 case. The Workforce Programs are customary benefits that the Debtor has provided to the Workforce that are consistent with benefits provided by other employers throughout the country. In many instances, the Workers crucially depend on the other Workforce Programs such as the Health and Welfare Programs, and it would cause a significant and undue hardship for the Workforce if the Debtor were forced to discontinue such programs. Indeed, failure to continue the Workforce Programs may result in Workers departing from the Debtor in favor of employers who can provide the Workforce with such protections and benefits. Such departures would imperil the Debtor's efforts in this chapter 11 case to preserve its business and to maximize the value of its estate.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

29. By this Motion, the Debtor requests that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtor has established cause for a waiver of any stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 6004(h). For the reasons set forth herein and in the First Day

Declaration, the Debtor submits that notice of the relief requested herein is appropriate under the circumstances and that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h).

## **The Requirements of Bankruptcy Rule 6003 Are Satisfied**

30. The Debtor seeks immediate authorization for the relief requested in this Motion. Pursuant to Bankruptcy Rule 6003(b), a bankruptcy court cannot grant "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" within the first twenty-one (21) days after the petition date unless the relief is "necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(b). For the reasons set forth herein, Rule 6003(b) has been satisfied.

WHEREFORE, the Debtor respectfully requests entry of the Proposed Order, granting the relief requested herein and such other relief as is just and proper.

Dated: July 2, 2021
Kansas City, Missouri

Respectfully submitted,

ARMSTRONG TEASDALE LLP

 */s/  Pamela Putnam*
Pamela Putnam, MO 61158
2345 Grand Blvd. Suite 1500
Kansas City, MO  64108
Telephone: (816) 221-3420
Facsimile: (816) 221-0786
Email:  pputnam@atllp.com

- and -

Richard W. Engel, Jr., MO 34641
Erin M. Edelman, MO 67374 (pro hac vice motion pending)
**ARMSTRONG TEASDALE LLP**
7700 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105
Telephone: (314) 621-5070
Facsimile:  (314) 612-2239
Email:  rengel@atllp.com
Email:  eedelman@atllp.com

*Proposed Counsel to the Debtor*