# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| In re: | ) |
| | ) |
| INTERSTATE UNDERGROUND | ) Case No. 21-40834-DRD |
| WAREHOUSE AND INDUSTRIAL | ) |
| PARK, INC., | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| | ) |

## DEBTOR'S MOTION FOR ENTRY OF AN ORDER CONFIRMING INAPPLICABILITY OF THE AUTOMATIC STAY TO SALE OF REAL PROPERTY BY NON-DEBTOR SUBSIDIARY

The above captioned debtor and debtor in possession (the "Debtor" or "IUW") respectfully

states as follows in support of this motion (the "Motion"):

### Relief Requested

1.       By this Motion, the Debtor seeks entry of an order pursuant to sections 105, 362,

and 363(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 4001 and 6004

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-1 of the

Local Rules of Practice of the United States Bankruptcy Court for the Western District of Missouri

(the "Local Bankruptcy Rules"), (a) confirming the inapplicability of the automatic stay to the sale

of certain real property held by a non-debtor subsidiary; (b) confirming that neither the Debtor nor

said subsidiary needs approval of such sale; and (c) granting related relief.

### Jurisdiction and Venue

2.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the Order Regarding Reference of Bankruptcy Matters to United States Bankruptcy Judges of

the United States District Court for the Western District of Missouri dated August 15, 1984.  Venue

is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.       The statutory and legal predicates for the relief requested herein are sections 105, 362, and 363(b) of the Bankruptcy Code, Bankruptcy Rules 4001 and 6004, and Local Bankruptcy Rule 4001-1.

## **Procedural Background**

4.       On July 1, 2021 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor operates a network of underground storage facilities within a single location in Kansas City, Missouri. IUW houses approximately 3 million square feet of dry storage, 250,000 square feet of cooler space, and 500,000 square feet of freezer space for the storage of a variety of customer goods, ranging from coffins to spices. IUW provides warehousing, distribution, fulfillment, and storage services for its wide-ranging customer base.

5.       The Debtor continues to manage and operate its business as a debtor in possession under sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner or official committee has been appointed in these chapter 11 cases.

6.       Information regarding the Debtor's business, its capital and debt structure and the events leading to the filing of this case is set forth in the *Declaration of Leslie Reeder in Support of Debtor's First Day Motions* (the "<u>First Day Declaration</u>"),[1] filed on July 2, 2021 [Docket No. 19].

---

[1] The First Day Declaration is incorporated herein by reference. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

## Basis for Relief Requested

### A.        Interstate Underground Warehouse LLC and the Weld Wheel Property

7.        Among the Debtor's various assets is a 100% ownership interest in Interstate Underground Warehouse LLC ("IUW LLC"), a Missouri limited liability company. *See* Debtor's Schedule A/B: Real and Personal Property [Docket No. 1] at p. 41. IUW LLC is not a debtor in this chapter 11 case or any other bankruptcy proceeding.

8.        IUW LLC holds title to certain real property located at the intersection of Union Avenue and Mulberry Street in Kansas City, Missouri (the "Property" or the "Weld Wheel Property").

9.        The Weld Wheel Property is alleged to be subject to a Deed of Trust, Assignment of Rents and Security Agreement (the "Deed of Trust") in favor of C. Floyd Anderson and Sharon Anderson (the "Andersons"). A true and accurate copy of the Deed of Trust is attached hereto as Exhibit A. The Deed of Trust purports to secure a promissory note with a face amount of $3 million (the "Note") which is claimed to have been issued by IUW LLC, the Debtor and Harrisonville Senior Care Center LLC (another non-debtor wholly-owned subsidiary of the Debtor). The current balance purportedly owing on the Note is approximately $3.7 million.

10.        The Andersons claim to hold a guarantee of the debt owing on the Note enforceable against the Debtor and a second-position lien in the Debtor's real property from which the Debtor operates its storage business. The Debtor scheduled the claim asserted against it by the Andersons as disputed. *See* Debtor's Schedule D: Creditors Who Have Claims Secured by Property [Docket No. 1] at p. 42.[2]

---

[2] After the Debtor further investigated the Deed of Trust and the Note, the Debtor determined that it will not dispute the validity of the Deed of Trust and the Note. However, the Debtor reserves its right to dispute the asserted guarantee claim against the Debtor and any amounts alleged to be owed by the Debtor if additional facts arise. The Debtor in no way concedes that such claim is allowed at this time.

11.     Pending the sale of the Weld Wheel Property and resolution of the Andersons'
claim through this chapter 11 case, the Debtor continues to make ongoing monthly principal
payments on the Note pursuant to a series of forbearance agreements negotiated between the
Debtor and the Andersons.

**B.      The Proposed Sale**

12.      On or about September 29, 2020, IUW LLC entered into a Purchase and Sale
Agreement (as subsequently amended, the "PSA") with MTP – SRI Holdings, LLC (the "Buyer")
for the Weld Wheel Property. A true and accurate copy of the PSA is attached hereto as Exhibit
B. The agreed sale price for the Property is $3.8 million.

13.     The closing date for the proposed sale of the Property has been extended repeatedly
by mutual agreement of IUW LLC and the Buyer to allow additional time for due diligence. IUW
LLC and the Buyer are prepared to close within the next 30 days provided that IUW LLC can
provide sufficient documentation of clean title to the Buyer's title examiner and insurer.

14.     As part of the Buyer's due diligence in connection with the proposed sale of the
Weld Wheel Property, the Buyer was informed of this chapter 11 case. In order for IUW LLC to
provide satisfactory evidence of clean title to the Property, the Buyer requested that IUW LLC
obtain a "comfort order" from this Court confirming that the proposed sale by non-debtor IUW
LLC is not subject to sections 362 and 363 of the Bankruptcy Code.

**C.      The Inapplicability of Bankruptcy Code Sections 362 and 363**

15.     The provisions of the Bankruptcy Code relating to the automatic stay and the sale
of property of the estate do not apply to the proposed sale of the Weld Wheel Property by non-
debtor IUW LLC.

16.     Section 362(a) of the Bankruptcy Code provides for an automatic stay of, as
applicable to this Motion, "(3) any act to obtain possession of property of the estate or of property

4

from the estate or to exercise control over property of the estate; (4) any act to create, perfect or enforce any lien against property of the estate; (5) any act to create, perfect or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title; [and] (6) any act to collect, assess, o recover a claim against the debtor that arose before the commencement of the case under this title[.]" *Id.*

17.     Section 363(b) of the Bankruptcy Code permits a chapter 11 debtor-in-possession "after notice and a hearing, [to] use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" *Id.*

18.     Each of these Code provisions applies only to property of the Debtor or the estate, not to property of non-debtor entities. *See, e.g., In re Panther Mountain Land Development, LLC*, 686 F.3d 916, 923 (8th Cir. 2012) (quoting *Kreisler v. Goldberg*, 478 F.3d 209, 213 (4th Cir. 2007) ("[T]he automatic stay does not, in general, apply to actions against parties who enjoy factual or legal relationships with a debtor, such as a debtor's wholly owned subsidiaries. . . . 'It is a fundamental precept of corporate law that each corporation is a separate legal entity with its own debts and assets, even when such corporation is wholly owned by another corporate entity.'").

19.     The only relevant asset of the Debtor or the estate is the ownership interest in non-debtor IUW LLC. The Weld Wheel Property, and the proceeds of any sale of the Property, are assets of IUW LLC not subject to the automatic stay or to the provisions of Code section 363 governing sale of property of the estate. *See In re Panther Mountain Land Development, LLC*, 686 F.3d at 922.

20.     The proposed sale of the Property by IUW LLC would not alter the property of the Debtor or its estate, because the Debtor would continue to own exactly that property it did prior to

the sale, namely the ownership interest in IUW LLC.  Accordingly, Bankruptcy Code sections 362 and 363 do not apply to the proposed sale of the Weld Wheel Property by IUW LLC.

### D.      Authority to Issue "Comfort Order"

21.      Bankruptcy Code Section 362(j) provides for the issuance of an order confirming that the automatic stay has been terminated pursuant to section 362(c) in cases involving successive bankruptcy petitions. *Id*. Although this provision is not directly applicable to the Debtor's requested relief in this Motion, courts have found authority to issue similar "comfort orders" in circumstances well beyond the limitations of subsections (c) and (j) of Code section 362. *See, e.g., In re KG Winddown, LLC*, 628 B.R. 739, 749 (Bankr. S.D.N.Y. 2021) ("[T]he contention that an order providing for survival of the Sale Order (either in whole or in party) constitutes an unnecessary 'comfort order' is unavailing. . . . [E]ven if such an order is not required, approval would eliminate many unnecessary ambiguities. 'Comfort orders' can be appropriate in many circumstances, including this one."); *see also In re Hill*, 364 B.R. 826, 828 (Bankr. M.D. Fl. 2007) (noting the broad discretion provided to bankruptcy courts in determining whether to enter comfort orders granted by section 105 of the Code).

22.      Under the present circumstances, entry of a comfort order is entirely appropriate and stands to benefit the Debtor and the estate. The proposed sale of the Weld Wheel Property does not involve property of the Debtor or the estate and is not subject to the automatic stay. Further, by liquidating the collateral which purportedly secures the Andersons' claim against the Debtor, the proposed sale will facilitate the resolution of the Andersons' disputed claim without requiring the Debtor to incur ongoing expenses related to the Property.

### E.      Proposed Treatment of Sale Proceeds

23.      The Debtor anticipates that IUW LLC will receive the sale proceeds and pay such proceeds to the Andersons to be applied toward the outstanding obligation on the Note. Any

reduction in the balance on the Note following application of the sale proceeds would serve to reduce the balance purportedly owed by the Debtor to the Andersons on the alleged guarantee claim. For the sake of clarity, the Debtor is not requesting by this Motion that the Court authorize or direct either the Debtor or IUW LLC to apply the sale proceeds in any particular manner. The Debtor contends that any such action by this Court would be beyond the scope of this chapter 11 case as the Weld Wheel Property and any proceeds generated therefrom are not assets of the Debtor or the bankruptcy estate.

## **Reservation of Rights**

24.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtor or a waiver of the Debtor's or any other party-in-interest's rights to dispute any claim.  The Debtor expressly reserves its right to contest any claim related to the relief sought herein.

25.     For the reasons set forth above, the Debtor respectfully requests that the Court enter an order (a) confirming the inapplicability of the automatic stay to the sale of the Weld Wheel Property held by non-debtor IUW LLC; (b) confirming that neither the Debtor nor IUW LLC needs approval of such sale; and (c) granting such other and further relief as the Court deems just and proper.

Dated:   September 15, 2021    Respectfully submitted,
          Kansas City, Missouri
          ARMSTRONG TEASDALE LLP

          _/s/  Pamela Putnam_
          Pamela Putnam, MO 61158
          2345 Grand Blvd. Suite 1500
          Kansas City, MO  64108
          Telephone: (816) 221-3420
          Facsimile: (816) 221-0786
          Email:  pputnam@atllp.com

          - and -

          Richard W. Engel, Jr., MO 34641
          Erin M. Edelman, MO 67374 (admitted pro hac vice)
          **ARMSTRONG TEASDALE LLP**
          7700 Forsyth Boulevard, Suite 1800
          St. Louis, Missouri 63105
          Telephone: (314) 621-5070
          Facsimile:  (314) 612-2239
          Email:  rengel@atllp.com
          Email:  eedelman@atllp.com

          _Proposed Counsel to the Debtor_

**Exhibit A**

Deed of Trust

**Deed of Trust, Assignment of Rents and Security Agreement**

(cover page)

| | |
|---|---|
| Date of Document: | October 5, 2017 |
| Name of Grantor: | Interstate Underground Warehouse LLC |
| Grantor Mailing Address: | 8201 E. 23rd Street, Kansas City, MO 64129 |
| Name of Beneficiary/Lender: | C. Floyd Anderson and Sharon Anderson |
| Beneficiary/Lender Mailing Address: | c/o McDowell, Rice, Smith & Buchanan, P.C. 605 West 47th Street, Suite 350 Kansas City, MO  64112 Attn:  Charles W. Smiley |
| Name of Trustee: | MR Trustee Services Corp. |
| Trustee Mailing Address: | 605 West 47th Street, Suite 350 Kansas City, MO  64112 Attn:  Charles W. Smiley |
| Legal Description: | See Exhibit A attached |

5898742

*Prepared by and after recording*
*return to:*

Charles W. Smiley
McDowell, Rice, Smith & Buchanan, P.C.
605 West 47th Street, Suite 350
Kansas City, MO  64112

## DEED OF TRUST, ASSIGNMENT OF RENTS AND SECURITY AGREEMENT

This Deed of Trust, Assignment of Rents and Security Agreement, which shall also serve as a fixture filing (the "Deed of Trust"), is made as of October 5, 2017, by and between Interstate Underground Warehouse LLC, a Missouri limited liability Company, with an address of 8201 E. 23rd Street, Kansas City, MO 64129 (the "Grantor"), MR Services Corp., a Missouri corporation with an address of 605 W. 47th St., Ste. 350, Kansas City, Missouri 64112 (the "Trustee"), and C. Floyd Anderson and Sharon Anderson, (jointly, the "Lender" or "Beneficiary"), with an address of 605 W. 47th St., Ste. 350, Kansas City, MO 64112, Attn:  Charles W. Smiley.

WHEREAS, Grantor, together with Interstate Underground Warehouse and Industrial Park, Inc., a Missouri corporation and Harrison Senior Care Center LLC, a Missouri limited liability company, jointly and severally (the "Borrower") executed and delivered to Lender a Promissory Note dated on or about the date hereof as maker, to the Lender, as payee, in the stated principal amount of Three Million Dollars ($3,000,000.00);

WHEREAS, the foregoing Promissory Note and any other promissory notes issued on or after the date hereof, as any of the foregoing may be amended, renewed, restated, replaced, consolidated or otherwise modified from time to time, are collectively referred to herein as the "Note";

WHEREAS, the Grantor's obligations under this Deed of Trust and any other documents and any other indebtedness or other obligations of the Borrower to the Lender, in each case whether monetary, nonmonetary, direct, indirect, acquired, joint, several, joint and several, existing, future, contingent or otherwise, and any replacements, renewals, extensions and other modifications of any of the above, together with all principal, premium, interest, fees, expenses and other amounts and charges relating thereto, and any amounts expended by or on behalf of the Lender for the protection and preservation of the mortgage lien and security interest granted herein, are hereinafter sometimes collectively called the "Obligations"; without limiting the foregoing, this Deed of Trust secures all future advances by Lender to Borrower (or any one or more of them) and all future obligations of Borrower (or any one or more of them) to Lender under the Note, and the other Loan Documents as hereinafter defined up to and including the stated principal indebtedness of Three Million Dollars ($3,000,000.00).  THIS DEED OF TRUST IS TO BE GOVERNED BY RSMO § 443.055.

