**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| In Re:  INTERSTATE UNDERGROUND WAREHOUSE AND INDUSTRIAL PARK, INC. | ) ) ) ) | Case No. 21-40834-DRD-11  Chapter 11 |
| Debtor | ) | |

**OBJECTION BY CREDITOR WAYNE REEDER TO DEBTOR'S DISCLOSURE
STATEMENT AND CHAPTER 11 PLAN
(CHAPTER 11 PLAN AND FIRST AMENDED CHAPTER 11 PLAN)**

COMES NOW Creditor Wayne Reeder ("Reeder"), by and through counsel, and hereby objects to the Debtor's Disclosure Statement (Doc. #325), Chapter 11 Plan (Doc. #324), and the First Amended Chapter 11 Plan (Doc. #369). For his objection, Reeder states as follows:

1. Reeder incorporates the objections raised by the Office of the United States Trustee in its objection (Doc. #378).

2. Reeder further objects to the documents for the following additional reasons:

    a. The Disclosure Statement

The Disclosure Statement provides scant details about the business operations of the Debtor. The Disclosure Statement fails to disclose the claims Reeder asserted in the Circuit Court of Jackson County, Missouri pre-petition against the Debtor and the Debtor's principals. It also fails to acknowledge that Reeder was de facto operator of the Debtor from 1993-March 2020, notwithstanding the terms of Reeder's divorce from Sammy Jo Reeder and Reeder's departure as an official officer and director. Reeder in his capacity took steps including solicitation of bids for new infrastructure as well as preparations for income tax filings for the Debtor for the tax years 2018 and 2019 that have not been used or incorporated. The Debtor elected not to use these returns prepared for a CPA that had worked with the Debtor since the late 1970s.

The Disclosure Statement also references the need for a new freezer system.  However, the Disclosure Statement fails to explain why – outside of the projected $40,000 per month the Debtor projects to spend on freezer repair.  The freezer is a critical component of any viable business moving forward because the new refrigeration system uses ammonia, rather than freon (or R-22).  As of January 2020, freon is banned from production and import (see, e.g., [https://www.epa.gov/sites/default/files/2015-07/documents/phasing_out_hcfc_refrigerants_to_protect_the_ozone_layer.pdf](https://www.epa.gov/sites/default/files/2015-07/documents/phasing_out_hcfc_refrigerants_to_protect_the_ozone_layer.pdf), accessed 3/4/2022).  There are environmental costs as well as significant potential regulatory concerns to operating a freon-based refrigeration system, and these costs would be tremendous and are unaccounted for if any violations are discovered.  Therefore, one of two things will happen: (1) the Debtor will need to borrow more money to retrofit the system or (2) the Disclosure Statement and Plan severely underestimate the costs to obtain freon.

Further, the need for the refrigeration upgrade is significant because the Debtor's plan relies on refinancing within a year (or, failing that, a balloon plan after 3 years).  As a practical matter, a lender who performs a through inspection would be unlikely to lend to a company without the means to proceed with legal and cost-effective refrigeration.  As a going concern, a business that relies on a system for nearly half of its monthly income is a high risk if the system is outdated and the Debtor is disinterested in investing in modernization.

The Disclosure Statement references a quote for an upgrade of the freezer system and electrical system, yet fails to identify an amount or any financing terms.  Mr. Reeder, on behalf of the Debtor, obtained a quote for this work in January 2019.  At the time, notwithstanding 3 years of further deterioration and the challenges of finding labor and materials during the COVID-19 pandemic, the quote for the work, exclusive of freight and tax, exceeded over $2.6 million, with 30% due on equipment.  However, the costs have increased.  A quote prepared by the same company for Leslie Reeder in June 2020 (attached) came back at a higher amount.

Excluding taxes and numerous other potential costs, the bid calls for <u>at least</u> $3,400,000, with $1,36 million as a down payment (attachment, P. 5 of 9).  The total overall costs (including the excluded items) could range from $5 million to $7 million,  The Debtor does not propose to fund these repairs and instead suggest spending over $2.6 million for "Repairs Freeze"  (Doc 325-1, Exhibit A projections).

This is not the strategy of a company that is looking to operate long term, but one that is looking to drain its remaining cash and assets and ultimately liquidate. In short, the Debtor has lacked the cash flow necessary to commit to this project and, based on the cash flow projections submitted, will continue to do so for the foreseeable future.

