IN THE UNITED STATES BANKRUPTCY COURT FOR
THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| In Re: | ) |
| | ) |
| INTERSTATE UNDERGROUND WAREHOUSE | )   Case No.  21-40834-drd11 |
| AND INDUSTRIAL PARK, INC., | ) |
| | ) |
| Debtor. | ) |

<u>DEBTOR'S **SECOND AMENDED** DISCLOSURE STATEMENT</u>

I. INTRODUCTION

This Second Amended Disclosure Statement ("Disclosure Statement") is provided to the creditors of Interstate Underground Warehouse and Industrial Park, Inc. ("IUW" or "Debtor"), to enable the creditors to arrive at an informed judgment in exercising their rights under the Debtor's Third Amended Plan of Reorganization (the "Plan"). The definitions of Article I of the Plan shall have the same meaning when used in this Disclosure Statement.

The function of this Disclosure Statement is to provide "adequate information" to all creditors.  "Adequate information" is defined in 11 U.S.C. '1125 as follows:

**<u>Section 1125.  Postpetition disclosure and solicitation.</u>**

"(a)     In this section --

(1)     'adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor; and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan...; and

(2)     'investor typical of holders of claims or interests of the relevant class' means investor having --

(A)     a claim or interest of the relevant class;

(B)     such relationship with the debtor as the holders of other claims or interests of such class generally have; and

(C)     such ability to obtain such information from sources other than the disclosure required by

this section as holders of claims or interests
in such class generally have."

THE REPRESENTATIONS MADE IN THIS DISCLOSURE STATEMENT ARE THE ONLY REPRESENTATIONS AUTHORIZED BY THE DEBTOR RESPECTING ITS BUSINESS OPERATIONS, THE VALUE OF ITS PROPERTY OR ANY OTHER MATTERS WHATSOEVER. CREDITORS SHOULD NOT RELY ON ANY UNAUTHORIZED REPRESENTATIONS WHICH ARE MADE TO SECURE THEIR ACCEPTANCE OR REJECTION OF THE PLAN. THE COURT WILL CONDUCT A HEARING ON WHETHER OR NOT THIS DISCLOSURE STATEMENT SHOULD BE APPROVED AS CONTAINING ADEQUATE INFORMATION TO ENABLE ALL CREDITORS TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

The information provided in this Disclosure Statement is true and accurate to the best of the Debtor's knowledge, information, and belief.  However, certain information relating to projections and values is necessarily subjective.

CREDITORS ARE ENCOURAGED TO CONSULT WITH THEIR FINANCIAL ADVISORS, ATTORNEYS, AND OTHER CREDITORS IN ORDER TO OBTAIN A MORE COMPLETE UNDERSTANDING OF THE FINANCIAL AND LEGAL IMPLICATIONS OF THE DISCLOSURE STATEMENT AND THE PLAN.  CREDITORS AND PARTIES IN INTEREST SHOULD CONSULT THEIR OWN COUNSEL AND TAX ADVISORS REGARDING THE INCOME TAX CONSEQUENCES OF CONFIRMATION OF THE PLAN AS IT RELATES TO THEM. THE DEBTOR MAKES NO REPRESENTATION REGARDING THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AND INTERESTS.

Creditors may contact counsel for the Debtor for additional information. The counsel for the Debtor can now provide tax returns for (fiscal years) 2017 through 2020. These tax returns have now been completed and filed. The tax returns recently prepared reflect the activity of the Debtor June 1, 2017 through May 31, 2021.  The next fiscal year (6/1/21-5/31/22) hasn't ended and the returns are not yet due.  Debtor's counsel can also provide Monthly Operating Reports.

Attached to this Disclosure Statement are Historical Information (**Exhibit A**) from 2017 to the present (based upon fiscal years) as well as Projections for 2022-2026 (based upon annual years) as **Exhibit B**.

The Court will probably conditionally approve the Disclosure Statement and set a hearing on confirmation of the Plan and final approval of the Disclosure Statement. When the Court sets a hearing for confirmation of the Plan and final approval of the Disclosure Statement, the Debtor's counsel will mail a copy of the Plan, Disclosure Statement, Ballot, and Notice of the hearing to all creditors. At the confirmation hearing, the Court will determine whether the Disclosure Statement provides adequate information. At the confirmation hearing, the Court will determine whether the Plan has been accepted by the requisite number of classes of creditors and will rule on whether the Plan complies with the confirmation requirements of 11 U.S.C. §1129.

