**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In Re:   INTERSTATE UNDERGROUND | ) | Case No. 21-40834-DRD-11 |
|               WAREHOUSE AND INDUSTRIAL | ) | |
|               PARK, INC. | ) | Chapter 11 |
|                              Debtor | ) | |

### OBJECTION BY CREDITOR WAYNE REEDER TO DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION

**COMES NOW** Creditor Wayne Reeder ("Reeder"), by and through counsel, and hereby objects to the Third Amended Chapter 11 Plan (the "Plan") (Doc. #423). For his objection, Reeder states as follows:

### PRELIMINARY STATEMENT

The Debtor, after nearly one year in Chapter 11, has filed this Third Amended Plan. While there are several specific objections setout below, just a cursory review confirms once again that the Plan rests on a foundation that is seriously flawed, and which cannot support confirmation.

First, The Plan's success rests entirely on a freezer more than fifty years old (originally built to use Freon, the manufacture and import is which is now banned) as its refrigerant, and which during the last several years has required the expenditure of substantial sums to keep it operating. At a point, yet unknown, the freezer must undergo a complete retrofit of its system because of its then operating condition, or to comply with regulations issued by the E.P.A. (pursuant to the Clean Air Act, and concerning Global Warming and depletion of the Ozone layer) applicable to the refrigerant used in its system.

Recognizing the ultimate necessity for the retrofit, beginning in 2018, the Debtor's then management began designing, planning for, and obtaining cost estimates for the retrofit. As part of the planning process, and in the consideration of the E.P.A. regulations applicable to the ownership of commercial freezers, it was decided to use ammonia as the refrigerant in the new system for two reasons. First, an ammonia system is cheaper to operate than other systems. Second, ammonia is presently the only refrigerant that has a "zero impact" on Global Warming and depletion of the Ozone.

While there have been several cost estimates to complete the retrofit and the associated site improvements, beginning in 2018 and continuing to date, the range of those estimates has been between $3.1 and $4.8 million. The most recent bid for the retrofit, provided in June of 2020 to the current CEO of the Debtor, quotes $3.4 million for the overhaul, plus freight, plus uncalculated costs for taxes and other contracting services, plus another $1.091 million for electrical work (with exclusions for taxes and

1

other services). The Debtor would have needed $436,000 down for the electrical work and $1.36 million down for the main retrofit just to start the overhaul. The Debtor through its operating reports filed monthly demonstrates, beyond all doubt, that it lacks the funds necessary in its own cash flow projections to support this work.

In addition to the cost of the retrofit, the E.P.A. regulations must be considered because: (a) they may dictate when the retrofit must be done; and (b) which requirements may apply now to the ownership/operation of the freezer. When the retrofit must be done, and its cost, are critical to the success of the Plan. Which requirements may apply currently to the ownership/operation of a commercial freezer are also critical to the Plan because they may require when the retrofit must be completed.

One such requirement is the responsibility of the Debtor to maintain a log each year, and to retain the logs for three calendar years, which records the date, nature of all repairs, and the amount of refrigerant in the aggregate that escapes from leaks or is added to the system in connection with each repair job. The amount of refrigerant added to the system in a calendar year may trigger the retrofit if it exceeds the quantity permitted by the regulation. The quantity of refrigerant lost is a percentage of the system's refrigerant capacity.

Once the triggering event has occurred, a plan must be submitted to the E.P.A. within thirty days demonstrating how the problem of the refrigerant leakage will be corrected. Then, the corrective action must be completed within one year. The Debtor did not maintain a log for 2019, and, on information and belief, has not maintained a log for 2020 and 2021. If a triggering event has already occurred, the requirement for completion of the retrofit is immediate.

The Plan, and the accompanying Disclosure Statement, brush off the seriousness of the freezer situation even though the freezer generates approximately 40% of the Debtor's gross monthly income. The Debtor's five-year projections assume the freezer will continue operating, and sufficient funds are included in the projections to pay for any necessary repairs. However, if the retrofit should be required, the Reorganized Debtor will obtain a new loan, the proceeds of which will be used to pay for the retrofit.