WHEREAS, any agreements, documents or instruments evidencing, securing or otherwise relating to any of the Obligations (including, without limitation, this Deed of Trust and

*Deed of Trust – Page 2*

any other Loan Documents), and any amendments, restatements, replacements, consolidations and other modifications of any of the foregoing are hereinafter sometimes collectively called the "Loan Documents";

NOW, THEREFORE, to secure the full and prompt payment and performance of the Obligations, the Grantor does hereby GRANT, BARGAIN, and SELL, CONVEY and CONFIRM, unto the Trustee, for the benefit of the Lender, and unto the Trustee's successors and assigns forever, all of the Grantor's right, title and interest in and to the following property, whether such property or interest therein is now owned or existing or hereafter acquired or arising (collectively, the "Property"): (a) all of the tracts, parcels or other units of land described in Exhibit A attached hereto (the "Premises"); (b) all of the buildings, structures and other improvements now or hereafter situated on the Premises, together with any alterations, additions and improvements thereto and all restorations and replacements thereof made from time to time (collectively, the "Building"); (c) all machinery, apparatus, equipment and fixtures of every kind and nature whatsoever now or hereafter located in, on or about the Building or upon the Premises, or attached to or used or usable in connection with the operation or maintenance of the Premises or the Building or in connection with any construction being conducted on the Premises, including, but not limited to, all heating, lighting and power equipment, engines, plumbing, electrical, mechanical, refrigeration, ventilating and air conditioning equipment and apparatus, elevators, cranes, fittings, tools, ducts and compressors (collectively, the "Building Equipment"), which Building Equipment shall, to the fullest extent permitted by law, be deemed to be part of the real property encumbered by this Deed of Trust; (d) all easements, tenements, hereditaments, appurtenances, rights and rights of way, public or private, pertaining, belonging or otherwise relating to the Premises or the Building; (e) all insurance proceeds and any judgments, settlements, awards and other payments, including interest thereon, which may be made in respect of the Property as a result of damage to or destruction of the Property, the exercise of the right of condemnation or eminent domain over any interest in the Property, the closing of, or the alteration of the grade of, any street on or adjoining the Premises, or any other injury to or decrease in the value of the Property; (f) to the extent permitted by applicable law, all franchises, permits, licenses and other rights respecting the use, occupation or operation of the Property or the activities conducted thereon or thereabout; (g) all rents, income and other benefits arising out of or otherwise relating to the Property and all leases on or affecting the Property, and any security deposits, contract rights, general intangibles, actions, rights of action, and unearned insurance premiums relating to such leases or the Property; and (h) all accessions to, substitutes for, and all modifications, replacements, renewals, products and proceeds of any of the foregoing.

This Deed of Trust secures to Lender the repayment and performance of all Obligations. For this purpose, Grantor irrevocably grants and conveys to Trustee, in trust, with power of sale, the Property.

TO HAVE AND TO HOLD the Property unto the Trustee, and unto the Trustee's successors and assigns forever, IN TRUST, WITH POWER OF SALE, for the benefit of the Lender, to secure the payment and performance of the Obligations.

The Grantor covenants, represents and warrants to the Lender and the Trustee as follows:

*Deed of Trust – Page 3*

1.     <u>Indebtedness Secured</u>.  This Deed of Trust is given and is intended to secure the full and prompt payment and performance of the Obligations.  The total principal amount of Obligations secured hereby is Three Million Dollars ($3,000,000.00) plus unpaid interest thereon.  In addition, the Deed of Trust secures unpaid balances of advances made by the Lender with respect to the Property, for the payment of Impositions, as hereinafter defined, insurance premiums and costs incurred for the protection of the Property and any charges, expenses and fees, including reasonable attorneys' fees in connection with enforcement of the Deed of Trust after a default, which, by the terms hereof, shall be added to and increase the Obligations.  All of the duties and obligations imposed on the Grantor hereunder, whether absolute or contingent, due or to become due, are for the reasonable protection of the lien of this Deed of Trust.  This Deed of Trust shall remain in full force and effect with respect to all of the Property until all Obligations shall have been paid and performed in full.  If the Obligations are paid and performed in accordance with the terms of the applicable Loan Documents, including, without limitation, the observance of all the agreements contained in this Deed of Trust, the Lender agrees, within a reasonable period of time after receiving written notice of the same from the Grantor, to release this Deed of Trust.

2.     <u>Title to Property and Other Representations and Warranties</u>.  The Grantor represents, warrants and covenants to the Lender that:  (a) the Grantor owns the Premises and the improvements thereon in fee simple absolute and has good and marketable title to the remainder of the Property; (b) the Property is free of all liens, encumbrances, adverse claims and other defects of title whatsoever except for declarations and easements of record; (c) the Grantor does hereby and shall forever warrant and defend its and the Lender's respective title to and interest in the Property (including, without limitation, the validity and priority of the lien of this Deed of Trust) against all claims and demands whatsoever of any Person; (d) the Building presently on the Premises complies with all applicable zoning and building codes, ordinances and regulations, and such compliance is based solely upon the Grantor's owning the Property and not upon the Grantor's title to or interest in any other property; (e) any Building hereafter constructed on the Premises will comply with all applicable zoning and building codes, ordinances and regulations and will lie wholly within the boundaries of the Premises; (f) there are no actions, suits or proceedings pending or, to the Grantor's knowledge, threatened against or affecting the Property; and (g) the Grantor has the good and unrestricted right, full power and lawful authority to subject the Property to this Deed of Trust.

3.     <u>Maintenance</u>.  The Grantor will maintain the Property in good order, condition and repair, excepting ordinary wear and tear.  The Grantor will make, as and when the same becomes necessary, all structural and non-structural repairs, whether exterior or interior, ordinary or extraordinary, foreseen or unforeseen.  The Grantor will not commit or suffer any waste of the Property.  The Grantor will not construct any new or additional buildings on the Premises without the prior written consent of the Lender in each instance.  Notwithstanding the foregoing, if the Grantor is required by applicable law to undertake any such alterations to the Building or the Building Equipment, the Grantor may do so without obtaining the Lender's consent thereto.  In such event, the Grantor will promptly give the Lender written notice of any such legal requirement and, prior to undertaking such alterations, will notify the Lender in writing of any such alterations that the Grantor proposes to undertake.  The Lender and the Trustee, and their respective agents, contractors and representatives, may enter upon and inspect the Property at all reasonable times until this Deed of Trust is released.  Without limiting the generality of the

*Deed of Trust – Page 4*

foregoing, the Lender and the Trustee, and their respective agents, contractors and representatives, may from time to time enter upon the Property and conduct upon the Property inspections and tests to determine the extent to which any hazardous substances, wastes or other environmentally unsound materials have been placed or discharged upon or otherwise affect the Property, all at the sole expense of the Grantor.

4.    Restoration. If any of the improvements or equipment comprising the Property is damaged or destroyed, in whole or in part, by fire or other casualty (whether or not covered by insurance), or by any taking in condemnation proceedings or the exercise of any right of eminent domain, the Grantor will promptly restore, replace or rebuild the same to as nearly as possible the value, quality and condition they were in immediately prior to such fire or other casualty or taking, with such alterations or changes as may be approved in writing by the Lender, which approval will not be unreasonably withheld; *provided, however,* that the Grantor is under no duty to so restore, rebuild or replace such property to the extent that the Lender receives and applies any insurance, condemnation or similar proceeds relating to such casualty to satisfy any part of the Obligations. The Grantor will give prompt notice to the Lender of any material damage to the Property.

5.    Compliance with Declaration and Laws; Use of Property. The Grantor will comply with all provisions of any restrictions filed of record prior to this Deed of Trust (the "Declaration"). The Grantor will comply with all present and future laws, statutes, ordinances, rules, regulations and other requirements (including, without limitation, applicable zoning and building requirements) of all governmental and quasi-governmental authorities whatsoever having jurisdiction with respect to the Property. The Grantor will promptly perform and observe all of the terms, covenants and conditions of all instruments of record affecting the Property, non-compliance with which may affect the security of this Deed of Trust, or which shall impose any duty or obligation upon the Grantor or any tenant or other occupant of the Premises, and the Grantor will do all things necessary to preserve intact and unimpaired any and all easements, appurtenances and other interests and rights in favor of or constituting any portion of the Property. The Grantor will not use or permit the use of the Property in any manner not permitted by the Declaration which would tend to impair the value of the Property or materially increase the risk of fire or other casualty.

6.    Impositions. The Grantor will pay when the same becomes due and payable all real estate taxes, assessments, water and sewer rates and charges, license fees and all other governmental levies and charges of every kind and nature whatsoever, general and special, ordinary and extraordinary, foreseen and unforeseen, which are assessed, levied, confirmed, imposed or become a lien upon or against the Property or which are payable with respect thereto (collectively, "Impositions"). Notwithstanding the foregoing, the Grantor may contest any Imposition by appropriate and timely proceedings, provided that on or before the due date for payment of such Imposition the Grantor establishes an escrow or other provision for payment of such Imposition satisfactory to the Lender in an amount estimated by the Lender to be adequate to pay such Imposition and any interest or penalties that may result from its nonpayment on the due date. In all such cases of contest, the Grantor will pay the contested Imposition within 10 days after the dismissal of the proceedings or the final and unappealable determination of the Grantor's or the Property's liability therefor, as the case may be. So long as any Event of Default is in effect, however, the Grantor will, upon demand by the Lender, pay the whole of any

*Deed of Trust – Page 5*

assessment for local improvement which may be payable in installments, notwithstanding that such installments may not be due and payable at the time of such demand by the Lender. The Grantor will deliver to the Lender, within 10 days after the Lender's request therefor, the original or a photocopy of the official receipt evidencing such payment or other proof of payment satisfactory to the Lender.

       7.    <u>Insurance</u>. (a) The Grantor, at the Grantor's sole expense, will insure the Property for the benefit of the Lender against loss or damage thereto and will keep in effect, for the Lender's benefit, comprehensive general public liability insurance against claims for bodily injury, death or property damage. The policies of insurance required by this Section will be in or with, as the case may be, companies, forms and amounts, and for such periods and with such deductibles, as is customary for property similar in use, location and condition to the Property, or as the Lender may otherwise require from time to time, and will insure the respective interests of the Grantor and the Lender. The insurance proceeds from all such policies of insurance (other than the proceeds in respect of any liability insurance policy) shall be payable to the Lender and Grantor jointly pursuant to a noncontributing first mortgagee endorsement satisfactory in form and substance to the Lender. Upon request by the Lender, the Grantor will promptly furnish evidence of satisfactory insurance on the Property and that the Grantor has complied with the other provisions of this Section. In addition to the other policies of insurance required hereunder, the Grantor will cause a title insurer reasonably acceptable to the Lender to insure, in favor of the Lender, the Grantor's ownership of, and the Lender's lien on, the Property; such insurance to be in such amounts, in such form, and with such affirmative coverage and endorsements as the Lender may request.

       (b)    All proceeds of the insurance obtained by the Grantor hereunder (other than those relating to any liability insurance policy), will be paid to the Lender and Grantor jointly. The Lender and Grantor shall agree to apply the Insurance Proceeds in reduction or satisfaction of all or any part of the Obligations or, if any improvements are not restored, to maintain and restore the property relating to such proceeds to the extent that the Lender so applies such Insurance Proceeds, and the Lender may release the Insurance Proceeds to the Grantor in whole or in part upon conditions satisfactory to the Lender. So long as no Event of Default exists, the Grantor will have the right to compromise any such claims, subject to the Lender's prior consent thereto, which consent will not be unreasonably withheld.

       (c)    In the event of a foreclosure under this Deed of Trust, the purchaser of the Property will succeed to all of the rights of the Grantor, including any right to unearned premiums, in and to all policies of insurance which the Grantor is required to maintain under this Section and to all proceeds of such insurance.

       The following notice is provided pursuant to Section 427.120 of the Missouri Revised Statutes:

       Unless you provide evidence of the insurance coverage required by your agreement with us, we may purchase insurance at your expense to protect our interests in your collateral. This insurance may, but need not, protect your interests. The coverage that we purchase may not pay any claim that you make or any claim that is made against you in connection with the collateral. You may

<em>Deed of Trust – Page 6</em>

later cancel any insurance purchased by us, but only after providing evidence that you have obtained insurance as required by our agreement. If we purchase insurance for the collateral, you will be responsible for the costs of that insurance, including the insurance premium, interest and any other charges we may impose in connection with the placement of insurance. The costs of the insurance may be added to your total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance you may be able to obtain on your own.

8.    Deposits for Impositions and Insurance.    Upon notice from the Lender, the Grantor will deposit with the Lender on the first day of each month an amount equal to one-twelfth of (i) the aggregate annual payments for the Impositions, and (ii) the annual insurance premiums on the policies of insurance required to be obtained and kept in force by the Grantor under this Deed of Trust.  In addition, upon notice from the Lender (which notice will not be given unless an Event of Default is in effect), the Grantor will deposit with the Lender such sum of money which, together with such monthly installments, will be sufficient to pay all the Impositions and insurance premiums at least thirty (30) days prior to the due date thereof.  If the amounts of any Impositions are not ascertainable at the time any deposit is required to be made, the deposit will be made on the basis of the amounts of the Impositions for the prior tax year and, upon the amounts of the Impositions being fixed for the then current year, the Grantor will, upon notice from the Lender, deposit any deficiency with the Lender.  If the amount of the insurance premiums is not ascertainable at the time any deposit is required to be made, the deposit will be made on the basis of the amount of the insurance premiums for the prior year of the policy or policies, and, upon the amount of the insurance premiums being fixed for the then current year of the policy or policies, the Grantor will, upon notice from the Lender, deposit any deficiency with the Lender.  If on a date thirty (30) days prior to the due date for the payment of any of the Impositions or the insurance premiums there are insufficient funds on deposit with the Lender to pay the same, the Grantor will, upon notice from the Lender, forthwith make a deposit with the Lender in the amount of such deficiency.  The funds so deposited with the Lender will be held by the Lender without interest, and may be commingled with other funds of the Lender, and provided that an Event of Default has not occurred, such funds will be applied in payment of the Impositions and insurance premiums when due to the extent that the Grantor will have deposited funds with the Lender for such purpose.  Upon the occurrence of an Event of Default, the funds deposited with the Lender may, at the option of the Lender, be retained and applied toward the payment of any or all of the Obligations, but no such application will be deemed to have been made by operation of law or otherwise until actually made by the Lender.  The Grantor will furnish the Lender with a bill for each of the Impositions and insurance premiums and such other documents necessary for their payment at least thirty (30) days prior to the date they first become due.  Upon an assignment of this Deed of Trust prior to any default hereunder by the Grantor, the Lender will have the right and obligation to pay over the balance of such deposits in its possession to the assignee, and thereupon the Lender will be completely released from all liability with respect to such deposits and the Grantor will look solely to the assignee in reference thereto.   The provisions of the preceding sentence will apply to each and every assignment or transfer of such deposits to a new assignee.

9.    Condemnation.  (a) The Grantor will give immediate notice to the Lender upon the Grantor's learning of (i) any interest on the part of any Person possessing or who has expressed the intention to possess the power of eminent domain to purchase or otherwise acquire

*Deed of Trust – Page 7*

the Property, or (ii) the commencement of any action or proceeding to take the Property by exercise of the right of condemnation or eminent domain or of any action or proceeding to close or to alter the grade of any street on or adjoining the Premises. The Lender may participate in any such actions or proceedings in the name of the Lender or, whenever necessary, in the name of the Grantor, and the Grantor will deliver to the Lender such instruments as the Lender shall request to permit such participation. The Grantor will not settle any such action or proceeding, whether by voluntary sale, stipulation or otherwise, or agree to accept any award or payment without the prior written consent of the Lender, which consent will not be unreasonably withheld. The total of all amounts awarded or allowed with respect to all right, title and interest in and to the Property or the portion or portions thereof taken or affected by such condemnation or eminent domain proceeding and any interest thereon (herein collectively called the "Award") is hereby assigned to and shall be paid upon receipt thereof to the Lender and the amount received shall be retained and applied as provided in Section 9(b) below.