Finally, without completed income tax returns for the years 2018-2020, creditors are unable to determine if the cash flow projections submitted are realistic and feasible, with or without a new freezer. At a minimum, the Debtor should bring itself current on its severely delinquent obligation to file tax returns before asking this Court to confirm a plan of Reorganization based on speculation. Reeder has concerns about potential tax consequence in the future when losses generated by LLCs in which the Debtor holds interests are no longer available as shelters to offset income. Without accurate financials and time to review them, creditors cannot possibly rely on the representations of 5 year old returns and rough outlines of current returns.

b. <u>Chapter 11 Plan/First Amended Chapter 11 Plan</u>

As to class 13 claims including Reeder's, the treatment in both plans is substantially the same. Both plans fail the absolute priority rule and the Debtor has not demonstrated that class 13 has accepted the plan.

As stated above, the problems that lie within the details of the Disclosure Statement and cash flow projections suggest that the Debtor is unable to proceed without liquidation. Even more troubling may be the proposed payroll. The Debtor proposes to contribute approximately $5 million to Payroll over 2022-2026. This is not broken down and almost certainly includes payments to insiders. Leslie Reeder is paid $7,000 per month ($3,000 biweekly) plus a living expense amount of $8,000 per month, Sammy Jo Reeder is paid over $7,000 per month, and Stacy Reeder $3,250 per month, according to the Interim Order Authorizing the Debtor to Pay Pretition Wages and Workforce Obligations (Doc. #35).

Upon information and belief, neither Sammy Jo nor Stacy Reeder reside in the metropolitan Kansas City area. In her Rule 2004 examination, Sammy Jo Reeder testified that she hasn't been to the Debtor's business location in over 20 years. Neither is essential to the continued operations of the Debtor. Furthermore, while it is understandable that the Debtor would seek to maintain its personnel

and its leadership, it should not and cannot do so at the expense of payments to unsecured creditors. These payments to the Reeders collectively total $25,000 per month, or $1.5 million over a five year plan.  This is particularly troubling because of the proposed timetable for refinancing, upon which the unsecured creditors would be left without recourse if the plan fails.

The bigger concern lies with 11 U.S.C. §1129(a)(11).  Even if the Debtor addresses the proof of claim of the Internal Revenue Service and the Court sets aside the discrepancies between the Debtor's projected tax liability and the claimed liability, the Debtor does not have the financial capacity to survive under its Plan.  The Debtor proposes to refinance Woodmen within one year of confirmation, yet does not detail any attempts to do so or provide any specifics.  If that plan fails, the Debtor simply prepares to maintain the status quo for three years, deferring the issue.  Unfortunately, as it has done by failing to address its refrigeration and other infrastructure, the Debtor only puts itself in a worse financial situation by leaving its financing in question and paying premiums to struggle while failing to address its critical needs for the future.  The operators of the Debtor would, under the plan, maintain their interests without any apparent contributions of their own, to the detriment of the unsecured creditors.  This would be true even if the Debtor had capital (which it does not propose to obtain, either through capital contributions by its leadership or debtor-in-possession financing) to provide the upgrades it needs to secure the refinance.  This may explain why the Plan and Disclosure Statement are extremely vague on details.

It is simply unreasonable to assume that a lender, seeing a system that hasn't been retrofitted, a system that generates approximately 40% of the Debtor's monthly revenue, to agree to a refinance without a complete overhaul to address the freon ban and any further concerns.  At a Rule 2004 examination, Leslie Reeder testified regarding the freezer that "The freezer is 50 years old, it's in a state of disrepair.  It needs to be replaced with an ammonia brine system. It has decades of deferred maintenance. It's just a very, very old failing freezer (Rule 2004 exam, P. 75, Lines 13-17). Unfortunately, the Debtor's plan does not address this situation.

Conclusion

Together with the conflicting financial testimony addressed by the United States Trustee, the lack of detail and feasibility of this Plan – either in its original form or the Amended Plan filed less than a week ago – should be sufficient for this Court to deny confirmation.

WHEREFORE, Reeder respectfully joins the United States Trustee in its objection and requests this court enter an order Denying confirmation of the Debtor's Disclosure Statement, its Chapter 11 Plan (if not withdrawn) and First Amended Chapter 11 Plan, and for any further relief deemed appropriate by this Honorable Court.

Dated: March 4, 2022

Respectfully submitted,
WM Law

s/ Ryan A. Blay
Ryan A. Blay, MO #KS001066; KS #28110
15095 W. 116th St.
Olathe, KS 66062
Phone (913) 422-0909 / Fax (913) 428-8549
blay@wagonergroup.com
bankruptcy@wagonergroup.com
COUNSEL FOR CREDITOR WAYNE REEDER

## CERTIFICATE OF SERVICE

I hereby certify that on March 4, 2022, the foregoing Objection was served upon all parties receiving electronic notification.

s/ Ryan A. Blay