The Plan will have several Classes of Claims and each creditor should examine those Classes to determine where its Claim has been placed. A Class of Claims will have accepted a Plan if the Plan has been accepted by creditors [other than any entity designated under 11 U.S.C. §1126(e)] which hold at least two-thirds in amount and one-half in number of the Allowed Claims of such Class held by creditors [other than any entity designated under 11 U.S.C. §1126(e)] that have voted to accept or reject the Plan.

If the Plan is accepted by the impaired Classes, it will likely be confirmed. If the Plan is not accepted by the impaired Classes, the Plan may nonetheless be confirmed under §1129(b) of the Bankruptcy Code if it is accepted by at least one Class of Claims or interests which is impaired by the Plan and the Bankruptcy Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or interests that is impaired by, and has not accepted, the Plan. The Debtor reserves the right to request that the Court confirm the Plan under §1129(b) of the Bankruptcy Code if the Plan is not accepted by all impaired Classes and, if necessary, to revise and amend the Plan so as to provide such treatment as the Court may determine to be necessary or sufficient to assure that the Plan does not discriminate unfairly, and is fair and equitable, with respect to any Class of Claims or interests rejecting or failing to accept the Plan.

## II. ORGANIZATION AND HISTORY OF THE DEBTOR

IUW was established on February 23, 1978 as Callaway Mining Company with the Missouri Secretary of State by Michael C. Kirk. The initial directors were Wayne Reeder, Warren Reeder and Freida Cribbs. On January 13, 1989, the name of the company was changed to Interstate Underground Warehouse and Industrial Park, Inc.

In 1992, Wayne Reeder and his wife Sammy Jo Reeder divorced. The outstanding stock of IUW, which was previously owned by both spouses, 50% by each, was transferred to Sammy Jo Reeder, so that she owned and continues to own 100% of the outstanding stock. Wayne Reeder had been an officer in 1992 but Sammy Jo Reeder was the sole director in 1992.

The annual registration report filed in 1993 reflects the departure of Wayne Reeder as an officer and director. From 1993 to March, 2020, Wayne Reeder was allowed to consult with the existing management of the Debtor's business. In March 2020, Wayne Reeder was terminated from his role and since then, has had no role as a manager, employee or consultant.

The corporation owns land at 8301 East 23rd Street, Kansas City, Missouri. The land is primarily limestone caves, and the company leases its space to individuals and companies. The caves are conveniently located at I-435 and 23rd Street, north of the I-70 Interchange and east of downtown Kansas City, Missouri.

The Debtor offers three million square feet of dry storage in a constant environment, nearly 250,000 square feet of cooler space, and more than 500,000 square feet of freezer space.

Debtor has been recognized as a leader in frozen food storage. Debtor offers self-storage with a wide range of units as well as self-storage for vehicles, RVs, and boats.

## III. GROWTH TRENDS FOR THE DEBTOR

A. Marketing/Advertising

Debtor has embarked on a new marketing and advertising campaign to attract new customers, targeting commercial customers who might be able to rent larger space and at a higher rate.

Debtor has made and is continuing to make improvement to its infrastructure which includes (i) new lighting, (ii) painting, (iii) cleaning and (iv) signage to create a new and fresh image.

Debtor has revised its pricing in leased areas and vehicle storage areas to reflect current market rates.

Debtor has repurposed areas that were previously unleased or under-utilized and is continuing this process. To illustrate the expansion of usable leased space, Debtor has, since August, 2021, leased approximately 100,000 of newly prepared space with another 339,833 of available space added to the existing inventory of leasable space.

B. Shortage of Leasable Commercial Space

As a result of the COVID 19 crisis, the market for commercial warehouse space has changed dramatically. This began in early 2020. Many businesses moved away from brick-and-mortar stores and began warehousing their products in facilities like the Debtor's. There was an increase in construction for housing and remodeling that caused a huge demand in the construction industry for materials. Also, because of supply chain problems, many suppliers purchased materials beyond their immediate need for future use and needed to stockpile those materials in warehouse facilities.