Depending on when the retrofit is required, for example if immediate or in the first few years of the Plan, the amount of a new loan may require more than just the retrofit funds. The new loan may require additional funds necessary to clear existing liens encumbering on the Reorganized Debtor's assets, because those assets must serve as the collateral for the new loan. It is unreasonable to believe that the Reorganized Debtor (operating under the terms of a Chapter 11 Plan) will be able to obtain a new loan for millions of dollars using only its current assets as security. Even if a new loan could be obtained, it is reasonably foreseeable that one of the conditions for making the new loan will be the

2

personal guarantee of Sammy Jo Reeder (the record holder of 100% of the equity interest in the Reorganized Debtor) provided the lender is satisfied that she has the financial strength to pay the balance due on the loan in the event of default. The Plan does not include any information about her financial strength, or an agreement by her to execute a personal guarantee in the event one is required.

The success of the Plan is completely dependent on the income received from the freezer lease. Without that income, the Plan fails. The Debtor's remaining income is insufficient to continue the Plan. The continuation of the freezer lease is dependent on the Reorganized Debtor being able to complete the freezer retrofit, if required to do so. Completion of the retrofit is dependent on the ability of the Reorganized Debtor to obtain a new loan. Obtaining a new loan is dependent on Sammy Jo Reeder's financial strength and delivery of a personal guarantee to secure repayment of the new loan. Assuming she has sufficient financial strength to guarantee repayment of the new loan, there no agreement between she and the Reorganized Debtor to do so.

Therefore, Reeder objects to the Plan because the facts show it is likely to be followed by liquidation or the need for further financial reorganization, and therefore, is not feasible within the meaning of 11 U.S.C., §1129(a)(11).

Second, the Plan is funded solely from the Debtor's monthly income. This income is derived from leasing the freezer and renting and/or leasing open spaces to the public for storage in its underground cave. The Plan suggests the Debtor will increase the available space for rent or lease, and the overall occupancy rate will also increase. This increase in usable space and the occupancy rate will then be sufficient to meet its projection going forward. However, the Plan does not provide any estimates for the cost of making the necessary improvements to support the projected increase in available space, or the source of funds to pay for those improvements.

As for the projections of income (which are based on the occupancy rate), the projections are not based on any independent third-party marketing study, or matters of public record, if any. The projections have been prepared under the supervision of a C.E.O., who has been operating the Debtor's business for slightly over two years. Not only is her experience with the Debtor's operation brief, but beyond that, she has absolutely no prior history with the Debtor's operations. The accompanying Disclosure Statement provides no information about the C.E.O.'s education or marketing background.

With the lack of information in the nature of a professional and reliable marketing study, third party cost estimates for any improvements required to increase the space to rent or lease, and the source of funds to pay the cost of the improvements, a reasonable businessman would find the projections unreliable.

3

Such unreliable projections cannot support the second most important issue upon which the success of the Plan rests (following the freezer issue). Based on the Monthly Operating Reports, the Debtor has the means to obtain someone with some expertise. The obvious question then becomes, did the Debtor want the projections to fit the need to project more income, which is necessary to support the Plan?

Reeder objects to the Plan because there is no reasonable and reliable information necessary to support the projected income, which income is the only source of funds to fund the Plan. Therefore, the Debtor has not demonstrated the Plan to be feasible within the meaning of 11 U.S.C., §1129(a)(11).

Third, the current holder of the equity interest in the Debtor (Sammy Jo Reeder) has the exclusive right to propose the Plan thereby barring consideration of any competing plan.

The proposed Plan provides for an unsecured creditor to receive a prorate share of $250,000, and payable equal installments of $50,000 over five years. Over the same time, Sammy Jo Reeder, Leslie Reeder, and Stacey Reeder Robinson (according to the information made available) will receive over $1.1 million. This is over four times the amount going to unsecured creditors.

In addition to cash, Sammy Jo Reeder will retain the entire equity interest in the Reorganized Debtor without making any substantial contribution of new money, or money's worth, necessary for a successful reorganization, and reasonably equivalent to the value of the interest obtained (the entire equity interest in the Reorganized Debtor). to the Plan.  Under the terms of the Plan, Sammy Jo Reeder is capturing not only cash but also the full value of the Reorganized Debtor's land and business on the backs of the unsecured creditors.  Reeder objects to the Plan because it violates the Absolute Priority Rule, and therefore, is not fair and equitable within the meaning of 11 U.S.C. §1129(b).

The foundation for this Plan which has been brought forward after nearly one year since the Chapter 11 Petition was filed, is nothing more than unreasonable speculation, coupled with great inequity and unfairness.