(b)     Upon the Lender's receipt of any Award, the Lender may, at its option, either (i) retain and apply the Award toward the payment and performance of, or as cash collateral for, the Obligations, or (ii) subject to such escrow provisions as the Lender may require, pay the Award over in whole or part to pay or reimburse the Grantor for the cost of restoring or reconstructing the Property remaining after such taking (the "Remaining Property"). If the Lender elects to pay the Award, or any part thereof, over to the Grantor, upon the completion of the restoration or reconstruction of the Remaining Property, any portion of the Award not used for the restoration or reconstruction of the Remaining Property will, at the option of the Lender, be applied in reduction of the Obligations; *provided, however,* that to the extent that such portion of the Award shall exceed the amount required to satisfy in full the then total amount of the Obligations, the Lender will pay over to the Grantor (or to whoever else may be lawfully entitled) the amount of such excess. In no event shall the Lender be required to release this Deed of Trust until the Obligations are fully paid and performed, nor shall the Lender be required to release from the lien of this Deed of Trust any portion of the Property so taken until the Lender receives the Award for the portion so taken.

10.     Assignment of Rents and Leases.  (a) The Grantor presently assigns to the Lender all of the Grantor's right, title and interest in and to any Leases, as defined hereinafter, with respect to the Property, and all rents, issues and profits of the Property. "Lease" means every lease or occupancy agreement for the use or hire of all or any portion of the Property which is in effect on the date hereof, or which is hereafter entered into, and by which the Grantor is a lessor or the like, and any renewals, extensions or other modifications thereof. The Grantor grants to the Lender, with or without the Lender or any other Person (including, without limitation, a receiver) taking possession of the Property, the right to give notice to the tenants of this assignment, to collect rents, issues and profits from the tenants and to enter onto the Property for the purpose of collecting the same and to let the Property and to apply such rents, issues and profits, after payment of all charges and expenses relating to the Property, to the Obligations. This assignment is an absolute assignment, subject to the license herein granted to the Grantor and the Grantor's obligations hereunder, and shall continue in effect until the Obligations are fully paid and performed. The Lender grants a revocable license to the Grantor to collect and use such rents, issues and profits; *provided, however,* that the foregoing license will be automatically revoked, without any action on the Lender's part, upon the occurrence of an Event of Default. Notwithstanding any law to the contrary, if there is an Event of Default, and if there is any

*Deed of Trust – Page 8*

applicable law requiring the Lender to take possession of the Property (or some action equivalent thereto, such as securing the appointment of a receiver) in order for the Lender to "perfect" or otherwise "activate" its rights and remedies as set forth herein, then the Grantor waives all benefits of such laws and agrees that such laws will be fully satisfied, without any action on the Lender's part, solely by the occurrence of such Event of Default. If, notwithstanding such waiver by the Grantor, such laws require the undertaking of some affirmative act by the Lender, the Grantor agrees that such laws will be fully satisfied solely by the Lender giving the Grantor notice, written or oral, that such Event of Default has occurred and that the Lender intends to enforce its rights in any Leases and/or any rents, issues and profits assigned herein.

(b)     The Grantor will, from time to time upon request by the Lender, execute, acknowledge and deliver to the Lender, in form and substance satisfactory to the Lender, separate assignments of any Leases in order to further evidence the foregoing assignment. The Lender will not be obligated to perform any obligation to be performed by the Grantor under any Lease or other agreement affecting the Property, and the Grantor agrees to indemnify the Lender for, and hold the Lender harmless from, any and all liability and expenses arising from any such Lease or other agreement or any assignments thereof, and no assignment of any such Lease or other agreement will place the responsibility for the control, care, management or repair of the Property upon the Lender, nor make the Lender liable for any negligence or other tortuous conduct, whether by the Lender or any other Person, with respect to the management, operation, upkeep, repair or control of the Property resulting in injury, death, property or other damage or loss of any nature whatsoever.

(c)     The Grantor will not cancel, amend or otherwise modify the terms and conditions of any Lease without obtaining the Lender's prior consent; nor will the Grantor accept payments of rent or the like more than one month in advance without obtaining the Lender's prior consent.

(d)     The Lender may exercise its rights from time to time under this Section 10 without first commencing foreclosure proceedings against the Property if it so elects. Any such election by the Lender to exercise its rights from time to time under this Section 10 will not prohibit the Lender from simultaneously or thereafter foreclosing upon the Property or exercising any other rights available to the Lender hereunder or at law.

11.     <u>Lender's Right to Perform the Grantor's Covenants</u>. If the Grantor fails promptly and fully to pay, perform or observe any of the Obligations, then the Lender may, at its option, but without any obligation to do so, and without waiving or releasing the Grantor from any of the Obligations, pay any Obligation or perform any Obligation or take such other action as the Lender deems necessary or desirable in order to cause such Obligation to be paid, performed or observed, as the case may be. The Grantor grants to the Lender, and agrees that the Lender will have, the absolute and immediate right to enter in and upon the Property to such extent and as often as the Lender, in its discretion, deems necessary or desirable for such purpose. The Lender may pay and expend such sums of money as the Lender deems reasonably necessary to protect the Property, and the Grantor hereby agrees to pay to the Lender all such reasonable sums so paid or expended by the Lender. All sums so paid or expended by the Lender, and the interest thereon, will be added to the Obligations and will be secured by the lien of this Deed of Trust.

*Deed of Trust – Page 9*

12.    <u>No Claims Against Lender</u>.  Nothing contained in this Deed of Trust constitutes any consent or request by the Lender, expressed or implied, for the performance of any labor or services or the furnishing of any materials or other property in respect of the Property, or shall be construed to permit the making of any claim against the Lender in respect of labor or services or the furnishing of any materials or other property or any claim that any lien based on the performance of such labor or services or the furnishing of any such materials or other property is prior to the lien of this Deed of Trust.

13.    <u>Liens</u>.  This Deed of Trust is and shall be maintained as a first and prior valid lien on the Property, subject only to declarations and easements of record.  The Grantor will not, directly or indirectly, create or suffer or permit to be created, or to stand, against the Property or against the rents, issues and profits therefrom, any lien, charge, mortgage, deed of trust, adverse claim or other encumbrance; *provided, however,* that nothing contained in this Section requires the Grantor to pay any real estate taxes or other Impositions prior to the time when same are required to be paid under this Deed of Trust.  The Grantor will keep and maintain the Property free from all liens of Persons supplying labor or materials relating to the construction, alteration, modification or repair of the Property.  In no event will the Grantor do or permit to be done, or omit to do or permit the omission of, any act or thing where such act or omission may impair the security of this Deed of Trust.

14.    <u>Security Agreement; Fixture Filing</u>.  The Grantor, as debtor, grants to the Lender, as secured party, as further security for the Obligations, a security interest in all personal property of the Grantor now or hereafter located on or about the Premises or the improvements thereon, or which otherwise relate to the Property or the Grantor's use of the Property in any respect, or in which the Grantor otherwise has any interest, including, without limitation and in addition thereto, all of the Grantor's presently owned or hereafter acquired fixtures, equipment, inventory, other goods, accounts, general intangibles, chattel paper, instruments, deposit accounts, investment property and all other property in which a security interest can be granted under applicable law.  This Deed of Trust shall be effective as a "fixture filing" for purposes of Article 9 of the Uniform Commercial Code as in effect in the State of Missouri.

15.    <u>Default</u>.  The Obligations will become immediately due and payable in full at the option of the Lender upon the occurrence of any one or more of the following (an "<u>Event of Default</u>"): (a) the occurrence of an Event of Default in the Promissory Note; (b) the Grantor fails to pay any Imposition on or before the date such Imposition may be paid without any penalty, interest or other premium within ten (10) days after written notice from Lender; (c) the Grantor fails to pay timely any premiums for insurance required under Section 7 or the Grantor fails to reimburse the Lender on demand for premiums paid by it on the insurance required under Section 7 within ten (10) days after written notice from Lender; (d) the Grantor directly or indirectly creates, suffers or permits to be created or to stand against the Property or against the rents, issues and profits therefrom, any lien, security interest, charge, mortgage, deed of trust or other encumbrance not expressly permitted herein without in each instance obtaining the Lender's prior written consent thereto which is not removed within thirty (30) days after written notice; (e) the Grantor's default in the observance or performance of any other covenant of the Grantor hereunder (other than a covenant the performance or observance of which is specifically referred to elsewhere in this Section 15), which default is not cured within thirty (30) days after the Lender gives the Grantor notice thereof (or, if earlier, after the Grantor obtains knowledge of

*Deed of Trust – Page 10*

such default); (f) the Grantor delivers to the Lender any notice terminating or purporting to terminate, or the Grantor takes any other action to terminate or purporting to terminate, the operation of this Deed of Trust as security for any future advances or future obligations; or (g) the filing of any action to condemn, acquire by eminent domain or otherwise take any part of the Premises or Building which, in the Lender's determination, materially and adversely affects the use or intended use of the Property as a whole or otherwise materially and adversely affects the Grantor's business prospects.

16.   Notice Upon Acceleration; Application of Payments.   Whenever the Lender in this Deed of Trust or in the other Loan Documents is given the option to accelerate the maturity of all or part of the Obligations, the Lender may, to the extent permitted by law, do so without presentment, protest, notice to or demand upon the Grantor.   The Lender has the sole and exclusive right, and the Grantor irrevocably waives any right, to direct or redirect the application of any monies received by the Lender on account of the Obligations (whether such monies are received before or after the occurrence of an Event of Default, in the ordinary course of affairs, by acceleration, maturity or otherwise) against the Obligations (or to hold such monies as cash collateral for all of any of the Obligations) in such manner as the Lender may deem advisable, from time to time, notwithstanding any entry by the Lender upon any of its books and records.

17.   Appointment of Receiver.   After the occurrence of an Event of Default, or if any action is commenced to foreclose this Deed of Trust, without obligation to do so, the Lender, to the extent permitted by applicable law, may apply for the appointment of a receiver of the rents, issues and profits of the Property without notice or demand, and shall be entitled to the appointment of such receiver as a matter of right, without consideration of the value of the Property as security for the amounts due to the Lender or the solvency of any Person liable for the payment of such amounts.

18.   Foreclosure.   After the occurrence of an Event of Default, the Lender may, to the extent permitted by law, institute an action of judicial foreclosure, or take such other action as the law may allow, at law or in equity, to enforce this Deed of Trust and to realize upon the Property or any other security which is herein or elsewhere provided for, and to proceed to final judgment and execution for the entire unpaid balance of the Obligations at the applicable rate or rates specified in the Loan Documents to the date of default, and thereafter at the Default Rate, together with, to the extent permitted by applicable law, all other sums secured by this Deed of Trust, all costs of suit, and interest at the Default Rate on any judgment obtained by the Lender from and after the date of any judicial sale of the Property (which may be sold in one parcel or part or in such parcels or parts, manner or order as the Lender may elect) until actual payment is made to the Lender on the full amount due the Lender.   The Lender may foreclose or otherwise realize upon one parcel or any other part of the Property, on one or more occasions, without releasing this Deed of Trust or precluding the further foreclosure or other realization hereunder of any other parcels or parts of the Property not so foreclosed or realized upon.   Failure to join or to provide notice to tenants or any other Persons as defendants or otherwise in any foreclosure action or suit will not constitute a defense to such foreclosure or other action.   Upon any foreclosure sale, whether by virtue of judicial proceedings or otherwise, the Lender may bid upon and purchase the Property or any part thereof or interest therein, and upon compliance with the terms of the sale, may hold, retain, possess and dispose of the same in its own absolute right, without further accountability.

*Deed of Trust – Page 11*

19.   Sale by the Trustee.  (a) After the occurrence of an Event of Default, if Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an Event of Default and of Lender's election to cause the Property to be sold. Lender or Trustee shall mail copies of the notice as prescribed by applicable law to Grantor and to the other persons prescribed by applicable law.  Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law.  After the time required by Missouri law, Trustee, without demand on Grantor, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one (1) or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

(b)   The Trustee will not be disqualified from acting as the trustee hereunder or from performing any of the duties of the trustee, or from exercising the rights, powers and remedies herein granted, by reason of the fact that the Trustee is an attorney, agent, officer, employee or stockholder of the Lender or is otherwise affiliated with the Lender in any respect.

(c)   Upon any trustee's sale, the Trustee will execute and deliver a deed or deeds of conveyance of the Property sold to the purchasers thereof, and any statement or recital or fact in such deed will be prima facie evidence of the truth of such statement or recital, and the Trustee will receive the proceeds of such sale, out of which the Trustee will pay the following amounts in the following order of payment:  first, the reasonable costs and expenses of selling the Property including, without limitation, publication, survey, title and abstract costs and other expenses, and compensation to the Trustee and to any attorneys employed by the Trustee or the Lender for their services and expenses; second, to the Lender, upon the usual vouchers therefor, all monies paid for insurance, taxes, lien claims, and any other costs and expenses advanced or incurred by the Lender to preserve or protect the Property, and interest on any of the foregoing to the extent permitted herein and allowed under applicable law; third, to the Lender, the amount of the outstanding Obligations together with the interest thereon; fourth, the amount due on junior encumbrances, if any, with interest; fifth, the remainder of such proceeds, if any, will be paid to the Grantor or, at the Lender's option, to any other Person lawfully entitled thereto. In the event of a sale hereunder, the abstract of title to the Property, if any, and all policies of insurance delivered as hereinabove provided, may, at the Trustee's option, be assigned and delivered to the purchaser at such sale; and the Trustee is hereby authorized, should the Trustee so elect, to make such assignment of insurance and in the name of the insured in such policy.

20.   Substitute Trustee.  The Trustee, or any substitute trustee, may be removed at any time, with or without cause, at the option of the Lender, by written declaration of such removal signed by the Lender, without any notice to, demand upon or consent of the Trustee, any substitute trustee, the Grantor or any other Person, duly acknowledged and recorded in the office of the recorder in the county where the Property is located.  If at any time the Trustee or any substitute trustee should be so removed, or should become absent from Missouri, die, or refuse, fail or be unable to act as such Trustee or substitute trustee, the Lender may appoint any Person as substitute trustee hereunder, without any formality other than a written declaration of such appointment executed by the Lender and duly acknowledged and recorded with the office of the recorder in the county the Property is located; and upon such appointment and recording, the substitute trustee so appointed will automatically become vested with all the estate and title in

*Deed of Trust – Page 12*

the Property, and with all of the rights, powers, privileges, authority, options and discretions, and charged with all of the duties and liabilities, vested in or imposed upon the Trustee by this Deed of Trust, and any conveyance executed by such substitute trustee, including the recitals therein contained, will have the same effect and validity as if executed by the Trustee.

21.    Possession of Property.   To the extent permitted by applicable law, after the occurrence of an Event of Default, the Lender and its agents, designees or assigns are authorized to (i) take possession of the Property, with or without legal action; (ii) lease the Property; (iii) collect all rents, issues and profits therefrom, with or without taking possession of the Property; and (iv) after deducting all costs of collection and administration expenses, apply the net rents, issues and profits to the payment of Impositions, insurance premiums and all other carrying charges (including, but not limited to, agents' compensation and fees and costs of counsel and receivers) and to the maintenance, repair or restoration of the Property, or on account and in reduction of the Obligations, in such order and amounts as the Lender, in the Lender's sole discretion, may elect.   The Lender is liable to account only for rents, issues and profits actually received by it.