Further, the extent of available leased space decreased significantly in July, 2021 when the Leeds Warehouse facility suffered a huge fire and was permanently closed. It had about 1.5 million square feet of storage space. That facility was close by the Debtor's operation and Debtor's operation became a convenient substitute for the Leeds facility. Debtor obtained a number of customers who had previously utilized the Leeds facility.

Debtor leased from July, 2021 through April, 2022, approximately 150,000 square feet and has renovated/repurposed another 200,000 square feet which is now available for lease.

C. Development/expansion of cave space—mining

Construction materials that are in high demand include rock and gravel. The Debtor's facilities have areas that are unmined and could be leased to a mining company. Debtor would obtain royalties from the mining company. The Debtor estimates that a mining company could go

down 8-12 feet for winterset rock.

## IV. TROUBLE THAT CAUSED DEBTOR TO SEEK BANKRUPTCY PROTECTION

Leslie Reeder arrived in Kansas City to inspect the Debtor's property. Sammy Jo Reeder, the sole owner, was very concerned as she had learned that payroll was not current. Further, Wayne Reeder was attempting to have Sammy Jo Reeder sign a personal guaranty for a $12,000,000 loan to consolidate all debts of the Debtor and a number of subsidiary debts. Leslie Reeder discovered the Debtor was in dire financial condition with numerous unpaid bills, all loans were in default. Further, loans of the subsidiaries were similarly in default. Wayne Reeder, who represented himself as an owner and/or manager, caused Debtor to guarantee loans such as to Citizens Bank & Trust Company (approximately $8,000,000) without Sammy Jo's knowledge or consent.

Wayne Reeder created Park Reserve, LLC, a wholly owned subsidiary of the Debtor. Park Reserve, LLC purchased property near 31st and Main, Kansas City, Missouri (the old Trinity Lutheran Hospital site) in approximately 2008. Park Reserve, LLC constructed condominium units to sell to the general public. It was initially planned for 267 units and a three-year target to sell all 267 units. However, by mid 2019, when the garage was condemned by the City of Kansas City, and a large number of lawsuits were filed by condo owners and the Homeowners' Association, only 76 units had been sold (in 11 years). As a result of gross mismanagement and numerous construction defects, the Debtor and others were sued along with Park Reserve, LLC. The Debtor was forced to retain counsel to defend these cases. A huge liability to the Debtor was the result of Wayne Reeder allegedly guarantying the Park Reserve LLC loan with Citizens Bank & Trust (approximately $8,000,000). Citizens Bank & Trust filed for a receivership in the Circuit Court of Jackson County, Missouri and is attempting to sell the property for $8,000,000, which may result in a deficiency amount that the Debtor would owe as an unsecured creditor.

There were fires in September, 2018 and October, 2018, while Wayne Reeder was purporting to manage the Debtor's business. The fires caused extensive damage to property of tenants. The insurance coverage for the tenants' losses is insufficient to cover all claims and multiple lawsuits were filed against the Debtor for these damages. The litigation caused Debtor to retain legal counsel and expend substantial legal fees to defend these and other actions. Moreover, the fires were devastating to Debtor's reputation. Debtor believes it has now rehabilitated its reputation with the quality of its leased space and contracting with credit-worthy tenants.

Due to Wayne Reeder's mismanagement, debt service was delinquent as stated above. Woodmen instituted a foreclosure action in 2018. Loans with high interest rates were taken out to bring the Woodmen loan current. To bring the Woodmen loan current, the Debtor paid $229,039.31 (which included $20,129 of attorneys' fees for the Woodmen attorneys). Similarly, the Andersons threatened to foreclose and the Debtor was forced to enter into multiple forbearance agreements with the Andersons. Each time, the Debtor was forced to pay fees for the forbearance agreements.

When Leslie Reeder took over in March, 2020, she discovered many bills had not been timely paid. As an example, the electric company was owed in excess of $75,000 and service was threatened to be disconnected. If it had been disconnected, it would have effectively destroyed the entire property and created a loss of all tenants.

## V. IMPROVEMENTS NEEDED TO MAINTAIN AND GROW REVENUE

The existing freezer system is over 50 years old and in disrepair, both due to its age and because it was very poorly maintained by the previous management. It uses a R22 Freon operating system which is outdated and expensive to operate and is available for purchase only as a recycled product at this time.