Accordingly, each of the Objections to the Plan setout herein should be sustained, confirmation of the Plan denied, and in the best interest of creditors, the Chapter 11 case should not be converted to Chapter 7 but continued for a reasonable time to permit any party-in-interest to seek confirmation of a plan, including a plan based on Mr. Wahl's outstanding offer to purchase substantially all of the Debtor's assets as more particularly discussed below.

## OBJECTIONS TO PLAN

**1.** Reeder hereby incorporates herein the entire Preliminary Statement, including the Objections set forth therein.

4

**2.**     Reeder hereby joins in and incorporates the objection of CCC Capital (Doc #433), including any amendments thereto, and Timothy Wahl's Response to the Plan (Doc. #431), including the Amended Response to the Plan filed on June 10, 2022. Mr. Wahl submitted an offer to purchase substantially all of the Debtor's assets (except for the Debtor's cash on hand) for $4,750,000 cash. The offer was for the freezer "as is" understanding the freezer's condition, and the need to eventually complete its retrofit at his expense.

When the Debtor did not respond in writing to his offer, Mr. Wahl filed a Response to the Plan to make his offer public. Still receiving nothing in writing from the Debtor, on June 10, 2022, Mr. Wahl filed an Amended Response to Plan. Reeder is not a party to Mr. Wahl's offer to purchase or connected in any way with Mr. Wahl. However, Reeder holds a disputed unsecured claim and believes Mr. Wahl's proposal would pay more to the unsecured creditors than they would receive through the proposed Plan, and payment would be faster.

**3.**     Reeder objects to the Court counting the ballots and holding the presently scheduled hearing on confirmation of the Plan, or confirming the Plan at any other time, using ballots to tally the votes cast by the holders of claims and interests whose votes were solicited with only a copy of the Preliminary Disclosure Statement contrary to the specific provisions of 11 U.S.C. §1125(b), which provides solicitation for votes on the Plan can only occur after the accompanying Disclosure Statement has been found to contain "adequate information" within the meaning of 11 U.S.C. §1125(b).

The language of 11 U.S.C. §1125(b) is clear and unambiguous on its face, and nothing suggests it is superseded or modified in any way by 11 U.S.C. §1125(f), which applies only to Small Business Debtor Reorganization, or that the provisions of 11 U.S.C. §1125(f) may be substituted for the procedure provided for in 11 U.S.C. §1125(b).

11 U.S.C. §1125(f) provides that notwithstanding 11 U.S.C.§1125(b) in a Small Business Case - sub-section (f)(A) provides a court may conditionally approve a disclosure statement subject to final approval - sub-section (f)(B) provides acceptance or rejection of a plan may be solicited based on a conditionally approved disclosure statement if the debtor provides adequate information to each holder of a claim or interest that is solicited -sub-section (f)(C) provides for the hearing on the disclosure can be combined with confirmation of the plan.

In this Case the Court found the proposed Disclosure Statement sufficient to constitute a Preliminary Disclosure Statemen. The Debtor may use it to solicit acceptance or rejection of the Plan, and a final hearing on the Disclosure Statement would be held later when combined with the hearing on confirmation of the Plan. The Debtor did in fact mail out ballots soliciting votes on the Plan, together

5

with the Preliminary Disclosure Statement, and holders of claims did in fact vote to accept or reject the Plan.

Reeder's Objection is based on 11 U.S.C. §§1125(b), 1129(a)(1), and confirmation of the Plan under the circumstances denies him due process of law.

**4.** Reeder continues his 11 U.S.C. §1129(b) objection contained in the third point of the Preliminary Statement above, namely the Plan is not fair and equitable (a) A fair and equitable plan is a plan that complies with the Absolute Priority Rule. *Norwest Bank Worthington v. Ahlers*, 485 U.S 197, 207. The Debtor's Plan that does not comply with the Absolute Priority Rule because:

    a.    <u>One or more classes of claims vote no.</u> Reeder believes one or more classes will vote not to accept the Plan. <u>11 U.S.C. §1129(b)(2)</u> would then be a barrier to confirmation.

    b.    <u>Class 15. Retain Ownership of Reorganized Debtor</u>. The Plan provides for Sammy Jo Reeder to own one hundred percent (100%) of the equity interest in the Reorganized Debtor which violates the Absolute Priority Rule, absent an exception, **because:** "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property…."

    c.    <u>"New Value Rule" is an exception to Absolute Priority Rule.</u> The Plan attempts to satisfy the "New Value Rule" based on money paid by Sammy Jo Reeder post-petition in three parts. One part to a post-petition creditor, one part to the Debtor, and one part to attorneys retained to represent the Debtor in this Chapter 11 case but were disqualified from doing so because they failed to make the required disclosures. Since the attorneys could not be retained and paid by this Chapter 11 estate, she paid their outstanding invoice.