22.    Waiver of Redemption.   To the extent permitted by applicable law, the Grantor hereby irrevocably waives and releases:  (i) any right of redemption after the date of any sale of the Property upon foreclosure, whether statutory or otherwise, in respect of the Property now or hereafter in force (irrespective of whether the Lender or any other Person purchases the Property at such foreclosure); (ii) the benefit of any and all valuation and appraisement laws now or hereafter in force; (iii) all exemption laws whatsoever and all moratoriums, extensions or stay laws or rules, or orders of court in the nature of either of them, now or hereafter in force; and (iv) any right to have the Property marshaled upon any foreclosure of this Deed of Trust.

23.    Expenses of the Lender and the Trustee.   To the extent permitted by applicable law, all costs and expenses paid or incurred by the Lender and/or the Trustee, including, without limitation, attorneys' fees, in any action, proceeding or dispute of any kind in which the Lender and/or the Trustee is made a party or appears as a plaintiff or defendant, affecting the Lender, the Trustee, this Deed of Trust, the other Loan Documents and/or the Property, including, but not limited to, the enforcement of this Deed of Trust, any condemnation action involving the Property, any action to protect the security hereof, or any case or proceeding under Title 11 of the United States Code will be added to and included in the Obligations and will be secured by this Deed of Trust and, upon demand, will be immediately due from the Grantor.   Without limiting the generality of the foregoing, if this Deed of Trust is foreclosed, or if any of the other Loan Documents are placed in the hands of an attorney for collection or is collected through any court, including any bankruptcy court, the Grantor, to the extent permitted by applicable law, will pay to the Lender the reasonable attorneys' fees, court costs, disbursements and other costs incurred (irrespective of whether litigation is commenced in pursuance thereof) in collecting or attempting to collect the Obligations or enforcing or defending the Lender's rights hereunder, or under the other Loan Documents, or under any other collateral securing the Obligations, and all allowances provided by law, to the extent allowed by the laws of the state in which the Property is located, or any state in which any of such other collateral for the Obligations is situated, or other applicable law.   All of the Grantor's obligations under this Section shall survive the foreclosure, release or other termination of this Deed of Trust, the satisfaction of the other

*Deed of Trust – Page 13*

Obligations secured hereby, and any merger of this Deed of Trust into any judgment or the like, whether pursuant to foreclosure or otherwise.

24.    <u>Discontinuance of Action</u>.  The Lender may from time to time, to the extent permitted by applicable law, take action to recover any sums, whether interest, principal or any other obligation or sums, required to be paid under this Deed of Trust or the other Loan Documents, as the same become due, without prejudice to the right of the Lender thereafter to bring an action of foreclosure, or any other action, for a default existing when such earlier action was commenced.  If the Lender proceeds to enforce any right under this Deed of Trust or the other Loan Documents, and such proceedings are discontinued or abandoned for any reason, then in every such case the Grantor and the Lender will be restored to their former positions and the rights, remedies and powers of all parties hereto will continue as if no such proceedings had been taken.

25.    <u>Taxes</u>.  Upon passage after the date of this Deed of Trust of any law of the United States, the State of Missouri or any other governmental entity which deducts from the value of real property, for purposes of taxation, any indebtedness secured by mortgages or which changes in any way the laws for the taxation of mortgages or debts secured by mortgages for State or local purposes or the manner of the collection of any such taxes, and which imposes a tax, either directly or indirectly, on this Deed of Trust or all or any part of the sum secured hereby or the interest thereon, the Lender may declare the whole of the Obligations and the interest accrued thereon, due on a date to be specified by not less than thirty (30) days' written notice to the Grantor; *provided, however,* that such declaration will be ineffective if the Grantor is permitted by law to pay such tax in addition to all other payments required hereunder, without any penalty or charge thereby accruing to the Lender, and if the Grantor pays such tax within such thirty (30) day period.  The Grantor will pay any taxes except income taxes imposed on the Lender relating to this Deed of Trust.

26.    <u>Recording and Other Fees; Further Assurances</u>.  The Grantor will pay all recording and filing fees, all recording taxes and all other costs and expenses in connection with the preparation, execution and recordation and other manner of perfection of this Deed of Trust and any other Loan Documents, and will reimburse the Lender on demand for such costs and expenses incurred by or on behalf of the Lender.  The Grantor agrees to execute and deliver promptly such instruments and other documents, and promptly to take such action or promptly refrain from taking such action, as the Lender may request, from time to time, to evidence, create, perfect, continue or otherwise assure the Lender of the real and personal property security interests granted, or purported to be granted, to or for the benefit of the Lender hereunder and all other rights and benefits granted, or purported to be granted, to or for the benefit of the Lender hereunder; all at the sole cost and expense of the Grantor.  Without limiting the generality of the foregoing, the Grantor will, at any time on request of the Lender, execute or cause to be executed and will deliver financing statements, continuation statements, security agreements, or the like, in respect of any Property and the Grantor will pay all filing fees, including, without limitation, fees for filing continuation statements, in connection with such financing statements.

27.    <u>No Waiver</u>. Any failure by the Lender to insist upon the strict performance by the Grantor of any of the Obligations will not be deemed to be a waiver of any of such Obligations,

*Deed of Trust – Page 14*

and the Lender, notwithstanding any such failure, may thereafter insist upon the strict performance by the Grantor of any and all of the Obligations.

28.   <u>No Release</u>.  The Grantor and any other Person now or hereafter obligated for the payment or performance of all or any part of the Obligations will not be released from paying and performing such Obligations and the lien of this Deed of Trust will not be affected by reason of (i) the failure of the Lender to comply with any request of the Grantor, or of any other Person so obligated, to take action to foreclose this Deed of Trust or otherwise enforce any of the provisions of this Deed of Trust or of any of the Obligations secured by this Deed of Trust; (ii) the release, regardless of consideration, of the obligations of any Person or Persons liable for payment or performance of the Obligations or any part thereof; or (iii) any agreement or stipulation extending the time of payment or modifying the terms of any of the Loan Documents and in the event of such agreement or stipulation, the Grantor and all such other Persons will continue to be liable under such Loan Documents, as amended by such agreement or stipulation, unless expressly released and discharged in writing by the Lender.

29.   <u>Release and Reconveyance of Collateral</u>.  The Lender may release or partially release, regardless of consideration, the obligation of any Person liable for payment of any of the Obligations secured hereby, or may release any part of the Property or any other collateral now or hereafter given to secure the payment of the Obligations or any part thereof, without impairing, reducing or otherwise affecting the Obligations, the remainder of the security of this Deed of Trust or the priority of the rights created by this Deed of Trust.  Lender shall release the lien of this Deed of Trust when all Obligations are satisfied.  Lender shall request Trustee to reconvey the Property and shall surrender this Deed of Trust to Trustee.  Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it.  Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under applicable law.  If the fee charged does not exceed the fee set by Missouri law, the fee is conclusively presumed to be reasonable.

30.   <u>Rights Cumulative</u>.  The rights and remedies provided for in this Deed of Trust, or which the Lender may have otherwise, at law or in equity, will be distinct, separate and cumulative and will not be deemed to be inconsistent with each other, and none of them, whether or not exercised by the Lender, will be deemed to be in exclusion of any other, and, to the extent permitted by law, any two or more of all such rights and remedies may be exercised at the same time.

31.   <u>Severability</u>.  If any term or provision of this Deed of Trust or the application thereof to any Person or circumstance shall to any extent be invalid or unenforceable, the remainder of this Deed of Trust, or the application of such term or provision to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Deed of Trust shall be valid and enforceable to the fullest extent permitted by law.  If any payments (including, without limitation, any interest payments) required to be made hereunder or under the other Loan Documents shall be in excess of the amounts allowed by law, the amounts of such payments shall be reduced to the maximum amounts allowed by law.

*Deed of Trust – Page 15*

32.   Notices. All notices, demands, consents, approvals and requests given or required to be given by any party hereto to any other party hereto are to be in writing and are to be given in accordance with the terms and provisions of the Loan Documents.

33.   Indemnification Against Liabilities. The Grantor will protect, indemnify, hold harmless and defend the Lender from and against any and all liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including, without limitation, attorneys' fees and expenses) imposed upon incurred by or asserted against the Lender by reason of (a) ownership of or any other interest in the Property, (b) any accident or injury to or death of Persons or loss of or damage to or loss of the use of property occurring on or about the Property, or the adjoining sidewalks, curbs, vaults and vault spaces, if any, streets, alleys or ways, (c) any use, non-use or condition of the Property, or the adjoining sidewalks, curbs, vaults and vault spaces, if any, streets, alleys or ways, (d) any failure on the part of the Grantor to perform or comply with any of the terms of this Deed of Trust or the other Loan Documents, (e) performance of any labor or services or the furnishing of any materials or other property in respect of the Property made or suffered to be made by or on behalf of the Grantor, (f) any negligence or other tortuous act on the part of the Grantor or any of its agents, contractors, lessees, licensees or invitees, (g) any negligence or other tortuous act on the part of the Lender or any of its agents, contractors, lessees, licensees or invitees (other than gross negligence or willful misconduct), and (h) any work in connection with any alterations, changes, new construction or demolition of the Property; irrespective of whether any such liabilities, obligations, claims, damages, penalties, causes of actions, costs or expenses are, caused by, or otherwise arise out of, in whole or in part, the Lender's negligence or other tortuous conduct (other than gross negligence or willful misconduct), whether active or passive. The Grantor will pay and hold the Lender harmless against any and all liability with respect to any intangible personal property tax or similar imposition of the state in which the Property is located or any subdivision or authority thereof now or hereafter in effect, to the extent that the same may be payable by the Lender in respect of this Deed of Trust, the other Loan Documents or the Obligations. All amounts payable to the Lender under this Section will be payable on demand and will be deemed Obligations secured by this Deed of Trust. If any action, suit or proceeding is brought against the Lender by reason of any such occurrence, the Grantor, upon request of the Lender will, at the Grantor's expense, resist and defend such action, suit or proceeding or cause the same to be resisted or defended by counsel designated by the Grantor and approved by the Lender. All of the Grantor's obligations under this Section shall survive the foreclosure, release or other termination of this Deed of Trust, the satisfaction of the Obligations, and any merger of this Deed of Trust into any judgment or the like, whether pursuant to foreclosure or otherwise.

34.   Environment. (a) The Grantor will comply with all applicable laws (whether statutory, common law or otherwise), rules, regulations, orders, permits, licenses, ordinances, judgments or decrees of all governmental authorities (whether federal, state, local or otherwise), including, without limitation, all laws regarding public health or welfare, environmental protection, water or air pollution, composition of products, underground storage tanks, toxic substances or chemicals, solid and special wastes, hazardous wastes, substances, material or chemicals, waste, used, or recycled oil, asbestos, occupational health and safety, nuisances, trespass, and negligence.

*Deed of Trust – Page 16*

(b)      The Lender does not assume and shall not be deemed to have assumed any responsibility, liability, or obligation with respect to compliance with any federal, state, or local environmental law, rule, regulation, order, permit, license, ordinance, judgment or decree; *provided, however,* that in the event of the imposition or assumption for any reason whatsoever of any such responsibility, liability, or obligation, the Grantor agrees to indemnify and hold the Lender harmless from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements, of any kind or nature whatsoever, including without limitation, attorneys' and experts' fees, which may be imposed on, incurred by or asserted against it in any way relating to or arising from the Obligations, this Deed of Trust, the other Loan Documents and/or the Property. All of the Grantor's obligations under this Section shall survive the foreclosure, release or other termination of this Deed of Trust, the satisfaction of the Obligations, and any merger of this Deed of Trust into any judgment or the like, whether pursuant to foreclosure or otherwise.

35.      Certain Definitions. The following terms shall, for purposes of this Deed of Trust, have the respective meanings herein specified unless the context otherwise requires: (a) "Lender" means the Lender herein named and any subsequent beneficiary of this Deed of Trust, and its, his, her or their respective successors, assigns, heirs and personal representatives. (b) "Building" means all of the Building described herein including any part thereof. (c) "Building Equipment" means all of the Building Equipment described herein including any part thereof. (d) "Grantor" means the Grantor herein named and any subsequent owner or owners of the Property and its, his, her or their respective successors, assigns, heirs and personal representatives. (e) "Person" means an individual, corporation, partnership, trust, unincorporated organization or government, or any agency or political subdivision thereof, or any other legal entity. (f) "Premises" means all of the Premises described herein including any part thereof. (g) "Property" means all of the Property described herein including any part thereof.

36.      Successors and Assigns. The terms, covenants and provisions of this Deed of Trust apply to and are binding upon the Grantor and all subsequent owners and other Persons who have an interest in the Property, and inures to benefit of the Lender, the successors and assigns of the Lender, and all subsequent holders of this Deed of Trust, but the provisions of this Section shall not be construed to modify the provisions of Section 15(f).

37.      Miscellaneous. The Grantor further agrees as follows: (a) This Deed of Trust cannot be changed, waived, discharged or terminated orally but only by an agreement in writing, signed by the party against whom enforcement of the change, waiver, discharge or termination is sought. (b) This Deed of Trust shall be construed without regard to any presumption or rule requiring construction against the party causing such instrument or any portion thereof to be drafted. (c) All terms and words used in this Deed of Trust, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require. (d) If there is more than one Grantor, the representations, warranties, covenants and other obligations of the Grantor hereunder are the joint and several representations, warranties, covenants and other obligations of each and every Grantor. Whenever the terms of this Deed of Trust prohibit the Grantor from doing or permitting to be done, whether voluntarily or otherwise, any act or event, each such negative covenant applies to each and every Grantor and the failure of any one Grantor in respect thereof shall be deemed a default of such negative covenant notwithstanding that any other Grantor may not be in default

*Deed of Trust – Page 17*

of such negative covenant. (e) The Section headings in this Deed of Trust and any index at the beginning of this Deed of Trust are for convenience of reference only and do not limit or otherwise affect any of the terms hereof. (f) All covenants contained herein run with the Property until the Obligations have been fully paid and performed. (g) Time is of the essence in the payment and performance by the Grantor of the Obligations. (h) If this Deed of Trust imposes any benefits or burdens on the Lender which, by law or otherwise, should or may be imposed on the Trustee, the Lender may assign to the Trustee all or any part of such benefits and burdens without notice to, or the consent of, the Grantor or any other Person. (i) If this Deed of Trust imposes any benefits or burdens on the Trustee which, by law or otherwise, should or may be imposed on the Lender, the Trustee may assign to the Lender all or any part of such benefits and burdens without notice to, or the consent of, the Grantor or any other Person (other than the Lender). (j) This Deed of Trust shall be governed by the laws of the State of Missouri, without regard to any choice of law rule thereof giving effect to the laws of any other jurisdiction.