Wayne Reeder, in his objection to the original Disclosure Statement, complained that the freon system like Debtor's were no longer produced or imported. However, Wayne Reeder's objection failed to recognize that Freon R22 systems are still widely used today because repurposed freon is available and is lawful to use.

The cost of the freon is factored into the $40,000 per month cost of maintaining the refrigeration system. The Debtor has made repairs which has allowed a substantial reduction in the freon use and costs. Previously, the Debtor was ordering freon once a month at $30,000 per purchase. Since Leslie Reeder has taken over as CEO, the freon usage is substantially less and the Debtor only needs to order freon every six months which is a considerable savings for the Debtor.

The Debtor has bids for a new, efficient freezer using an ammonia/brine cooling system. This system is able to maintain consistently lower temperatures with greater energy efficiency. The cost of this system is approximately $3,500,000. with a construction period of approximately 9 to 12 months. Additionally, there will be electrical and mechanical upgrades in the amount of approximately $600,000. Many of the repairs have begun with the purchase of a new compressor and new motor.

Wayne Reeder in his objection to the First Disclosure Statement misrepresented the cost of this new system. The aggregate cost of the new freezer system (with the needed lectrical/mechanical upgrades) is approximately $4,100,000. The company who will build and install the new system is Custom Refrigeration Solutions owned by Terry Williams. Mr. Williams has an excellent reputation in his very specialized field and is considered an expert in the industry. He has intimate and detailed knowledge of Debtor's existing system and has been responsible for the extensive repairs, enabling the existing system to keep operating and performing to the best of its current ability.

Debtor's projections (See **Exhibit B** to this Disclosure Statement) confirm that when Woodmen and Andersons are paid off in 2026, the Debtor will have as much as $900,000 available to cover a down payment for the new refrigeration system.

Debtor currently budgets $40,000 per month for maintenance and repairs to the existing R22 freezer system. The installation of the ammonia /brine system would eliminate this expenditure

entirely as the system will be covered by a warranty. Further, Debtor's existing freezer tenant, KC Cold Storage pays a base rent of $127,500 with an electrical reimbursement of $15,000. The reimbursed amount is not equal to the electricity used by the current system. Upon installation of the new system the freezer system will be separately metered and the tenant assumes the entire cost of the power to run the system, thereby eliminating a combined monthly expense of approximately $45,000.

## VI. FINANCING

Debtor would either seek a new loan which would pay off the existing lender Woodmen of the World Insurance Society ("Woodmen") or would increase its monthly payments so that the Woodmen loan could be paid off in the three (3) years allotted in the Plan. Woodmen's current loan balance is just at $2,000,000. Debtor intends to either borrow sufficient funds to pay off the Woodmen debt ($2,000) and finance the purchase/installation of the new freezer and electrical systems ($4,100,000) or payoff the Woodmen debt and only finance the new systems ($4,100,000). Further, Debtor would hope to include up to an additional $1,000,000 for other secured debt (any potential balance owed to Andersons and the balance owed to Optima, LLC), resulting in a maximum loan of $7,000,000, or if Woodmen is paid off before the loan is obtained, the Debtor would only need to borrow $4,100,000.

Leslie Reeder has had extensive contacts with institutional lenders as well as private equity firms and individuals, both in the United States and abroad. Over the past 2 years, the contacts and conversations between Ms. Reeder and the potential lenders have yielded favorable responses, with one major concern: the multitude of lawsuits and the loan guarantee of the Park Reserve debt owed to Citizens Bank. The guarantee of the Park Reserve debt was put in place by Wayne Reeder, when he had apparent (but not actual) authority to act as a manager. Further, Wayne Reeder filed a lawsuit against the Debtor and his family members in the Circuit Court of Jackson County, Missouri. That lawsuit is still pending as to the family members but the Debtor has now been dismissed.

Absent this bankruptcy the loan with Woodmen would have come due April, 2022. The Plan extends the loan until 2025. The Debtor will search for a new lender but the Plan calls for up to an additional three years with this lender in the event that the Debtor experiences difficulty obtaining replacement financing (combined with financing for the replacement of the refrigeration system and the electrical upgrades).