The Debtor originally sought to treat the payment made post-petition by Sammy Jo Reeder for the cost to replace a freezer compressor in the amount of $120,000.00 as a loan in exchange for an unsecured claim in the bankruptcy case (Doc. #65). A claim would dilute the aggregate sum available for holders of unsecured claims (Class 13 Claims). The claim would also result in providing further payments to insiders as the Plan already does.

Another post-petition payment was to attorneys in the sum of $50,877.84. The attorneys claimed to have provided legal services to the Debtor but could not collect from this Chapter 11 estate. The attorneys were disqualified from representing the Debtor for failing to make full and complete disclosures as required by the Bankruptcy Code.

6

The third payment was to the Debtor post-petition in the sum of $49,122.16. The total of all three payments is $220,000.00, which the Plan seeks to treat as a contribution for the purpose of satisfying the "New Value Rule" exception to the Absolute Priority Rule.

**First**, with respect to the payment of attorneys' fees, the attorneys were disqualified from representing the Debtor in this Chapter 11 case because they failed to satisfy the disclosure requirements. The Court should not permit this attempt to gain something of value thru the back door, and which could not be obtained thru the front door.

The payment of a debt the estate is not legally obligated to pay is not a benefit to this Chapter 11 estate, or the Reorganized Debtor's estate which is one of the goals underlying the "New Value Rule". contributing money or money's worth necessary for a successful reorganization. Further, to participate in such a transaction rewarding attorney for their failure to follow the disclosure rules will be against the policy those rules seek to enforce.

**Second**, neither the Disclosure Statement nor the Plan discuss preferential or fraudulent conveyance payments to insiders. Sammy Jo Reeder has admitted under oath that she received money regularly from the Debtor within one year of the Chapter 11 Petition being filed, and on information and belief, it appears received payments while the Debtor was insolvent.

The payments she received regularly were disguised as "salary" because she appeared as the President of the Debtor, which scheme is commonly referred to in the business world as a "ghost employee." The payments labeled as "salary" are really disguised dividend payments as evidenced by Sammy Jo Reeder's testimony at a 2004 Examination.

During a 2004 Examination of Sammy Jo Reeder taken on September 21, 2021 (just two months following the filing of the Chapter 11 Petition), she testified under oath as follows:

1. Page 41, lines 20-25: Question - "It would be fair to say, to call you a passive investor, meaning you weren't operating the business on a day-to-day -- you've never been an active owner operating the business; is that correct? Answer - That's correct."

2. Page 46, lines 1-22: Question – "under Investment, it says investment, Park Reserve, LLC, $6,060,163, do 4 you see that?" Answer – "Yes". Question - "Are you aware of the investment into Park 7 Reserve of over $6 million"? Answer – "No". Question - "The next one, investment, Weld Building for 10 $776,183.54"? Answer - "No". Question – "Are you aware of an investment of over $776,000 into the Weld Building"? Answer – "No". Question – "The next line, Harrisonville Senior Living, LLC, $996,707. Are you aware of an investment in Harrisonville Senior Living of almost $1 18 million"? Answer – "No".

7

    **3.**    Page 53, lines 5-20. Question – "And so these various entities, Interstate Underground Warehouse, LLC, the View at WB, LLC, Park Reserve, LLC, West Wyoming, LLC, Seven at KC, LLC, Harrisonville Senior Care Center, LLC, Scarritt Building and Scarritt Arcade Building, LLC, Nine at KC, LLC and Interstate Self-Storage, LLC, you weren't aware of these various LLCs; is that correct"? Answer – " No", I was not aware of them."

    **4.**    Page 37, lines 22-25 Question – "you remember starting any of these businesses that are listed here on page 55 of the bankruptcy petition"? Answer – "These all here are Wayne Reeder's businesses".