38.    WAIVER OF TRIAL BY JURY. LENDER, GRANTOR AND THE TRUSTEE IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY COURT IN ANY ACTION (A) LENDER OR THE TRUSTEE BRINGS TO COLLECT AMOUNTS OWED UNDER OR SECURED BY THIS DEED OF TRUST; (B) ALLEGING THAT (I) LENDER OR THE TRUSTEE OR GRANTOR HAS BREACHED THIS DEED OF TRUST OR ANY AGREEMENT SECURED BY THIS DEED OF TRUST, (II) LENDER, THE TRUSTEE OR GRANTOR HAS BREACHED ANY OTHER AGREEMENT, EXPRESS OR IMPLIED, (III) LENDER OR THE TRUSTEE OR ANY OF LENDER'S OR THE TRUSTEE'S OFFICERS, EMPLOYEES OR AGENTS HAVE ACTED WRONGULLY, NEGLIGENTLY OR OTHERWISE TORTIOUSLY WITH RESPECT TO THE GRANTOR; OR (C) TO WHICH GRANTOR, LENDER AND/OR THE TRUSTEE ARE PARTIES. THIS WAIVER OF TRIAL BY JURY DOES NOT WAIVE EITHER GRANTOR'S, THE TRUSTEE'S OR LENDER'S RIGHT TO BRING A LAWSUIT THAT A JUDGE, WITHOUT A JURY, WOULD DECIDE.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

**[SIGNATURE PAGE FOLLOWING]**

*Deed of Trust – Page 18*

IN WITNESS WHEREOF, this Deed of Trust has been duly executed by the Grantor and delivered to the Lender as of the day and year first above written.

Interstate Underground Warehouse LLC


By: _____
Name: _Amanda Plotner_____
Title: _Manager_____

Address for Notice:

8201 E. 23rd Street,
Kansas City, MO 64129

**<u>ACKNOWLEDGEMENT</u>**

STATE OF _MISSOURI_ )

                         ) ss.

COUNTY OF _JACKSON_ )

        On this 5th day of October, 2017, before me personally appeared _Amanda Plotner_ _____, as the _Manager_ of Interstate Underground Warehouse LLC, a Missouri limited liability company, known to me to be the person who executed the within document on behalf of said limited liability company and acknowledged to me that he/she executed the same for the purposes therein stated.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year last above written.

                                 _____
                                 Notary Public

My commission expires: _1/11/2018_

                               CAITLIN B. SHIVELY
                        NOTARY PUBLIC-NOTARY SEAL
                          STATE OF MISSOURI
                          JACKSON COUNTY
            MY COMMISSION EXPIRES 01/11/2018
                    COMMISSION # 13439648

*Deed of Trust – Page 20*

**Exhibit B**

Purchase and Sale Agreement

## PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "**Agreement**") dated as of September 29, 2020 (the "**Effective Date**"), is made by and between **Interstate Underground Warehouse, LLC**, a Missouri limited liability company, having an address at 8201 E. 23rd Street, Kansas City, MO 64129 ("**Seller**") and **MTP – SRI Holdings, LLC**, a Delaware limited liability company, having an address 130 West 42nd Street, Suite 2200, New York, New York 10036 (hereinafter "**Purchaser**" or "**Buyer**").

## RECITALS:

**A.** Seller desires to sell certain improved real property and certain related property described below, and Purchaser desires to purchase such real and other property from Seller.

**B.** Seller and Purchaser, intending to be bound by this Agreement, desire to set forth herein the terms, conditions and agreements under and by which Seller shall sell and Purchaser shall purchase the property described below.

## AGREEMENTS:

**NOW, THEREFORE**, in consideration of the mutual agreements and covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree as follows:

**1.    THE PROPERTY.**

1.1    Description. Subject to the terms and conditions of this Agreement, and for the consideration set forth herein, Seller hereby agrees to sell, assign and convey, and Purchaser hereby agrees to purchase, acquire and assume, all of Seller's respective right, title and interest in and to the following (the "**Property**"):

1.1.1    Those certain seven (7) parcels of land containing a total land area of 116,771 square feet being more specifically described on **Schedule 1.1.1** attached hereto (the "**Land**"), along with all buildings (the "**Buildings**") together with all other improvements, parking facilities and fixtures located on the Land (the Buildings and any and all other improvements located on the Land are hereinafter referred to collectively as the "**Improvements**") and all easements, hereditaments, appurtenances, parking rights, development rights, and other benefits, if any, pertaining to or affecting the Land (collectively, the "**Easements**"). The Land, Buildings, Improvements and Easements are hereinafter collectively referred to as the "**Real Property**";

1.1.2    All furniture, furnishings, fixtures, equipment and other tangible personal property affixed to and/or located at the Real Property and used in connection with the Real Property, or replacements of those items permitted pursuant to this Agreement (the "**Personal Property**");

1.1.3    Any and all written leases, tenancies, licenses and other rights of occupancy or use of or for any portion of the Real Property or the Personal Property (including all amendments, renewals and extensions thereof) (collectively, "**Leases**"), any and all Contracts (defined in Section 3.7, below), any and all permits, entitlements, governmental approvals, licenses and any and all warranties (including, but not limited to, any and all roof, equipment and service warranties), telephone exchange numbers, architectural or engineering plans and specifications and development rights that exist as of the Date of Closing and relate to the Real Property or the Personal Property (collectively, the "**Intangible Property**").

1.2     Agreement to Convey. Subject to the conditions set forth in Article 6, Seller agrees to sell and convey, and Purchaser agrees to purchase and accept, on the Date of Closing (defined in Section 2.4, below): (a) fee simple title to the Real Property by way of a Deed (defined in Section 8.1.1, below), to be executed and delivered by Seller in respect to the Property, and which shall be subject to the Permitted Exceptions (defined in Section 3.6, below) affecting or encumbering the Real Property; and (b) the remainder of the Property, by way of the assignment and assumption agreements, a bill of sale and other instruments of conveyance described in this Agreement.

## 2.     PURCHASE PRICE AND PAYMENT.

2.1     Purchase Price. The purchase price for the Property (the "**Purchase Price**") is **Three Million Eight Hundred Thousand and No/00 Dollars ($3,800,000.00)**.

2.2     Earnest Money Deposit.

2.2.1     Deposit.  As the initial deposit (the "**Earnest Money Deposit**"), Purchaser shall pay to the Title Company in immediately available funds, the sum of **One Hundred Thousand and 00/100 Dollars ($100,000.00)**.  The total amount of the Earnest Money Deposit due must be deposited with **First Nationwide Title Insurance Company**, 220 East 42nd Street, 24th Floor, New York, NY 10017, Tel: 646-386-2688 ("**Title Company**"), no later than **five (5) business days** following the mutual execution of this Agreement.  Regardless of the amount financed, if any, the Earnest Money Deposit will not be altered. Following its receipt by the Title Company, the Earnest Money Deposit will be fully refundable, provided that **$100.00** of the Deposit shall be released to Seller and shall constitute consideration to Seller for the execution of this Agreement, which amount shall not be refundable for any reason. If Purchaser shall fail to timely make the Earnest Money Deposit by 5:00 p.m. Eastern Time, as set forth herein, this Agreement shall automatically terminate and neither party shall thereafter have any further rights, obligations or liability hereunder, except as otherwise expressly set forth herein.  The Earnest Money Deposit shall be fully refundable to Purchaser for any of the following reasons (each, a "**Refundable Event**"): (a) termination of this Agreement on or before the end of the Due Diligence Period; (b) a material breach by Seller of its representations, warranties, covenants, or obligations under this Agreement (a "**Seller Breach**"), (b) the failure of any un-waived condition precedent to Purchaser's obligations specified under this Agreement, or (c) termination of this Agreement by either Party pursuant to any express right contained in this Agreement.

2.2.2     Maintenance of Deposit. The Earnest Money Deposit shall be held by Title Company in an interest-bearing account subject to receipt of a form W-9 from Purchaser. All interest earned on the Deposit shall be added to the principal held in the escrow and shall constitute a part of the Deposit (hereinafter defined).  The term "**Deposit**" as used herein shall mean the Earnest Money Deposit and any additional deposits as are described herein and all interest earned thereon.  Interest earned on the Deposit shall be deemed earned by Purchaser and shall be credited against the Purchase Price at Closing.

2.2.3     In the event of a Purchaser Default, retention of the Deposit by Seller represents a reasonable estimation as of the date hereof of Seller's damages hereunder, that actual damages would be impracticable or extremely difficult to ascertain, and that the provision for liquidated damages hereunder does not constitute a penalty. The parties acknowledge that these damages have been specifically negotiated between themselves and are, among other things, to compensate Seller it's costs and expenses associated with this Agreement and for Seller's lost opportunity costs.

2.3     Payment.  Purchaser shall pay to Seller the Purchase Price on or before 7:00 p.m. Eastern Time, on the Date of Closing (as defined below), by causing Title Company to wire the Adjusted Purchase Price (as defined in Section 8.4) to Seller in immediately available funds to such bank account(s) as Seller

- 2 -

may designate.  The Deposit shall be paid by Title Company to Seller at Closing and credited against the Purchase Price.  The Purchase Price shall also be subject to further adjustments for prorations and credits required to be made in accordance with Article 7, below.

2.4    Closing.  For purposes of this Agreement, "**Closing**" or "**Date of Closing**" shall mean the date that the Deed shall have been recorded in the Official Records of the County where the Property is located.  The Closing shall be consummated at a closing in escrow through Title Company on the Date of Closing, which shall be a date mutually agreed to by the parties hereto, and which shall be no later than the date that is **thirty (30) days** from the expiration of the Due Diligence Period (the "**Outside Date of Closing**").  Closing shall occur on the Date of Closing in escrow through the Title Company, or at such other place as may be agreed to in writing by Seller and Purchaser.  Notwithstanding the foregoing, the Close of Escrow may occur as a so-called "Gap Closing" in which  funds are disbursed prior to the recordation of the Deed and delivery of the documents and instruments deposited with Title Company, so long as Title Company insures Purchaser, as owner, as of the time the funds are disbursed.  The period from the end of the Due Diligence Period to the Outside Date of Closing shall be deemed to be the "**Closing Period**".

## 3.    INSPECTIONS AND APPROVALS.

3.1    Due Diligence Review.  Until 5:00 pm (PST) on the day that is **forty-five (45) days** from the mutual execution of this Agreement (the "**Due Diligence Period**"), Purchaser shall have a right to conduct the Due Diligence Review described below.  During the Due Diligence Period, Purchaser shall have the right to: (i) examine, inspect, and investigate the Property and all information relating thereto and, in Purchaser's sole and absolute judgment and discretion, determine whether the Property is acceptable to Purchaser, and (ii) obtain all necessary internal approvals to consummate the acquisition of the Property. If on or before the expiration of the Due Diligence Period Purchaser shall notify Seller in writing (e-mail being proper notice) that it has determined, in its sole and absolute discretion, that it does not intend to acquire the Property then as of written notification or expiration of the Due Diligence Period, respectively, the transaction shall be cancelled and the Deposit shall be returned to Purchaser within one (1) business day.

3.2    Documents.  Within **ten (10) business days** of the mutual execution of this Agreement, Seller shall provide Purchaser with a copy of all leases and documents related to such leases, agreements, surveys, title work, permits, plans, studies, reports, financials, insurance policies, tax statements, appraisals or valuations, inventory of personal property, copies of all written claims, demands or notices concerning the Property, and all other materials regarding the Property, or those that Purchaser shall reasonably request during Due Diligence that is in Seller's possession or control (each a "Property Document"), or Seller shall create a data room containing such documents and instruments from which Purchaser may obtain access to all such documents and instruments.

3.3    Right of Entry.  Purchaser and any potential financing source (each, a "**Lender**") shall have a right of entry between the date of mutual execution of this Agreement and the earlier to occur of the Closing and the termination of this Agreement.  Seller hereby agrees that, subject to the rights of the tenants and occupants of premises at or in the Property, Purchaser, Lender and their respective agents, representatives, contractors and subcontractors may enter upon the Property at all reasonable times during normal business hours in order to inspect the Property, reasonably communicate with tenants and conduct reasonable surface soils and environmental tests and inspections, engineering studies and land and other surveys; provided (i) none of the activities by or on behalf of Purchaser shall materially damage the Property, (ii) Purchaser shall repair any damage caused by its entry, and (iii) Purchaser shall pay in full for all such inspections, tests and any other work and activities conducted or materials furnished at the Property by or for Purchaser as and when due.

3.4     Survey. As part of the Property Documents, Seller will deliver or make available for inspection, the most recent survey, if any, in its possession to Purchaser (the "**Existing Survey**"). Each of Purchaser and/or Purchaser's Lender may, at its sole cost and expense, order an update to the Existing Survey (or if there is no Existing Survey, a new survey) (the Existing Survey, as updated, or a new survey, the "**Survey**").

3.5     Title Commitment. Within **ten (10) business days** of the mutual execution of this Agreement, Seller will provide from the Title Company, a Commitment for Title Insurance (the "**Title Commitment**"), setting forth the status of title to the Land and all exceptions which would appear in an Owner's Policy of Title Insurance.

3.5.1     Permitted Exceptions. Purchaser shall accept title to the Property, subject only to the following exceptions (the "**Permitted Exceptions**"):

(i)     Those matters affecting or relating to the title to, or the survey of, the Property which are shown on the Title Commitment or as shown on the Survey that Purchaser has approved in writing on or prior to the Date of Closing.

(ii)     The lien of non-delinquent taxes, assessments and other usual and customary charges assessed against the owners of real property in the state in which the Land is located.

(iii)     All building and zoning laws, codes and regulations affecting the Property, including all proffers, special exceptions, conditions, site plan approvals, and other similar matters, if any, relating to the zoning of the Property.

3.5.2     Seller's Obligation to Cure. Purchaser will have twenty-one (21) days ("Title Review Period") after Purchaser's receipt of the Title Commitment, Survey, and other items described in Section 3, in which to give written notice to Seller specifying Purchaser's objections to one or more of those items ("Title Objections"), if any, and Seller will, within five (5) days thereafter ("Cure Period") either satisfy the Title Objections at Seller's sole cost and expense, or promptly notify Purchaser in writing of the Title Objections that Seller cannot or will not satisfy at Seller's expense. If Seller elects not to satisfy any of the Title Objections within the Cure Period, Purchaser has the option of either (i) waiving the unsatisfied Title Objections, in which event the unsatisfied Title Objections will become Permitted Exceptions; (ii) extending the time for Seller's cure, in which event the Closing Date may, at Purchaser's option, be extended for an equivalent period of time; or (iii) terminating this Contract and receiving back the Deposit, in which latter event Seller and Purchaser will have no further obligations, one to the other, with respect to the subject matter of this Contract, except for return of the Deposit.

3.6     Contracts. On or prior to the expiration of to the Date of Closing, Purchaser shall provide written notice (the "**Assumed Contract Notice**") to Seller of those Contracts it is electing to assume at Closing (such Contracts being herein referred to as the "**Assumed Contracts**"), and any and all Contracts not included in the Assumed Contract Notice shall be terminated by Seller, such termination to be effective as of the Date of Closing.  As used herein, the term "**Contracts**" shall mean all service, maintenance, supply, or other contracts relating to the operation of the Property, and all other such assignable contracts or agreements in effect as of the Date of Closing.

3.6.1     Consents to Transfer. On or prior to Closing, Seller shall be responsible for securing any consent from third parties who have the right to consent to the transfer of any Assumed Contract, Permit, Intangible Property and/or Lease and Seller shall be responsible for paying any fee in connection therewith, including but not limited to, any termination fee.  The consents shall provide that if the transaction contemplated by this Agreement is not consummated, the consent will not be effective. It is

understood that a failure to obtain such consents is not a condition precedent to Purchaser's obligation to close, provided, however, that it shall be a condition precedent to Purchaser's obligation to close that any tenant granted a right of first refusal, right of first offer, or similar purchase right with respect to the Property under the Leases waive such right in writing prior to Closing.