## VII. INCOME NECESSARY TO FUND PLAN AND REFINANCE LOANS

The Debtor currently has close to 400,000 square feet of unleased space. Debtor has spent the past 18 months renovating unleased and it is now in leasable condition. Debtor's current rates for leased space average $0.40 cents per foot. This is a very competitive price in the Kansas City area. In the Kansas City area, warehouse available space in at its lowest inventory in years due to current economic conditions, placing the Debtor in an ideal position to easily lease up these new areas.

When fully leased, these areas will generate an increase in income of approximately $140,000 per month. Debtor estimates an absorption period of approximately 12 to 18 months to lease the entire 400,000 square feet now available. Debtor has launched an aggressive marketing program that is enjoying tremendous success.

As for future development, Debtor has over 500,000 square feet of undeveloped, mined space that can easily be repurposed for agricultural and botanical tenants. Further, there are vast unmined areas of property that could be reopened for mining purposes as the demand for rock and gravel is extremely high due to the prevailing construction market.

Debtor has complete confidence in its ability to reduce expenses, substantially increase revenues and to create new revenue streams in order to secure new financing and to move forward into a new era of success and prosperity for its business.

## VIII. HISTORICAL DATA

The Debtor has provided a detailed chart of its income and expenses for the fiscal years (6/1/17-5/31/21) of 2017, 2018, 2019 and 2020. The 2020 fiscal year runs from 6/1/20-5/31/21. The 2021 fiscal year has not yet completed. See the Chart attached to this Disclosure Statement as **Exhibit A.** Also, **Exhibit A** includes Balance Sheets and Income Statements for fiscal years ending 5/31/19, 5/31/2020 and 5/31/21. Also attached as part of **Exhibit A** are the Income Statement and Balance Sheet ending 2/28/22, which covers the first eight (8) months of operation after the filing of the bankruptcy.

## IX. THE CONFIRMATION PROCESS

Approval of the Plan requires that it be confirmed by the Court. Confirmation can be achieved in one of two ways - either (i) all classes of Claims or Interests entitled to vote have accepted the Plan by the requisite majorities, or (ii) the Court determines that the Plan is fair and equitable with respect to those Classes that have rejected the Plan, and that confirmation will be in the best interests of creditors.

A. <u>Classification of Claims and Eligibility to Vote.</u> For voting purposes, all Claims and Interests will be grouped into Classes where members of each such Class will hold substantially similar Claims or Interests. All persons with an impaired Claim are eligible to vote provided that they are determined to have an Allowed Claim or Interest. A Class is "impaired" if, under the Plan, its legal, equitable or contractual rights are in any way modified other than by curing defaults or payment in full on the Effective Date. Claims that are not impaired are presumed to have accepted the Plan and may not vote.

B. <u>Confirmation by Acceptance.</u> A Plan will be confirmed if it is accepted by all Classes entitled to vote. A Class will have accepted the Plan if votes representing at least two thirds of amount and one half in number of the Allowed Claims voting in that Class have voted to accept the Plan. If any creditor in an otherwise accepting Class have voted against the Plan, the Court must determine that each holder of a Claim or Interest in that Class will receive property, as

of the Effective Date, having a value that is not less than what such holder would receive if the Debtor was liquidated under Chapter 7 on that date.

      C.      <u>Confirmation Without Acceptance by All Classes</u>.  If the Plan is not accepted by all impaired Classes, the Court may nonetheless confirm the Plan if (i) at least one impaired Class has accepted the Plan, without counting votes by insiders, and (ii) the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired Class that has rejected the Plan.

      D.      <u>Balloting</u>.  This Disclosure Statement will be mailed to all creditors and equity holders along with the Plan, a ballot and an order containing instructions, setting certain deadlines, and setting a hearing on confirmation. Only those ballots timely filed will be counted.

      E.      <u>Confirmation</u>.  At the hearing on confirmation the Court will determine whether the requisite number of votes have been received for confirmation under the acceptance method or, if the Plan is not accepted by all Classes, then whether the Plan should be confirmed under the non-acceptance method.  The Debtor reserves the right to seek confirmation under the non-acceptance method if less than all Classes vote to accept the Plan. The effect of confirmation generally is to discharge the Debtor from any and all liabilities that arose prior to confirmation, except as provided in the Plan.