Sammy Jo Reeder's testimony, a brief excerpt of which is set out above, clearly demonstrates that she, at least until the time of the 2004 Examination, was admittedly a "passive investor" and nothing more. She was not involved in the day-to-day operation of the business, and was unaware of nature and extent of what the assets of the Debtor were. For example, that the Debtor claims to be the owner of a number of the LLCs, but she testified the LLCs belonged to Wayne Reeder.

The Debtor isn't going to examine preference and/or fraudulent conveyance payments because the Debtor is part of the scheme in the first place. The Debtor has failed to meet its burden and instead intends to overlook potentially fraudulent conveyances and/or preference payments in its attempt to overcome the Absolute Priority Rule. This issue was raised in objection to the prior Chapter 11 Plan and remains unchanged in the current version of the Plan.

**Third**, a contribution is necessary to retain an ownership interest in the Reorganized Debtor. Case v. Los Angeles Lumber Products Co., Ltd., 308 U.S. 106 (1939) sets forth the standard. Recent case law has addressed the standard through an opinion in an appeal before the 8th Circuit Court of Appeals. The standard is that absolute priority rule does not bar the operators of a debtor business from retaining their equity interest if they contributed a substantial sum of "money or money's worth" necessary to a successful reorganization and the contribution is reasonably equivalent to the interest obtained. See, e.g., Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988).

The value of the equity interest in the Debtor can be measured by an independent third party (Mr. Wahl's) all cash offer of $4,750,000, which does not include the Debtor's cash on hand. Further, the offer includes taking the freezer in an "as is" condition without looking to the estate for the payment of any portion of the costs associated with the retrofit. But, for the purpose of calculating the value of Sammy Jo Reeder's contribution, even if one uses the full amount of

8

$220,000, the contribution would represent only 4.6% of the $4,750,000. As such, the $220,000 proposed contribution can hardly be said to be substantial, or would affect the success of the reorganization, or be in anyway reasonably equivalent to the interest obtained, i.e. 100% of the equity interest in the Reorganized Debtor.

The Plan is not "fair and equitable," and does not satisfy the Absolute Priority Rule, or the "New Value Rule" exception. The Plan should not be confirmed.

**5.** Reeder continues his objection pursuant to 11 U.S.C. 1129(11) contained in the first and second part of the Preliminary Statement above.

Under 11 U.S.C. §1129(11), the court must make an independent evaluation of the Plan to determine whether it offers a reasonable probability of success. A plan is feasible if confirmation of the plan is not likely to be followed by a liquidation or further financial reorganization. In re Leslie Fay Cos., 207 B.R. 764 (Bankr. SD.N.Y.). ("The court must find the plan is workable and has a reasonable likelihood of success").

The burden is on the plan proponent to show not just the possibility of success, but the reasonable likelihood of success, such as contingencies inherent in the plan, the debtor's ability to meet projections and the reliability of experts. Courts, however, will be skeptical of plans whose success is contingent upon the occurrence of events that are beyond the debtor's control. That statement is this Chapter 11 case and the Third Amended Plan, which is the subject of the confirmation hearing. When will the retrofit of the freezer have to be completed.

    **(a)** Freezer. Nothing else in this case presents a greater challenge, and nothing else in this case will have a greater impact on the success or failure of any proposed plan for the reorganization of the Debtor.

    To date the Debtor has ignored and/or played down the issue. The Plan basically states the projections that have been made include sufficient funds to repair and keep the freezer running during the five years in which payments are to be made to holders of allowed claims. However, should the freezer require the retrofit be done during that time, the Reorganized Debtor will just get a new loan sufficient to pay for the retrofit.

    However, there will be a significant concern if the need to complete the retrofit should arise during the first six months, or the first year, or if it has already arisen because the E.P.A. regulations require it. But because the required records have not been maintained, it is unknown whether the trigger event has occurred which require the retrofit be done now.

The E.P.A. has a number of regulations that require owners of commercial freezers, with a refrigerant capacity of more than fifty lbs., must follow. The most important concern the regulations are meant to deal with is the escape and/or discharge of refrigerant into the air which they believe has an impact on the Ozone. They express concern about enforcing the Clean Air Act and Global Warming, but the Ozone is the major concern where refrigerant is concerned.