**4.      SELLER'S OBLIGATIONS PRIOR TO CLOSING.**

Until Closing, Seller and/or Seller's agents or representatives shall:

4.1      <u>Insurance</u>. Keep the Property insured in the same manner as it has in the past, including, without limitation, in an amount sufficient to satisfy any co-insurance requirement or stipulation, against fire and other hazards covered by extended coverage endorsement and comprehensive public liability insurance against claims for bodily injury, death and property damage occurring in, on or about the Property.

4.2      <u>Operation</u>. Maintain the Property in the same manner and condition as that in which Seller has maintained its physical condition in the past, including, without limitation, in good condition and shall make repairs and/or replacements in the ordinary course of business in connection with any damage to the Property, and deliver the Property to Purchaser at Closing in the condition existing as of the Effective Date, normal wear and tear and damage by casualty excepted.

4.3      <u>Notices</u>. Provide to Purchaser, immediately upon the receipt thereof, any and all written notices relating to the Property received by Seller or its agents or representatives from any governmental or quasi-governmental instrumentality, insurance company, vendor or other party under any of the Contracts, or from any other entity or party, which notices are of a type not normally received in the ordinary course of Seller's business, or which may have a material effect upon the Property or result in a material change in a representation or warranty made by Seller hereunder.

4.4      <u>Compliance with Agreements</u>. Take all actions necessary to comply with all agreements, covenants, encumbrances and obligations affecting or relating to the Property and the ownership, operation and maintenance thereof including, but not limited to, payment of all utility bills, tax bills and other invoices and expenses relating to the Property, as and when the same become due.

4.5      <u>New Contracts</u>. Not enter into any Contracts.

4.6      <u>Leases</u>. Not (a) amend or terminate any Leases; (b) consent to the assignment of any Leases or subleasing of any of the Property; or (c) enter into any new Lease of the Property or any portion thereof, unless and until Seller provides Purchaser with written notice of such actions and obtains Purchaser's prior written consent with respect thereto, which consent shall not be unreasonably withheld, conditioned or delayed.

4.7      <u>Personal Property Substitutions</u>. Not remove any item included in the Personal Property except if such removed Personal Property is substituted with an item of like kind and comparable fair market value.

4.8      <u>Discharge of Obligations</u>.  At or prior to Closing, Seller shall cause to be discharged or otherwise released from title as evidenced by the issuance of the Title Policy (as defined herein) in form required hereunder (collectively, the "<u>Automatically Disapproved Exceptions</u>"): (i) all mechanics' and materialmen's liens arising from any labor or materials furnished to the Property prior to the time of Closing; (ii) mortgages and deeds of trust; or (iii) any judgment, tax or other liens.

4.9     Significant Changes.  Seller shall promptly notify Purchaser of any significant change in any condition with respect to the Property or of any event or circumstance actually known to Seller (without any duty to conduct any investigation of any nature) that makes or would make any representation or warranty of Seller or Purchaser contained in this Agreement materially false or materially misleading, it being understood that Seller's providing the notice to Purchaser shall in no way relieve Seller or Purchaser of any liability for a breach by the breaching party of any of its representations, warranties or covenants under this Agreement.

4.10     Estoppel and SNDA. Not later than ten (10) business days after the end of the Due Diligence Period, Seller shall deliver all estoppel certificates and a subordination non-disturbance and attornment agreement in the forms (if any) related to the Property.

5.     **REPRESENTATIONS AND WARRANTIES.**

5.1     By Seller. Seller represents and warrants to Purchaser, as of the Effective Date and as of the Date of Closing, that:

5.1.1     Organization. Seller is a limited liability company that is duly organized, validly existing and in good standing under the laws of the State of Delaware, and qualified to do business under the laws of the State in which the Property is located.

5.1.2     Authority. Seller has the power, right and authority to enter into and perform all of the obligations required of Seller under this Agreement and the instruments and documents referenced herein, and to consummate the transaction contemplated hereby.  Seller has taken all requisite action and obtained all requisite consents, releases and permissions in connection with entering into this Agreement and the instruments and documents referenced herein or required under any covenant, agreement, encumbrance, law or regulation with respect to the obligations required hereunder, and no consent of any other party is required for the performance by Seller of its obligations hereunder. This Agreement is, and all agreements, instruments and documents to be executed and delivered by Seller pursuant to this Agreement shall be valid and legally binding upon Seller and enforceable in accordance with their respective terms.

5.1.3     No Breach. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument or other obligation to which Seller is a party or by which Seller may be bound or any law, statute, ordinance, rule, governmental regulation or any writ, injunction, order or decree of any governmental body applicable to Seller or to the Property.

5.1.4     Bankruptcy. No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against or, to the best of Seller's knowledge, contemplated by Seller, and Seller has not filed any of the foregoing. Seller: (a) is not in receivership or dissolution; (b) has not admitted in writing its inability to pay its debts as they mature; and (c) has not been adjudicated a bankrupt.

5.1.5     Taxes and Assessments. Except for taxes that will be paid at the Closing, there are no unpaid real or personal property taxes currently due and owing, assessments for streets, utilities or other public improvements against the Property and there are no unpaid taxes currently due and owing with respect to the Property. All sewer, water, gas, electric, telephone and drainage lines and facilities required by law and for the normal operation of the Property are fully installed, function properly and are adequate to service the Property and there are no unpaid assessments or charges for the installation of such utilities or for making connection thereto that have not been fully paid.

- 6 -

        5.1.6   <u>Good and Marketable Title</u>. Seller now has and will have at Closing good and indefeasible title in fee simple to the Property and no party, except as herein set forth, has or shall have any right in, or to acquire, the Property.

        5.1.7   <u>Free of Encumbrances</u>. At the Closing, the Property shall be free and clear of all encumbrances except Permitted Encumbrances.

        5.1.8   <u>No Claims</u>. There are no actions, suits, claims or other proceedings pending or contemplated or threatened against Seller that could affect Seller's ability to perform its obligations when and as required under the terms of this Agreement, including an uncured breach or default, whether declared or not, including, without limitation, nonpayment of any sum or nonperformance of any obligation, exists under, or with regard to, any obligation of Seller that is secured by a lien on the Property.

        5.1.9   <u>Compliance with Environmental Laws</u>. To the best of Seller's knowledge, the Property, including without limitation any subsurface soils and ground water, are free of contamination from any substance or material presently known to be toxic or hazardous, whether presently stored or otherwise located thereon or therein, including without limitation any radioactive substance, methane, volatile hydrocarbons, industrial solvents, or any other material or substance which based on present knowledge could presently or at any time in the future cause a detriment to or impair the beneficial use of the Property, or any portion thereof by Buyer, or constitute or cause a health, safety or other environmental hazard to occupants or users of the Property or any portion thereof, including without limitation any contractors, subcontractors or workmen performing remodeling, renovation, redevelopment or other alteration work on or to the Property, and no construction material used in any improvements located on the Property contains or is comprised of asbestos or any other substance or material presently known to be toxic or hazardous. Without limiting the generality of the foregoing, the Property (including without limitation all subsurface soils and ground water), and each portion thereof, are not subject to the assertion of any claim, liability, or obligation under or in respect of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA") (both CERCLA and SARA hereinafter collectively called "Superfund"), the Resource Conservation and Recovery Act of 1976, as amended, or any other now existing federal, state or local law or laws or under any common law or statutory tort, nuisance or absolute liability theories, or for or in respect of any impairment or diminution of, or other interference with, any environmental right, duty or obligation protected by law, or for or in respect of any damage to persons or property (including damage, alleged damage, injury, or alleged injury to fish, wildlife, biota, air, water, groundwater, drinking water supplies or other natural resources) (collectively "Environmental Claims"), relating to or arising, in whole or in part, out of any of the following:  (i) Seller's use or operation of the Property; (ii) the use or operation of the Property by any predecessor of Seller, direct or remote, as owner, lessee, licensee or other occupant of the Property, or any part thereof; (iii) any act or omission by any employee or agent of the Seller or Seller's predecessors, direct or remote, as owner, lessee, licensee or other occupant of the Property, or any part thereof; (iv) any act or omission by any third party (the foregoing hereinafter individually called a "Responsible Party" and collectively called "Responsible Parties") whether such Environmental Claim is absolute or contingent, matured or unmatured, known or unknown, (a) based on or arising from, in whole or in part, any solid, liquid, gaseous or thermal substance, contaminant, waste, irritant, or pollutant discharged into the Environment, or the discharge, treatment, storage or disposal of which was conducted, arranged for by contract, agreement or otherwise by any Responsible Party, or (b) based on or arising from, in whole or in part, the ownership, occupancy, use or control or operation by any Responsible Party of any of the Property at or from which any substance, contaminant, waste, irritant, or pollutant was manufactured, created, stored, treated, released (either intentionally or unintentionally) or discharged into the Environment prior to the Closing Date. The term "Environment" as used herein means any surface water, groundwater, drinking water supply, land surface or subsurface strata, or the ambient air; the tern "Costs" as used herein includes, without limitation, attorneys' fees, costs and expenses, cost of

- 7 -

any and all preliminary or secondary remedial feasibility studies, investigation, clean-up, preventative, restorative or mitigating measure (such as the providing of alternative water supplies and post cleanup monitoring) whether conducted at the Property or at any other location; the term "Discharge" as used herein means any spilling, leaking, pumping, pouring, emitting, emptying, releasing, injecting, escaping, leaching, dumping, depositing, or disposing into the Environment. Seller has not obtained, and is not required to obtain, and Seller has no knowledge of any reason Purchaser or Seller will be required to obtain, any permits, licenses, or similar authorizations to construct, occupy, operate, or use any buildings, improvements, fixtures, and equipment forming a part of the Property by reason of any Environmental Laws.

 5.1.10  Leases, Mortgages, and other Contracts. Seller has provided all leases, mortgages, and other contracts concerning the Property to Purchaser, each is in full force and effect, has not been otherwise modified, amended, or changed, and Seller is not in default under any of the agreements. Other than those agreements provided to Purchaser, there are no agreements for services or supplies on account of maintenance or repairs which expressly or impliedly will be binding upon the Purchaser or upon the Property or related to improvements to the Property which have not been fully paid.

 5.1.11  No Defects. To the best of Seller's knowledge at the time of the Closing, there will be no material defects with regard to any of the structural components of the buildings on the Property, the roof and exterior walls are free of leaks, and the electrical, mechanical, plumbing, and HVAC systems are in good working order.

 5.1.12  Foreign Person. Seller is not a "foreign person" within the meaning of Section 1445(e)(3) of the Internal Revenue Code of 1986, as amended.

 5.1.13  No Condemnation. The Real Property is not presently the subject of any condemnation or similar proceeding, and to the best of Seller's knowledge, no such condemnation or similar proceeding is currently threatened or pending.

 5.1.14  No Terrorism. Neither Seller nor any individual or entity having an interest in Seller is a person or entity described by Section 1 of the Executive Order (No. 13,224) Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (September 24, 2001), and does not engage in any dealings or transactions, and is not otherwise associated, with any such persons or entities.

 5.1.15  No Violation of Law. The location, construction, improvement, occupancy, operation, and use of the Property does not violate any applicable law, statute, ordinance, rule, regulation, order, or determination of any governmental authority or any board of fire underwriters (or other body exercising similar functions), or any restrictive covenant or deed restriction (recorded or otherwise) affecting the Property, including, without limitation, the American's with Disabilities Act and all applicable zoning ordinances and building codes, flood disaster laws, and health and environmental laws and regulations (hereinafter sometimes collectively called "Applicable Laws").

 5.1.16  No Material Change. Seller shall immediately notify Purchaser of any material change in respect to the Property or any information heretofore or hereafter furnished to Purchaser with respect to the Property.

 5.1.17  Indemnification. To the extent permitted by law, Seller, from and after Closing, shall indemnify and hold Purchaser harmless from and against any and all damage, loss, cost, expense, obligation, claim, or liability, including reasonable attorneys' fees and reasonable expenses of investigating, defending, and prosecuting litigation (collectively, the "Damages"), suffered by Purchaser as a result of:

(A) any liability or obligation relating to or arising from the ownership or operation of the Property before the Closing Date; (B) any brokers' or finders' fees or commissions arising with respect to brokers or finders retained or engaged by any person other the Purchaser and resulting from or relating to the transactions contemplated in the Agreement; (C) the breach of any representation or warranty of Seller set forth in this Agreement; and (D) the breach of, or failure to perform or satisfy, any of the covenants of Seller set forth in this Agreement.

5.1.18  Survival. The representations and warranties set forth in Article 5.1 shall be true as of the Effective Date and remain true through and including the Date of Closing, and shall not merge with the deeds, but shall survive twelve (12) months after Closing.

5.2     By Purchaser. Purchaser represents and warrants to Seller as of the Effective Date that:

5.2.1   Organization. Purchaser is a corporation, partnership, limited liability company, trust or other type of business organization that is duly organized, validly existing and in good standing under the laws of the state in which it was organized and Purchaser is qualified to do business in the jurisdiction in which the Property is located.

5.2.2   Authority. Purchaser has taken all requisite action and obtained all requisite consents, releases and permissions in connection with entering into this Agreement and the instruments and documents referenced herein or required under any covenant, agreement, encumbrance, law or regulation with respect to the obligations required hereunder, and no consent of any other party is required for the performance by Purchaser of its obligations hereunder.

5.2.3   No Breach. Neither the execution of this Agreement nor the consummation of the transactions contemplated hereby does now constitute or shall result in a breach of, or a default under, any agreement, document, instrument or other obligation to which Purchaser is a party or by which Purchaser may be bound, or any law, statute, ordinance, rule, governmental regulation or any writ, injunction, order or decree of any court or governmental body, applicable to Purchaser.

5.2.4   Survival. The representations and warranties set forth in Article 5.2 shall be true as of the Effective Date and remain true through the Date of Closing.

## 6.   CONDITIONS PRECEDENT TO CLOSING.

6.1     Conditions for the Benefit of Purchaser. The obligation of Purchaser to consummate the conveyance of the Property hereunder is subject to the full and complete satisfaction or waiver of the following condition precedent:

6.1.1   Seller shall have delivered to Purchaser or the Title Company, as applicable, the transaction documents referenced in this Agreement.

6.1.2   The representations and warranties of Seller contained in this Agreement shall be true, complete and accurate in all material respects when made, and as of the Date of Closing, as though made at and as of the Date of Closing.

6.1.3   Seller shall have performed and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed or complied with by Seller prior to or at the Date of Closing.

6.1.4   There shall be no actions pending to enjoin this transaction.

- 9 -

6.1.5    At least **three (3) business days** prior to Closing, Seller shall have provided Purchaser with a written waiver from any tenant granted a right of first refusal, right of first offer, or similar purchase right with respect to the Property under the Leases, of any such right.

6.1.6    The Title Company shall be irrevocably committed to issue an ALTA extended coverage owner's title policy (the "**Title Policy**") in the amount of the Purchase Price, naming Purchaser as the insured, showing fee simple title to the Property to be vested in Purchaser, free and clear of the Automatically Disapproved Exceptions and other exceptions, subject only to the Permitted Exceptions.

6.2    <u>Waiver of Conditions</u>. Purchaser shall have the right to waive some or all of the foregoing conditions in its sole and absolute discretion; provided, however, that no such waiver shall be effective or binding on Purchaser unless it is in writing.