## X. DISCLOSURES OF COMPENSATION

      A.      Krigel & Krigel, P.C., the attorneys for the Debtor, were paid an initial retainer of $35,000.  Additional sums of $25,000 were paid 1/18/22, 2/7/22, 2/28/22 and 4/12/22, totaling $100,000. Portions of these sums have been paid to the firm per the Court's prior order to pay monthly. The remainder of the retainer is presently held in the firm's trust account.

      B.      Leslie Reeder presently acts as CEO and is paid $3,000 every two weeks. She works full-time at the cave facility and works an average of 50 hours per week.

      Sammy Jo Reeder, the sole shareholder, works remotely from her home from 10-20 hours per week.  She reviews and approves all of Debtor's business decisions and reviews all correspondence (including email) relative to Debtor's business decisions. She is updated daily on business activities, litigation matters and matters relating to the subsidiaries of the Debtor. She previously earned $3,000 every two weeks and has agreed to reduce her salary to $1,500 every two weeks.

      Stacy Reeder Robinson also works remotely from her home from 10-15 hours per week.  She similarly reviews and approves all of Debtor's business decisions and reviews all correspondence (including email) relative to Debtor's business decisions. She is updated daily on business activities; litigation matters and matters relating to the subsidiaries of the Debtor. She previously earned $1,500 every two weeks and has agreed to reduce her salary to $375 every two weeks.

    C.    The Debtor has paid and is current with its U.S. Trustee Quarterly Fees.

V. THE CHAPTER 11 PLAN

The Chapter 11 Plan provides for payment to all creditors.

    A.    <u>Classification of Claims</u>.  The claims of creditors are classified as follows:

        5.1.    Class One includes the claim of Woodmen of the World Life Insurance Society ("Woodmen"), secured by a senior deed of trust on the Debtor's real estate and a senior lien on all of Debtor's personal property, including all equipment, inventory, accounts receivable, contract rights and general intangibles. As of July 1, 2021, the principal balance was $2,269,303.25 and the accumulated interest was $12,805.62, for a total of $2,282,108.87. The Promissory Note is dated 3/19/07, and was the current extension of the original loan taken out in May, 1996. The outstanding Note presently matures April 1, 2022 and bears interest at the rate of 6.81% per annum. The Plan proposes to refinance this loan and gives the Debtor three (3) years to complete the refinancing.

        5.2.    Class Two includes the claim of C. Floyd and Sharon Anderson ("Anderson"), secured by a junior Deed of Trust on Debtor's real estate. The amount of the Anderson's Claim is the sum, as of October 31, 2021, is $3,822,800 plus a claim for attorneys' fees of $25,000. The Promissory Note was executed by a wholly owned subsidiary Interstate Underground Warehouse LLC, which pledged its real estate (known as the Weld Wheel properties. The Harrisonville Senior Care Center LLC also pledged its real estate to secure said Note. The subsidiary Interstate Underground Warehouse LLC sold its real estate in late December 2021 and the Anderson's debt was reduced to $$863,228. The Debtor is assisting Harrisonville Senior care Center LLC with the sale of its real estate and if sold, the Debtor is hopeful that sale will fully pay this claim. The claim against this Debtor is contingent.

        5.3    Claim Three includes the claim of Optima, LLC, secured by a junior Deed of Trust on Debtor's real estate. The amount of Optima's Claim is the sum, as of July 1, 2021, is $604,750.83.  That amount was disputed. The parties have reached a settlement and the Debtor will pay the settled amount of $273,169.20 with interest at 5% per annum, payable over twenty (20) years.

        5.4    Claim Four includes the claim of Ford Motor Credit ("Ford") (Claim #2), secured by a 2019 Ford Edge, VINxxx61451. The amount owed to Ford, as of 7/1/21, was $20,783.23 plus attorneys' fees. There is no interest on this loan. The Debtor is required to pay $593.82 for 59 months and $593.35 for the 60th month. The loan is extended to pay off the attorneys' fees at the $593.82/month. The loan should pay off by 5/8/25.