The total number of pounds of refrigerant the freezer system is charged with in a calendar year is the principal measurement that gives rise to the need to take the required corrective action. Since the Debtor has not maintained the required records for 2019, 2020, or 2021, and should an audit occur, it may be very difficult to create an appropriate record sufficient to satisfy the E.P.A.

Technicians that repair freezers have certain regulations to follow as well. These regulations require an invoice be prepared for each repair that is undertaken. The invoice is required to contain the nature of the repair, and if refrigerant is added, the quantity added. The regulations also contain system testing requirements, and the results of the tests are to be recorded and a copy given to the owner.

Because the Debtor had not maintained a log so that the annual lbs. of refrigerant added to the system could be determine, Reeder had the technician who has worked on the system come in for a 2004 Examination. He was requested to bring with him a copy of all invoices for years 2019, 2020, and 2021. He appeared without the invoices claiming they had become unavailable.

It appears there are no records are available to verify whether or not the freezer retrofit is required to be completed now. This is not pure speculation, but an undisputed fact. As such, any attempt to make an independent evaluation of the reasonable probability of success can only be pure speculation.

**(b)** Paragraph 4.1 of the Plan addresses the treatment of the senior lien on real estate held by Woodmen.  The language states "Debtor will actively seek to refinance this loan to pay off Woodmen. If Debtor is unable to refinance this loan, the monthly payments will continue after the Effective Date for a maximum of three (3) years, at which time the unpaid balance shall be due and payable"

The Debtor has been in its Chapter 11 bankruptcy for nearly a year.  The C.E.O. said recently that she has had conversations with a couple of banks about obtaining a loan. She did not provide the names of the banks, or any information about size of the loan she was discussing.

10

The Debtor has been in this proceeding for nearly one year. During this time, it has not produced a single letter, non-binding commitment, memorandum of understanding or any other information from any financial institution or hard money lender to suggest it is actively seeking refinancing.

Given the state of the freezer system (described above), and the financial condition of the Debtor observed from the operating reports it files monthly, it is virtually certain the Debtor will fail to comply with this provision. The Debtor is simply deferring this existential decision for three years, at which time unsecured creditors will be left in a worse position.

The Debtor proposes to refinance the Woodmen loan within one year of confirmation, yet does not detail any attempts to do so, or provide any specifics. If the Debtor fails to obtain a new loan in a year, the Debtor simply prepares to maintain the status quo for three years, deferring the issue. Unfortunately, as it has done by failing to address its freezer and other infrastructure issues, the Debtor only puts itself in a worse financial situation. The insiders of the Debtor would, under the plan, maintain their interests without making any contributions of their own, to the detriment of the unsecured creditors.

**6.** Reeder objects to confirmation of the Plan because it fails to satisfy the express provisions of 11 U.S.C., Section 1129(a)(5).

**7.** Reeder objects to confirmation of the Plan because the Plan fails to satisfy the provisions of 11 U.S.C., Section 1129(a)(3). The Debtor is in violation of a number of sections of the Code of Federal Regulations (CFR) with respect to the ownership and operation of the freezer, among which are regulations under Section 608 of the Clean Air Act. Confirmation of the Plan without first coming into full compliance will simply foster the uncertainty with respect to when the freezer retrofit must be done. Further, violation of these regulations can result in administrative actions and fines, both of which will affect cash flow.

**WHEREFORE**, Reeder respectfully joins other creditors in their objections and responses to the Plan and requests this court enter an order Denying confirmation of the Debtor's Third Amended Chapter 11 Plan, and for any further relief deemed appropriate by this Honorable Court.

Dated: June 13, 2022               Respectfully submitted,
                                   WM Law

                                   s/ Ryan A. Blay
                                   _____

11

Ryan A. Blay, MO #KS001066; KS #28110
15095 W. 116th St.
Olathe, KS 66062
Phone (913) 422-0909 / Fax (913) 428-8549
blay@wagonergroup.com
bankruptcy@wagonergroup.com
COUNSEL FOR CREDITOR WAYNE REEDER

## **CERTIFICATE OF SERVICE**

    I, the undersigned, hereby certify that a true and correct copy of this pleading was served, in addition to the parties notified by the US Bankruptcy Court's electronic notification, upon the affected creditors and other parties in interest via US First Class Mail, postage prepaid, on Monday, June 13, 2022.

                                                                                          /s/ Ryan A. Blay