6.3    <u>Conditions for the Benefit of Seller</u>. The obligation of Seller to consummate the conveyance of the Property hereunder is subject to the full and complete satisfaction or waiver of each of the following conditions precedent:

6.3.1    Purchaser shall have delivered to Seller or the Title Company, as applicable, the transaction documents referenced in this Agreement;

6.3.2    Purchaser shall have delivered the Purchase Price to Seller or the Title Company (inclusive of the Deposit); and

6.3.3    All (A) representations and warranties of Purchaser set forth herein shall have been true and correct in all material respects when made, and (B) all covenants, agreements and conditions required to be performed or complied with by Purchaser prior to or at the time of Closing in connection with the transaction shall have been duly performed or complied with by Purchaser in all materials respects prior to or at such time or waived in writing by Seller.

6.4    <u>Waiver of Conditions</u>. Seller shall have the right to waive some or all of the foregoing conditions in its sole and absolute discretion; provided, however, that no such waiver shall be effective or binding on Seller unless it is in writing.

6.5    <u>Failure of a Condition</u>. In the event any of the conditions set forth in this Article are not fulfilled or waived for a reason other than the default of Purchaser or Seller under this Agreement, this Agreement shall terminate and all rights and obligations hereunder of each party shall be at an end and the Deposit shall be returned to Purchaser, and neither party shall have any obligations to the other except for those obligations which expressly survive Closing, and any cancellation charges payable to the Title Company shall be divided equally between Purchaser and Seller.

7.    **CLOSING COSTS AND PRORATIONS.**

7.1    <u>Purchaser's Costs.</u>    <u>Purchaser will pay the following costs of closing this transaction</u>:

7.1.1    the cost of the title policy in excess of an ALTA owner's policy of title insurance at standard rates, including endorsements requested by Purchaser (except for endorsements Seller agreed to obtain for Purchaser in lieu of removing a title exception objected to by Purchaser);

7.1.2    any cost of updating the survey; and

7.1.3    The fees and disbursements of Purchaser's counsel and any other expense(s) incurred by Purchaser or its representative(s) in inspecting or evaluating the Property or closing this transaction;

7.1.4    One-half (½) of the fee charged by Title Company in connection with is responsibilities as escrow holder pursuant to this Agreement.

7.1.5    Any and all costs and expenses in connection with obtaining financing for the purchase of the Property, including without limitation any recordation or transfer taxes required to be paid upon the recordation of any deed of trust, mortgage or other security agreement executed and recorded in connection with such financing; and

7.2    Seller's Costs. Seller will pay the following costs of closing this transaction:

7.2.1    Seller will be responsible for the title search, the commitment, including any leasehold policy, and the title insurance premium up to the amount of an ALTA owner's policy of title insurance at standard rates, endorsements Seller agreed to obtain for Purchaser in lieu of removing a title exception objected to by Purchaser;

7.2.2    all applicable documentary transfer taxes, sales taxes, recording fees and other taxes; and

7.2.3    One-half (½) of the fee charged by Title Company in connection with is responsibilities as escrow holder pursuant to this Agreement

7.2.4    The fees and disbursements of Seller's counsel and Brokers.

7.2.5    All release fees and other charges required to be paid in order to release from the Property the lien of any mortgage or other security interest which Seller is obligated to remove pursuant to the terms of this Agreement.

7.3    Prorations. All revenues collected, and all expenses, including, but not limited to rents and any other amounts paid by tenants, personal property taxes, installment payments of special assessment liens, vault charges, sewer charges, utility charges, reimbursement of maintenance and repair expenses and normally prorated operating expenses billed or paid as of the Date of Closing (or estimates for invoices for such operating expenses which are unbilled as of the Date of Closing but shall include expenses applicable to a time period on or after the Date of Closing), shall be prorated as of **11:59 p.m. Eastern Time**, on the day before the Date of Closing and shall be adjusted against the Purchase Price due at Closing. Purchaser shall receive a credit against the Purchase Price at Closing in an amount equal to any and all refundable tenant security deposits in Seller's possession with respect to the Leases. Any and all rents received by Purchaser following the Date of Closing, which relate to time periods prior the Closing, shall accrue to the benefit of Seller, and Purchaser shall have an affirmative obligation to remit such amounts to Seller. Seller shall remain liable for refunds of any amounts due tenants under the Leases relating to time periods prior to Closing. No proration shall be made for utility expenses that are separately metered to and paid, directly by tenants and for which Seller has no obligation to pay. Within one (1) year following the Date of Closing, Buyer and Seller shall reconcile the actual amount of revenues or liabilities upon receipt or payment thereof, to the extent those items were prorated or credited at Closing based upon estimates. Seller shall prepare such reconciliation and deliver the same to Purchaser for its approval, in its reasonable discretion, no later than **five (5) days** prior to the Date of Closing, and the parties hereto shall make such payments or refunds as may be necessary as a result of such reconciliation.

7.4    Taxes. Seller shall pay all taxes for the years prior to Closing and general real estate taxes and special assessments relating to the Property payable during the year in which Closing occurs shall be prorated with respect to the Property as of the day before the Date of Closing whether or not such amounts are due on the Date of Closing. If Closing shall occur before the actual taxes and special assessments payable during such year are known, the apportionment of taxes shall be upon the basis of taxes for the Property payable during the immediately preceding year. If, as the result of an appeal of the assessed valuation of the Property for any real estate tax year prior to (or including) the Closing, there is issued after Closing an administrative ruling, judicial decision or settlement by which the assessed value of the Property for such tax year is reduced, and a real estate tax refund issued, Seller shall be entitled to all such refunds relating to the period prior to Closing. If Seller engaged the tax appeal agent then the tax appeal agent shall remain responsible solely to Seller for such appeal. If the appeal is successfully culminated either prior to or after the proposed sale transaction, and Purchaser would benefit from such appeal for the current or subsequent tax year, then Purchaser shall pay a pro-rata share portion of the costs and expenses incurred by Seller in connection with the appeal.

7.5    In General. Any other costs or charges of closing this transaction not specifically mentioned in this Agreement shall be paid and adjusted in accordance with local custom or ordinance in the jurisdiction in which the Property is located.

7.6    Purpose and Intent. Except as expressly provided herein, the purpose and intent as to the provisions of prorations and apportionments set forth in this Article 7 and elsewhere in this Agreement is that Seller shall bear all expenses of ownership and operation of the Property and shall receive all income therefrom accruing through midnight of the day preceding the Closing and Purchaser shall bear all such expenses and receive all such income accruing thereafter.

7.7    Errors. If any errors or omissions are made regarding adjustments and prorations as set forth above, the parties shall make the appropriate corrections promptly upon discovery, provided that the error or omission is discovered within one (1) year after the Close of Escrow. Any error or omission not discovered within that period shall not be subject to adjustment. The amount necessary to correct any adjustment or proration that is to be corrected under the foregoing shall be paid in cash to the party entitled to the amount in question. Notwithstanding anything to the contrary set forth herein, the parties' obligations under this Section 7.7 shall survive the Closing.

## 8.    CLOSING AND ESCROW.

8.1    Seller's Deliveries. Seller shall deliver either at the Closing or by making available at the Property, as appropriate, the following original documents, each executed and, if required, acknowledged:

8.1.1    A Special Warranty Deed, in the form attached hereto as **Schedule 8.1.1** (the "**Deed**"), conveying title to Purchaser of the Property free and clear of any and all liens, defects and adverse encumbrances, subject only to the Permitted Exceptions. Seller shall reasonably cooperate with Purchaser in connection with the conveyance of the Property by a Deed containing the Survey legal description as well as a Deed containing the record legal description, to the extent they are different.

8.1.2    (a) Originals (to the extent in Seller's possession) of all of the Assumed Contracts relating to the Property which Purchaser has elected to assume pursuant to the terms hereof; and (b) an assignment of the Leases, Contracts, Permits and Intangible Property to Purchaser by way of an assignment and assumption agreement, in the form attached hereto as **Schedule 8.1.2** (the "**Assignment and Assumption Agreement**"), conveying to Purchaser Seller's rights, title and interest in and to the Intangible Property attributable to the Property.

- 12 -

8.1.3 (a) Originals (to the extent in Seller's possession) of all warranties then in effect, if any, with respect to the Property or to the Improvements (including, but not limited to, any and all roof, equipment and service warranties) or any repairs or renovations to such Improvements and (b) an assignment of all such warranties being conveyed hereunder, conveying to Purchaser Seller's rights, title and interests in and to the warranties attributable to the Property (including, but not limited to, any and all roof, equipment and service warranties).

8.1.4 An affidavit pursuant to the Foreign Investment and Real Property Tax Act.

8.1.5 Appropriate evidence of authority, capacity and status of Seller as reasonably required by Title Company.

8.1.6 An "**Owner's Affidavit**", in form reasonably acceptable to Seller and Title Company and sufficient for Title Company to delete any exceptions for (a) mechanics' or materialmen's liens arising from work at the Property which is the responsibility of Seller hereunder, (b) parties in possession, other than tenants as tenants only, and, (c) matters not shown in the public records.

8.1.7 A joint settlement statement (the "**Settlement Statement**"), prepared by Title Company.

8.1.8 A bill of sale in the form attached hereto as **Schedule 8.1.8** (the "**Bill of Sale**"), transferring to Purchaser all of Seller's right, title and interest in the Personal Property.

8.1.9 A notice to tenants or lessees under the Leases providing notice of the change in ownership in the form attached hereto as **Schedule 8.1.10** (the "**Notice to Tenants**"), which notice shall be delivered by Seller to such tenants or lessees upon consummation of Closing.

8.1.10 Possession of the Property, subject only to the Permitted Exceptions and the rights of tenants under the Leases, and all keys and security codes to the Improvements.

8.1.11 Such other documents, certificates and other instruments as may be reasonably required to consummate the transaction contemplated hereby.

8.2 Purchaser's Deliveries. At the Closing, Purchaser shall (a) pay Seller the Purchase Price as required by, and in the manner described in, Article 2 hereof and (b) execute and deliver the following documents:

8.2.1 The Assignment and Assumption Agreement and Bill of Sale.

8.2.2 Evidence of Purchaser's authority, and the authority of the person executing any documents at Closing on behalf of Purchaser, acceptable to Seller and Title Company, to enter into the transactions contemplated by this Agreement.

8.2.3 The Settlement Statement.

8.2.4 Such other documents, certificates and other instruments as may be reasonably required to consummate the transaction contemplated hereby.

8.3 Possession. Purchaser shall be entitled to possession of the Property at Closing.

- 13 -

8.4    Escrow Closing. Purchaser and Seller (or their respective counsel on behalf of Purchaser and Seller) shall execute letters of escrow closing instructions (the "**Closing Instructions**") which will provide that, on the Date of Closing: (a) Seller and Purchaser shall each deposit with Title Company all of the documents and instruments described in Sections 8.1 and 8.2, above (the "**Closing Documents**"); and (b) Purchaser shall deposit with Title Company the balance of the Purchase Price required to be paid after application of the Deposit thereto and all prorations, adjustments and credits required to be made under this Agreement, (the "**Adjusted Purchase Price**") all of which shall be set forth on, and mutually agreeable pursuant to, a settlement statement executed by both Purchaser and Seller at Closing. Upon receipt of the Adjusted Purchase Price, and the satisfaction of all other conditions set forth in the Closing Instructions, Title Company shall be authorized and directed to disburse the Adjusted Purchase Price to Seller or its designee(s), record the Deed among the real property records of the County where the Property is located, and release the remaining Closing Documents to the appropriate parties, all in strict accordance with the Closing Instructions.

## 9.    DAMAGE, DESTRUCTION AND CONDEMNATION.

9.1    Casualty. Except as provided herein, Seller assumes all risk of loss or damage to the Property by fire or other casualty until consummation of Closing, at which time all risk of loss or damage to the Property by fire or other casualty shall be transferred to Purchaser. If at any time after the Effective Date but on or prior to the Date of Closing any portion of the Property is destroyed or damaged as a result of fire or any other cause whatsoever, Seller shall promptly give written notice thereof to Purchaser. If the estimated cost to repair the damage or destruction exceeds **$200,000** as reasonably estimated by a contractor selected by Purchaser, Purchaser shall have the right to terminate this Agreement by written notice to Seller within **ten (10) business days** following the date upon which Purchaser receives Seller's written notice of the destruction or damage, in which event this Agreement shall terminate, the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other, other than those obligations that expressly survive termination of this Agreement, provided, however, that if Purchaser fails to respond within such ten (10) business day period, it shall be deemed to have elected to terminate this Agreement in accordance with this Section. If Purchaser does not elect or is not deemed to have elected to so terminate this Agreement within said ten (10) business day period, or if the cost of repair is equal to or less than **$100,000**, this Agreement shall remain in full force and effect and the parties shall proceed to Closing without any reduction or adjustment in the Purchase Price, except that all insurance proceeds will be assigned to Purchaser at Closing and Seller shall not voluntarily settle, compromise or adjust any amounts payable related to the casualty loss without the prior written consent of Purchaser and Seller will pay to Purchaser any deductible under Seller's insurance policy.

9.2    Condemnation. In the event, at any time on or prior to the Date of Closing, any action or proceeding is filed, under which the Property, or any portion thereof, may be taken pursuant to any law, ordinance or regulation or by condemnation or the right of eminent domain, Seller shall promptly give written notice thereof (which notice shall describe the type of action being taken against the Property, and which portions of the Property will be affected thereby) to Purchaser. If the taking would (i) materially impair access to the Property, (ii) result in the taking of any building, (iii) reduce the number of parking spaces located on the Property below the number required to comply with requirements of applicable law, the terms of any Permitted Exception, or the terms of any Lease, or (iv) result in the taking of any portion of the Property having a reasonably estimated value or having a cost of repair or replacement of an amount equal to **five percent (5%)** of the Purchase Price or more, then Purchaser shall have the right to terminate this Agreement by written notice to Seller within **ten (10) business days** following the date upon which Purchaser receives Seller's written notice of such action or proceeding, in which event this Agreement shall terminate, the Deposit shall be returned to Purchaser and neither party shall have any further obligation to the other, other than those obligations that expressly survive termination of this Agreement, provided, however, that if Purchaser fails to respond within such ten (10) business day period, it shall be deemed to

- 14 -

have elected to terminate this Agreement in accordance with this Section. If Purchaser does not elect, or is not deemed to have elected, to so terminate this Agreement within said ten (10) business day period, this Agreement shall remain in full force and effect and the parties shall proceed to closing without any reduction or adjustment in the Purchase Price, except that all condemnation proceeds will be assigned to Purchaser.

## 10.    DEFAULT AND REMEDIES.

10.1    Purchaser Default. If Purchaser is in default of one or more of Purchaser's obligations under this Agreement other than a failure to timely close, then Seller may give written notice to Purchaser (with a copy to Title Company) specifying the nature of the default. Purchaser shall have **five (5) business days** after receiving that notice, but in no event beyond the Date of Closing, within which to cure that default. If Purchaser fails to cure that default within that period, then Seller's sole remedy for such default shall be to terminate this Agreement by giving notice of such termination to Purchaser (with a copy to Title Company) and receive the Deposit as liquidated damages. If Seller does so terminate this Agreement, then Title Company shall pay the Deposit to Seller.

10.2    Liquidated Damages. SELLER AND PURCHASER AGREE THAT PAYMENT OF THE DEPOSIT TO SELLER UNDER THIS ARTICLE 10 SHALL BE AS LIQUIDATED DAMAGES AND NOT AS A PENALTY.