        5.5    Claim Five includes the claim of Ford Motor Credit ("Ford") (Claim #3), secured by a 2019 Ford Transit Van, VIN xxx96022.The amount owed to Ford, as of 7/1/21, was $11,932.29 plus attorneys' fees. The interest rate on this loan is 9.59% per annum. The Debtor is

required to pay $435.66 for 60 months. The loan is extended to pay off the attorneys' fees at the $435.66/month. he loan should pay off by 1/27/25.

   5.6 Claim Six includes the claim of Citizens Bank & Trust Company ("Citizens"), which extended a loan to Park Reserve LLC, a limited liability company which is owned in part by the Debtor. Debtor guaranteed the debt. The balance owed to Citizens, according to its Proof of Claim, is $7,318,202.21. Citizens filed suit and requested a receivership in the Circuit Court of Jackson County, Missouri. The court in that case has entered an order establishing a general receivership. The receiver has retained a broker to sell the real estate owned by Park Reserve, LLC. There is a contract pending for $8,000,000. If sold as anticipated, this debt should be paid in full. Debtor's counsel has reached out to counsel for the bank to determine its outstanding balance. Debtor's counsel has not received a figure as of the filing of the Plan and Disclosure Statement. The claim against this Debtor is contingent.

   5.7. Class Seven includes the claim of CIT Bank NA for the sixty (60) month lease of a Xerox copy machine, account ending in 9575. The lease payments are $590.06 per month plus additional charges as set out in the lease agreement. The lease began in April, 2019 and the lease expires with March, 2024. The terms of the lease include a provision of automatic renewal for three (3) months and thereafter, on a month-to-month basis.

   5.8 Class Eight includes the claim of Pitney Bowes for the sixty-three (63) month lease of a postage machine, account ending in 7174. The lease payments are $80 per month, payable at $240/quarter until November, 2023.

   5.9 Class Nine includes the claim of Kansas City Cold Storage for the lease of the entire warehouse freezer space and other space pursuant to a Lease dated 3/1/19. The Lease runs until 2/28/29 and has two options. Kansas City Cold Storage shall pay to Debtor as set forth in the basic rent of $127,500/month. There is a separate provision for payment of utilities and a cost-of-living increase.

   5.10 Class Ten includes the claim of Lease Consultants Corporation for the lease of a floor scrubber and sweeper. The terms of the lease, which was executed on 6/21/21, is for 36 months at $713.79/month.

   5.11 Class Eleven includes the claim of E3 HR Inc. for the executory contract to lease employees and provide payroll services. This contract is an annual contract that automatically renews annually. Each party may cancel the contract.

   5.12 Class Twelve includes all Allowed Unsecured Priority Claims for claims of the Internal Revenue Service, Missouri Department of Revenue, California Franchise Tax Board and City of Kansas City. Recently, 2017-2020 federal, Missouri and Kansas City tax returns (fiscal year: June 1-May 31) were finalized, signed and mailed on April 26, 2022. The tax liabilities are as follows:

Internal Revenue Service:   2018-2020 income tax and interest: $486,742

Missouri Department of Revenue:	2018-2020 income tax and interest: $123,575
City of Kansas City:	2018-2020 income tax and interest: $ 40,468
City of Kansas City (claim filed)	2019 Business License:	$    111
California Franchise Tax Board (Claim filed)		$  3,392.72

    TOTAL UNSECURED PRIORITY CLAIMS: $654,288.72

    5.13   Class Thirteen includes all Allowed General Unsecured Non-Priority Claims of vendors, service providers, unsecured lenders and non-priority taxes. The detail of this Class can be found in the Plan.

The group of General Unsecured Non-Priority Claims shall be paid $250,00 of their Allowed Claims (paid prorata), payable at $50,000/year for five (5) years.

    5.14 Class Fourteen includes the Allowed General Unsecured Non-Priority Claims of those individuals and/or companies who assert a claim by virtue of some act that caused damage to said individuals and/or companies and who may be covered by insurance. Objections to the claims of the following parties have been filed and are pending. This class includes:

    Claim #17 Kline Van and Specialty Rental (asserted $11,500,000 in its Proof of Claim)
    Claim #38 Ashley Morgan (asserted unliquidated amount in her Proof of Claim)
    Claim #39 Ian and Danielle Young (asserted unliquidated amount in her Proof of Claim).