_____                                 _____
Buyer's Initials                                                            Seller's Initials

10.3    Seller Default. In the event Seller shall: (a) fail to sell, transfer and assign the Property to Purchaser in violation of the terms of this Agreement, and/or (b) fail to perform any other material obligation of Seller hereunder, and/or (c) breach any warranty made or granted by Seller under this Agreement and/or (d) have misrepresented any fact, or any of the representations of Seller contained herein are not true, accurate or complete in any material respect, Purchaser may as its sole and exclusive remedy, elect to (i) declare this Agreement to be null and void and demand and receive the return of the Deposit whereupon, and neither party shall have any further rights, duties or obligations hereunder except for those rights, duties or obligations which expressly survive Closing, or (ii) in lieu of terminating the Agreement and recovering the Deposit, pursue an action to enforce specific performance of the conveyance of the Property.

10.4    Termination. Upon any termination of this Agreement pursuant to any right of a party to terminate set forth in this Agreement, (a) the Deposit shall be paid over to the party entitled to the same, (b) all documents deposited by Purchaser and Seller into escrow shall be returned by Title Company to the party depositing the same, whereupon the parties will have no continuing liability to each other unless otherwise expressly stated in any provision of this Agreement.

10.5    Attorneys' Fees. Notwithstanding anything to the contrary in this Agreement, in the event that either Seller or Purchaser, as the case may be, shall bring a lawsuit against the other party for breach of such party's obligations under this Agreement, the losing party shall pay the prevailing party's costs and expenses incurred in connection with such litigation, including without limitation reasonable attorneys' fees. The "prevailing party" shall be determined by the court hearing such matter.

- 15 -

11.    **NOTICES.**

Any notice required or permitted to be given hereunder may be served by a party or its attorney and must be in writing and shall be deemed to be given (a) when hand delivered, (b) one (1) business day after pickup by Emery Air Freight, United Parcel Service (Overnight) or Federal Express, or another similar overnight express service, (c) when transmitted by telecopy or facsimile, provided that confirmation of the receipt of same is noted upon transmission of same by the sender's telecopy machine, or (d) when transmitted by electronic correspondence, in any case addressed or sent to the parties at their respective e-mail addresses set forth below:

|  |  |
|---|---|
| If to Seller: | Interstate Underground Warehouse, LLC<br>8201 East 23rd Street<br>Kansas City, MO 64129<br>Attn: Leslie Renee Reeder<br>Email: leslieinphuket@hotmail.com |
| With a copy to: | Pinnacle Real Estate Advisors, LLC<br>5205 W. 83rd Street<br>Prairie Village, KS 66208<br>Attn: Jon J. Walker<br>Email: jonwalker@pinnacleadvisorskc.com |
| If to Purchaser: | c/o Somera Road Inc.<br>130 West 42nd Street<br>Suite 2200<br>New York, New York 10036<br>Attn: Fergus Campbell<br>Email: fergus@someraroadinc.com |
| With a copy to: | Couzens Hall Advisors, LLC<br>105 East 34th Street<br>Suite 154<br>New York, New York 10016<br>Attn: Michael A. Fralin, Esq.<br>Email: michael@couzenshalladvisors.com |

or in each case to such other address as either party may from time to time designate by giving notice in writing pursuant to this Article 11 to the other party. Telephone numbers are for informational purposes only. Any and all notices to Seller shall be given to Seller's attorney. Any notice to Purchaser may be given to Purchaser's attorney.  Effective notice will be deemed given only as provided above, except as otherwise expressly provided in this Agreement.

12.    **MISCELLANEOUS.**

12.1    <u>Entire Agreement</u>. This Agreement, together with the Schedules attached hereto, all of which are incorporated by reference, is the entire agreement between the parties with respect to the subject matter hereof, and no alteration, modification or interpretation hereof shall be binding unless in writing and signed by both parties.

12.2 <u>Severability</u>. If any provision of this Agreement or its application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than those as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

12.3 <u>Applicable Law</u>. This Agreement shall be construed and enforced in accordance with the internal laws of the **State of Missouri**. The parties hereto irrevocably consent and submit to the nonexclusive jurisdiction of the courts of the state and federal district in which the Real Property is located and waive any objection based on venue of *forum non conveniens* with respect to any action instituted in those courts arising under this Agreement or in any way connected or related or incidental to the dealings of Purchaser and Seller in respect of this Agreement, in each case whether now existing or later arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any of those matters will be heard only in the courts described above.

12.4 <u>Assignability</u>. Purchaser may assign or transfer any of Purchaser's rights, obligations and interests under this Agreement, to any person or entity without Seller's consent.

12.5 <u>Successors Bound</u>. This Agreement shall be binding upon and inure to the benefit of Purchaser and Seller and their respective successors and permitted assigns.

12.6 <u>Captions; Interpretation</u>. The captions in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit or describe the scope of this Agreement or the scope or content of any of its provisions. Whenever the context may require, words used in this Agreement shall include the corresponding feminine, masculine, or neuter forms, and the singular shall include the plural and vice versa. Unless the context expressly indicates otherwise, all references to "Article" or "Section" are to sections of this Agreement.

12.7 <u>No Partnership</u>. Nothing contained in this Agreement shall be construed to create a partnership or joint venture between the parties or their successors in interest or permitted assigns.

12.8 <u>Time of Essence</u>. Time is of the essence with respect to the performance of the obligations of Seller and Purchaser under this Agreement.

12.9 <u>Counterparts and Electronic Signatures</u>. This Agreement may be executed and delivered in any number of counterparts, each of which so executed and delivered shall be deemed to be an original and all of which shall constitute one and the same instrument. Facsimile, documents executed, scanned and transmitted electronically and electronic signatures shall be deemed original signatures for purposes of this Agreement and all matters related thereto, with such facsimile, scanned and electronic signatures having the same legal effect as original signatures. Seller and Purchaser agree that this Agreement, any addendum thereto or any other document necessary for the consummation of the transaction contemplated by this Agreement may be accepted, executed or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act ("**E-Sign Act**"), Title 15, United States Code, Sections 7001 et seq., the Uniform Electronic Transaction Act ("**UETA**") and any applicable state law. Any document accepted, executed or agreed to in conformity with such laws will be binding on both Seller and Purchaser the same as if it were physically executed and Purchaser hereby consents to the use of any third party electronic signature capture service providers as may be chosen by Seller.

12.10 <u>Recordation</u>. Purchaser and Seller agree not to record this Agreement or any memorandum hereof.

12.11    <u>Proper Execution</u>. This Agreement shall have no binding force and effect on either party unless and until both Purchaser and Seller shall have executed and delivered this Agreement.

12.12    <u>Waiver</u>. No waiver of any breach of any agreement or provision contained herein shall be deemed a waiver of any preceding or succeeding breach of any other agreement or provision herein contained. No extension of time for the performance of any obligation or act shall be deemed an extension of time for the performance of any other obligation or act.

12.13    <u>Business Days</u>. If any date herein set forth for the performance of any obligations by Seller or Purchaser or for the delivery of any instrument or notice as herein provided should fall on a Saturday, Sunday or Legal Holiday (hereinafter defined), the compliance with such obligations or delivery shall be deemed acceptable on the next business day following such Saturday, Sunday or Legal Holiday. As used herein, the term **"Legal Holiday"** shall mean any local or federal holiday on which post offices are closed in the District of Columbia.

12.14    <u>Limitation of Liability</u>. No present or future partner, director, officer, member, shareholder, employee, advisor, affiliate, servicer or agent of or in Seller, Purchaser or any affiliate of any of the foregoing will have any personal liability, directly or indirectly, under or in connection with this Agreement or any agreement made or entered into under or in connection with the provisions of this Agreement, or any amendment or amendments to any of the foregoing made at any time or times, heretofore or hereafter. The limitations of liability contained in this paragraph will survive the termination of this Agreement or the Closing, as applicable, and are in addition to, and not in limitation of, any limitation on liability applicable to either party provided elsewhere in this Agreement or by law or by any other contract, agreement or instrument. In no event will Seller or Purchaser be liable for any consequential, exemplary or punitive damages under any circumstances in connection with this Agreement or the transaction contemplated hereby.

12.15    <u>WAIVER OF JURY TRIAL</u>. THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT, (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF PURCHASER AND SELLER IN RESPECT OF THIS AGREEMENT OR RELATED TRANSACTIONS, IN EACH CASE WHETHER NOW EXISTING OR LATER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. THE PARTIES HERETO AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT EITHER PARTY MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE OTHER PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

12.16    <u>No Third-Party Beneficiary</u>. This Agreement is solely for the benefit of Purchaser and Seller and Purchaser's permitted assigns. No other person or entity is entitled to the benefit or may enforce any of the provisions of this Agreement, except where expressly provided herein to the contrary.

12.17    <u>Purchaser Representation and Consent</u>. Purchaser acknowledges and confirms that it has had every opportunity to obtain legal representation in this matter and, if the name of Purchaser's counsel is not set forth in Article 11 hereof, then Purchaser has either intentionally declined to obtain representation, or not advised Seller of its representation; further, Purchaser confirms that he is a sophisticated purchaser of similar commercial properties, is familiar with all rights and remedies of **Missouri** law, and specifically waives any right to further representation. Purchaser confirms and acknowledges that he is not relying on any legal advice from Seller, Seller's counsel, the Brokers, or any other party in this matter.

12.18   Brokers.   Purchaser and Seller each represent and warrant to the other that neither has engaged any person to whom a commission or finders' fee may be owing by reason of the transactions contemplated by this Agreement, except for Jon Walker of Pinnacle Real Estate Advisors, LLC, and Gib Kerr & Jeffrey Bentz of Cushman & Wakefield ("Brokers").   Seller shall be solely responsible for paying all sales commissions to Brokers pursuant to a separately negotiated agreement and Seller shall indemnify Purchaser from any claim related to a commission or fee as a result of the transaction contemplated herein.

12.19   Exclusivity.   Seller agrees not to enter into any negotiations, talks or make any offers to or accept any offers from any party with respect to the purchase, sale, or lease of the Property from the Effective Date, during the Due Diligence Period, and during the Closing Period.

12.20   Purchaser and Buyer. When used in this Agreement or any document concerning the parties to this Agreement, the terms "Purchaser" and "Buyer" shall have the same meaning and be used interchangeably.

12.21   Section 1031 Like-Kind Exchange. Either Seller or Purchaser may consummate the purchase of the Property as part of a so-called like kind exchange (the "**Exchange**") pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended (the "**Code**"), provided that: (a) the Closing shall not be delayed or adversely affected by reason of the Exchange nor shall the consummation or accomplishment of the Exchange be a condition to Purchaser's or Seller's obligations under this Agreement; (b) either Seller or Purchaser may effectuate the Exchange through a qualified intermediary so long as neither of their respective rights and obligations under this Agreement are adversely affected thereby; and (c) neither Seller nor Purchaser shall be required to make an assignment of the purchase agreement for the exchange property or be required to acquire or hold title to any real property for the purposes of consummating the Exchange. Neither Seller nor Purchaser shall, by this agreement or acquiescence to the Exchange, (i) have their rights under this Agreement adversely affected or diminished in any manner, or (ii) be responsible for compliance with or be deemed to have warranted to the other that the Exchange in fact complies with Section 1031 of the Code.

12.22   Prohibited Persons and Transactions. Each party represents and warrants to such party's knowledge: (i) it is not a Prohibited Person (defined below); (ii) none of its investors, affiliates or brokers or other agents (if any), acting or benefiting in any capacity in connection with this Agreement is a Prohibited Person; (iii) with respect to Purchaser only, the funds or other assets Purchaser will transfer to Seller under this Agreement are not the property of, or beneficially owned, directly or indirectly, by a Prohibited Person; and (iv) with respect to Purchaser only, the funds or other assets Purchaser will transfer to Seller under this Agreement are not the proceeds of specified unlawful activity as defined by 18 U.S.C. § 1956(c)(7). "**Prohibited Person**" means any of the following: (a) a person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing (effective September 24, 2001) (the "**Executive Order**"); (b) a person or entity owned or controlled by, or acting for or on behalf of any person or entity that is listed in the Annex to, or is otherwise subject to the provisions of, the Executive Order; (c) a person or entity that is named as a "specially designated national" or "blocked person" on the most current list published by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") at its official website, http://www.treas.gov/offices/enforcement/ofac; (d) a person or entity that is otherwise the target of any economic sanctions program currently administered by OFAC; or (e) a person or entity that is affiliated with any person or entity identified in clause (a), (b), (c) and/or (d) above. The foregoing representations shall survive Closing and any termination of this Agreement.

## 13.    ESCROW AGREEMENT

13.1    Deposit. Title Company agrees to deposit the Deposit in an interest-bearing account, subject to the receipt from Purchaser of a form W-9 for the purposes of investing said funds and to hold and disburse said funds, and any interest earned thereon, as hereinafter provided. Upon written notification from Seller and Purchaser in accordance with the terms of this Agreement, Title Company shall release the funds in accordance with and pursuant to the written instructions. In the event of a dispute between any of the parties hereto sufficient in the sole discretion of Title Company to justify its doing so, Title Company shall be entitled to tender unto the registry or custody of any court of competent jurisdiction all money or property in its hands held under the terms of this Agreement, together with such legal pleading as it deems appropriate, and thereupon be discharged.

13.2    Title Company. Seller and Purchaser covenant and agree that in performing any of its duties under this Agreement, Title Company shall not be liable for any loss, costs or damage which it may incur as a result of serving as Title Company hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence. Accordingly, Title Company shall not incur any liability with respect to (i) any action taken or omitted to be taken in good faith upon advice of its counsel given with respect to any questions relating to its duties and responsibilities, or (ii) to any action taken or omitted to be taken in reliance upon any document, including any written notice of instruction provided for in this Agreement, not only as to its due execution and the validity and effectiveness of its provisions, but also to the truth and accuracy of any information contained therein, which Title Company shall in good faith believe to be genuine, to have been signed or presented by a proper person or persons and to conform with the provisions of this Agreement.

13.3    Indemnity. Seller and Purchaser hereby agree to indemnify and hold harmless Title Company against any and all losses, claims, damages, liabilities and expenses, including without limitation, reasonable costs of investigation and attorneys' fees and disbursements which may be imposed upon or incurred by Title Company in connection with its serving as Title Company hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence. The provisions of this Section 13.3 shall survive a termination of this Agreement.

*[Signature Pages Follow]*

- 20 -

**IN WITNESS WHEREOF,** Purchaser and Seller have executed this Agreement on the dates set forth below, effective as of the date first set forth above.

SELLER:

**Interstate Underground Warehouse, LLC,** a Missouri limited liability company

By: _____

Name: Leslie Reeder

Title: Manager

Date: 29 September 2020


PURCHASER:

**Somera – MTP Holdings, LLC,** a Delaware limited liability company

By: _____

Name: Fergus Campbell

Title: Authorized Signatory

Date: 9/30/2020

## ACKNOWLEDGEMENT BY TITLE COMPANY

**IN WITNESS WHEREOF,** Title Company has signed this Agreement for the limited purposes set forth herein.

**TITLE COMPANY:**

**FIRST NATIONWIDE TITLE ~~INSURNAC COMPANY~~** AGENCY, LLC

By: _____
Name: MICHAEL A. SCOTT
Title: NATIONAL UNDERWRITING COUNSEL
Date: 9/30/2020

Address for Notices to Title Company:

Michael A. Scott
National Underwriting Counsel
First Nationwide Title Insurance Company
220 East 42nd Street
24th Floor
New York, NY 10017
Tel: 646.386.2688
Michael.Scott@amtrustgroup.com