    If any of these creditors' claims are liquidated and the amounts owed are in excess of the insurance coverage, their Allowed General Unsecured Non-Priority Claims will be included in Class Thirteen above.

    5.15.   Class Fifteen includes the equity claim of Sammy Jo Reeder, the sole shareholder of the Debtor. She shall retain her equity ownership in the Debtor. No distributions, (except for salary), shall be made to Sammy Jo Reeder until such time as all payments to Allowed Secured and Unsecured Creditors are paid in full as provided in the Plan.

    In exchange for her equity interest in the Debtor, Sammy Jo Reeder has contributed the following to the Debtor since the filing of the petition:

    7/27/21: Sammy Jo Reeder paid CRS Custom Refrigeration Services the sum of $120,000 for a new compressor for the cave's refrigeration system.

    10-12/2021: Sammy Jo Reeder initially sent $100,000 to Armstrong Teasdale law firm for its retainer as counsel for the Debtor. When Armstrong Teasdale law firm could not serve as Debtor's counsel, it applied a portion of the $100,000 toward its unpaid balance and Sammy Jo Reeder contributed the remainder of $49,122.16 to the Debtor.

        5.16.    Class Sixteen includes all Allowed Administrative Claims, whether incurred before or after the Confirmation Date, allowable under §330 and §503(b) of the Bankruptcy Code, and which are entitled to priority payment under §507(a)(1) of the Bankruptcy Code. The Claims of this Class include attorneys' fees and accounting fees for post-petition services rendered to the Debtor on and after the Filing Date. These Claims also include Claims of the United States Trustee to the extent of any quarterly fees due under 28 U.S.C. §1930(a)(6) as of the Confirmation Date and post-petition taxes, if any.

        B.    <u>Treatment of Claims and Interests</u>.  The Debtor's Plan of Reorganization is incorporated into this Disclosure Statement. Creditors and parties in interest are referred to the Plan for a discussion of the treatment of each Class under the Plan.

        C.    <u>Means for Execution and Implementation of the Plan</u>.  The Debtor's gross sales should produce sufficient funds to create a positive cash flow. The Debtor believes that it can pay all debts that come due post-petition as well as pay the Plan payments as set forth in the Plan of Reorganization. See Projections for 2022 through 2026 attached as **Exhibit B** to this Disclosure Statement. **Exhibit B** projections are based, in part, upon the historical data provided in **Exhibit A.**

        D.    <u>Executory Contracts and Unexpired Leases</u>.  The Debtor will assume the leases set out in the classes of claims. All remaining executory contracts will be rejected.  Debtor will reject the lease and executory contract with Empire Holding, Inc., U.S. Patriot Services, American Veteran KCAE (a Kansas general partnership) and American Veteran STLA (a Missouri general partnership).  All unexpired leases with other current tenants will be assumed.

## VI. CONSEQUENCES OF DENIAL OF CONFIRMATION

If the Debtor's Plan or any amended Plan is not confirmed, the case may be converted to a case under Chapter 7 or it may be dismissed.  If converted, a trustee would be appointed to liquidate the Debtor's assets and distribute the proceeds to creditors. Based upon the analysis of assets, liabilities, and the tax consequences, there is no possibility that general unsecured non-priority creditors would receive more than what is being offered in this Plan.

## VII. LIQUIDATION ANALYSIS

The Debtor has prepared a liquidation analysis of its assets. This analysis is attached as **Exhibit C** to this Disclosure Statement.

The Debtor believes that under the best scenario, liquidation would realize significantly less for the unsecured creditors. As the Debtor's Plan proposes to pay the unsecured non-priority creditors that are listed in Class 13 a total of $250,000, it is extremely unlikely that the unsecured creditors would receive more if the assets were liquidated on the Effective Date of the Plan.

          INTERSTATE UNDERGROUND
          WAREHOUSE AND INDUSTRIAL
          PARK, INC.

Date  May 2, 2022            /s/  *Leslie Reeder*
          Leslie Reeder, CEO

KRIGEL & KRIGEL, P.C.

/s/ *Erlene W. Krigel*
Erlene W. Krigel,   No. 29416
4520  Main Street Suite 700
Kansas City, Missouri 64111
Telephone: (816) 756-5800
Facsimile: (816) 756-1999
ATTORNEYS FOR DEBTOR