IN THE UNITED STATES BANKRUPTCY COURT FOR
THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

In Re:                                                  )
                                                        )
INTERSTATE UNDERGROUND WAREHOUSE  )    Case No.  21-40834-drd11
AND INDUSTRIAL PARK, INC.,                )
                                                        )
        Debtor.                                  )

<u>DEBTOR'S **THIRD AMENDED** DISCLOSURE STATEMENT</u>

I. INTRODUCTION

This Third Amended Disclosure Statement ("Disclosure Statement") is provided to the creditors of Interstate Underground Warehouse and Industrial Park, Inc. ("IUW" or "Debtor"), to enable the creditors to arrive at an informed judgment in exercising their rights under the Debtor's Fourth Amended Plan of Reorganization (the "Plan"). The definitions of Article I of the Plan shall have the same meaning when used in this Disclosure Statement.

The function of this Disclosure Statement is to provide "adequate information" to all creditors.  "Adequate information" is defined in 11 U.S.C. '1125 as follows:

**<u>Section 1125.  Postpetition disclosure and solicitation.</u>**

"(a)    In this section --

   (1)    'adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor; and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan...; and

   (2)    'investor typical of holders of claims or interests of the relevant class' means investor having --

      (A)    a claim or interest of the relevant class;

      (B)    such relationship with the debtor as the holders of other claims or interests of such class generally have; and

1

    (C)  such ability to obtain such information from sources other than the disclosure required by this section as holders of claims or interests in such class generally have."

  THE REPRESENTATIONS MADE IN THIS DISCLOSURE STATEMENT ARE THE ONLY REPRESENTATIONS AUTHORIZED BY THE DEBTOR RESPECTING ITS BUSINESS OPERATIONS, THE VALUE OF ITS PROPERTY OR ANY OTHER MATTERS WHATSOEVER. CREDITORS SHOULD NOT RELY ON ANY UNAUTHORIZED REPRESENTATIONS WHICH ARE MADE TO SECURE THEIR ACCEPTANCE OR REJECTION OF THE PLAN. THE COURT WILL CONDUCT A HEARING ON WHETHER OR NOT THIS DISCLOSURE STATEMENT SHOULD BE APPROVED AS CONTAINING ADEQUATE INFORMATION TO ENABLE ALL CREDITORS TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

  The information provided in this Disclosure Statement is true and accurate to the best of the Debtor's knowledge, information, and belief. However, certain information relating to projections and values is necessarily subjective.

  CREDITORS ARE ENCOURAGED TO CONSULT WITH THEIR FINANCIAL ADVISORS, ATTORNEYS, AND OTHER CREDITORS IN ORDER TO OBTAIN A MORE COMPLETE UNDERSTANDING OF THE FINANCIAL AND LEGAL IMPLICATIONS OF THE DISCLOSURE STATEMENT AND THE PLAN. CREDITORS AND PARTIES IN INTEREST SHOULD CONSULT THEIR OWN COUNSEL AND TAX ADVISORS REGARDING THE INCOME TAX CONSEQUENCES OF CONFIRMATION OF THE PLAN AS IT RELATES TO THEM. THE DEBTOR MAKES NO REPRESENTATION REGARDING THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AND INTERESTS.

  Creditors may contact counsel for the Debtor for additional information. The counsel for the Debtor can now provide tax returns for (fiscal years) 2017 through 2020. These tax returns have now been completed and filed. The tax returns recently prepared reflect the activity of the Debtor from June 1, 2017 through May 31, 2021. The next fiscal year (6/1/21-5/31/22) has now ended but the tax returns are not yet due. Debtor's counsel can also provide Monthly Operating Reports.

  Attached to this Disclosure Statement as **Exhibit A** are Historical Information from 2017 to the present (based upon fiscal years) and Profit/Loss Summary and Balance Sheets for the fiscal year June 2021 through May 2022 (the most recent post-petition information. Further, Debtor has prepared Projections for each year beginning August, 2022-through July, 2027 (based upon years beginning with August, 022) as **Exhibit B**.

  The Court will probably conditionally approve the Disclosure Statement and set a hearing on confirmation of the Plan and final approval of the Disclosure Statement. When the Court sets

a hearing for confirmation of the Plan and final approval of the Disclosure Statement, the Debtor's counsel will mail a copy of the Plan, Disclosure Statement, Ballot, and Notice of the hearing to all creditors. At the confirmation hearing, the Court will determine whether the Disclosure Statement provides adequate information. At the confirmation hearing, the Court will determine whether the Plan has been accepted by the requisite number of classes of creditors and will rule on whether the Plan complies with the confirmation requirements of 11 U.S.C. §1129.

The Plan has several Classes of Claims and each creditor should examine those Classes to determine where its Claim has been placed. A Class of Claims will have accepted a Plan if the Plan has been accepted by creditors [other than any entity designated under 11 U.S.C. §1126(e)] which hold at least two-thirds in amount and one-half in number of the Allowed Claims of such Class held by creditors [other than any entity designated under 11 U.S.C. §1126(e)] that have voted to accept or reject the Plan.

If the Plan is accepted by the impaired Classes, it will likely be confirmed. If the Plan is not accepted by the impaired Classes, the Plan may nonetheless be confirmed under §1129(b) of the Bankruptcy Code if it is accepted by at least one Class of Claims or interests which is impaired by the Plan and the Bankruptcy Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or interests that is impaired by, and has not accepted, the Plan.  The Debtor reserves the right to request that the Court confirm the Plan under §1129(b) of the Bankruptcy Code if the Plan is not accepted by all impaired Classes and, if necessary, to revise and amend the Plan so as to provide such treatment as the Court may determine to be necessary or sufficient to assure that the Plan does not discriminate unfairly, and is fair and equitable, with respect to any Class of Claims or interests rejecting or failing to accept the Plan.

## II. ORGANIZATION AND HISTORY OF THE DEBTOR

The Debtor was established on February 23, 1978, as Callaway Mining Company with the Missouri Secretary of State by Michael C. Kirk. The initial directors were Wayne Reeder, Warren Reeder and Freida Cribbs. On January 13, 1989, the name of the company was changed to Interstate Underground Warehouse and Industrial Park, Inc.

In 1992, Wayne Reeder and his wife Sammy Jo Reeder divorced. The outstanding stock of IUW, which was previously owned by both spouses, 50% by each, was transferred to Sammy Jo Reeder, so that she owned and continues to own 100% of the outstanding stock. Wayne Reeder had been an officer in 1992 but Sammy Jo Reeder was the sole director in 1992.

The annual registration report filed in 1993 reflects the departure of Wayne Reeder as an officer and director. From 1993 to March, 2020, Wayne Reeder was allowed to consult with the existing management of the Debtor's business. In March 2020, Wayne Reeder was terminated from his role and since then, has had no role as a manager, employee or consultant.

The Debtor owns land at 8301 East 23rd Street, Kansas City, Missouri. The land is

primarily limestone caves, and it leases its space to individuals and companies. The caves are conveniently located at I-435 and 23rd Street, north of the I-70 Interchange and east of downtown Kansas City, Missouri.

The Debtor offers three million square feet of dry storage in a constant environment, nearly 250,000 square feet of cooler space, and more than 500,000 square feet of freezer space.

Debtor has been recognized as a leader in frozen food storage. Debtor offers self-storage with a wide range of units as well as self-storage for vehicles, RVs, and boats.

### III. GROWTH TRENDS FOR THE DEBTOR

A. Marketing/Advertising

Debtor has embarked on a new marketing and advertising campaign to attract new customers, targeting commercial customers who might be able to rent larger spaces and at a higher rate.

Debtor has made and is continuing to make improvement to its infrastructure which includes (i) new lighting, (ii) painting, (iii) cleaning and (iv) signage to create a new and fresh image. Major improvements to the air quality, including air flow controls and dehumidification throughout the facility, increased fire safety equipment and protocols, and the reopening of previously closed areas of roadway to allow for all traffic to flow in a one-way pattern.

Debtor has revised its pricing in leased areas and vehicle storage areas to reflect current market rates.

Debtor has repurposed areas that were previously unleased or under-utilized and is continuing this process. To illustrate the expansion of usable leased space, Debtor has, since August, 2021, leased more than 250,000 square feet of existing and newly prepared space with another 300,000 square feet of available space.

B. Shortage of Leasable Commercial Space

As a result of the COVID 19 crisis, the market for commercial warehouse space has changed dramatically. This began in early 2020. Many businesses moved away from brick-and-mortar stores and began warehousing their products in facilities like the Debtor's. There was an increase in construction for housing and remodeling that caused a huge demand in the construction industry for materials. Also, because of supply chain problems, many suppliers purchased materials beyond their immediate need for future use and needed to stockpile those materials in warehouse facilities.

Further, the extent of available leased space decreased significantly in July, 2021 when the Leeds Warehouse facility suffered a huge fire and was permanently closed. It had about 1.5 million square feet of storage space. That facility was close in proximity to the Debtor's

4

operation and Debtor's operation became a convenient substitute for the Leeds facility. Debtor obtained a number of new customers who had previously utilized the Leeds facility.

    C. Development/expansion of cave space—mining

Construction materials that are in high demand include rock and gravel. The Debtor's facilities have areas that are unmined and could be leased to a mining company. Debtor would obtain royalties from the mining company.  The Debtor estimates that a mining company could go down 8-12 feet for winterset rock.

### IV. TROUBLE THAT CAUSED DEBTOR TO SEEK BANKRUPTCY PROTECTION AND EFFORTS TAKEN TO RIGHT THE SHIP

Leslie Reeder arrived in Kansas City on March 12, 2020 to inspect the Debtor's property. Sammy Jo Reeder, the sole shareholder, was very concerned as she had learned that payroll was not current.  Further, Wayne Reeder was attempting to have Sammy Jo Reeder sign a personal guaranty for a $12,000,000 loan to consolidate all debts of the Debtor and a number of subsidiary debts. Leslie Reeder discovered the Debtor was in dire financial condition with numerous unpaid bills, and all long-term loans were in default. Further, loans of the subsidiaries were similarly in default. Wayne Reeder, who represented himself as an owner and/or manager to various lenders, caused Debtor to guarantee loans such as to Citizens Bank & Trust Company (approximately $8,000,000) without Sammy Jo Reeder's knowledge or consent.

Wayne Reeder created Park Reserve, LLC, a wholly owned subsidiary of the Debtor. Park Reserve, LLC purchased property near 31st and Main, Kansas City, Missouri (the old Trinity Lutheran Hospital site) in approximately 2008.  Park Reserve, LLC constructed condominium units to sell to the general public. It was initially planned for 265 units and a three-year target to sell all 265 units. However, by mid-2019, when the garage was condemned by the City of Kansas City, and a large number of lawsuits were filed by condo owners and the Homeowners' Association, only 76 units had been sold (in 11 years).  As a result of gross mismanagement and numerous construction defects, the Debtor and others were sued along with Park Reserve, LLC. The Debtor was forced to retain counsel to defend these cases. A huge liability to the Debtor was the result of Wayne Reeder allegedly guarantying the Park Reserve LLC loan with Citizens Bank & Trust (approximately $8,000,000). Citizens Bank & Trust filed for a receivership in the Circuit Court of Jackson County, Missouri and is expecting to sell the property for $8,000,000 in September, 2022, which would result in a deficiency amount that the Debtor would owe as an unsecured non-priority creditor in Class 14.

There were fires in September, 2018 and October, 2018, as well as 3 major rock falls in previous years while Wayne Reeder was purporting to manage the Debtor's business.  The fires and the rockfalls caused extensive damage to the facility and to the property of tenants. The insurance coverage for the tenants' losses is insufficient to cover all claims and multiple lawsuits were filed against the Debtor for these damages. The litigation caused Debtor to retain legal counsel and expend substantial legal fees to defend these and other actions.  Moreover, the fires

were devastating to Debtor's reputation. Debtor believes it has now rehabilitated its reputation with the quality of its leased space and contracting with credit-worthy tenants.

Due to Wayne Reeder's mismanagement, debt service was delinquent as stated above. Woodmen of the World Insurance Society ("Woodmen") instituted a foreclosure action in 2018. Loans with high interest rates were taken out to bring the Woodmen's loan current. To bring the Woodmen loan current, the Debtor paid $229,039.31 (which included $20,129 of attorneys' fees for the Woodmen attorneys). Similarly, the Andersons threatened to foreclose, and the Debtor was forced to enter into multiple forbearance agreements with the Andersons. Each time, the Debtor was forced to pay fees for the forbearance agreements.

When Leslie Reeder took over in March, 2020, she discovered many bills had not been timely paid. As an example, the electric company was owed in excess of $100,000 and service was threatened to be disconnected. If it had been disconnected, it would have effectively destroyed the entire property and created a loss of all tenants.

Since the time (June 23, 2022) of the confirmation hearing where the Third Amended Plan and the Second Amended Disclosure Statement were denied, the Debtor has successfully obtained a result where the Wayne Reeder's Proof of Claim was first amended (again) back to $0 and then, was ultimately withdrawn.

Then, the Debtor was able to negotiate a settlement with Kline Van and Specialty Rental, LLC ("Kline Van"), whereby Kline Van would receive relief from the automatic stay to go back to its state court action in the Circuit Court of Jackson County, Missouri and pursue its claims. If it receives a judgment or reaches a settlement, it agrees that any recovery would come solely from the Cincinnati Specialty Underwriters' insurance company that provides insurance coverage (under policies CSU0106733 and CSU0110350) for the fire/smoke damage and destruction and unauthorized disposal of its property in October, 2018. The Debtor and Kline Van filed a Motion to approve the settlement on July 20, 2022 (Doc. #486). The deadline for objections to said Motion is August 10, 2022. If granted, Kline Van will pursue its claims in the state court action and will not receive any recovery from the Debtor or its estate.

Citizens' counsel and Debtor's counsel have discussed the potential deficiency claim of Citizens once the sale of the Park Reserve, LLC property closes (which is hopefully in September, 2022). The Debtor believes the deficiency could be as large as $1,000,000. The additional expenses for the receivership (paying the receiver, receiver's counsel, Citizen's counsel, maintenance of the property, real estate taxes, insurance, etc.) has substantially increased the balance. Citizens' counsel has confirmed with Debtor's counsel that as long as Debtor retains the cave property, Citizens will not assert a deficiency claim as part of the unsecured non-priority class (Class 14). However, if the Debtor is forced to sell the cave property, Citizens will assert a deficiency claim as part of the unsecured non-priority class (Class 14), which will substantially increase the total amount of claims in Class 14.

Lastly, since the last confirmation hearing, the Debtor reached an agreement with Empire

Holding, Inc., U.S. Patriot Services, American Veteran KCA, and American Veteran STLA (collectively "Empire"). Empire is now listed as Class 12 in the Plan. The Debtor is assuming the existing Storage and Delivery Agreement (with agreed upon modifications), thereby avoiding the risk of having substantial rejection damages (which would also increase the total amount of claims in Class 14).

## V. IMPROVEMENTS NEEDED TO MAINTAIN AND GROW REVENUE

The existing freezer system is over 50 years old and in disrepair, both due to its age and because it was very poorly maintained by the previous management. It uses a R22 Freon operating system which is outdated and expensive to operate. This freon product is available for purchase only as a recycled product at this time.

Wayne Reeder, in his objection to the original Disclosure Statement, complained that the freon system like Debtor's were no longer produced or imported. However, Wayne Reeder's objection failed to recognize that Freon R22 systems are still widely used today because repurposed freon is available and is lawful to use.

The cost of the freon is factored into the $40,000 per month cost of maintaining the refrigeration system. The Debtor has made repairs which has allowed a substantial reduction in the freon use and costs. Previously, the Debtor was ordering freon once a month at $30,000 per purchase. Since Leslie Reeder has taken over as CEO, the freon usage is substantially less and the Debtor only needs to order freon every six months which is a considerable savings for the Debtor.

The Debtor has bids for a new, efficient freezer using an ammonia/brine cooling system. This system is able to maintain consistently lower temperatures with greater energy efficiency. The cost of this system (original proposal) is approximately $3,500,000. with a construction period of approximately 9 to 12 months. Additionally, there will be electrical and mechanical upgrades in the amount of approximately $600,000. The electrical and mechanical figure was initially $900,000 but Debtor has made substantial improvements and this figure has now been reduced to $600,000. Many of the repairs have begun with the purchase of a new compressor, new motor and substantial electrical upgrades already in place.

Wayne Reeder in his objection to the First Disclosure Statement misrepresented the cost of this new system. The aggregate cost of the new freezer system (with the needed electrical and mechanical upgrades) is approximately $4,100,000. The company who will build and install the new system is Custom Refrigeration Solutions owned by Terry Williams. Mr. Williams has an excellent reputation in his very specialized field and is considered an expert in the industry. He has intimate and detailed knowledge of Debtor's existing system and has been responsible for the extensive repairs, enabling the existing system to keep operating and performing to the best of its current ability.

Debtor's projections (See **Exhibit B** to this Disclosure Statement) confirm that when Woodmen and Andersons are paid off in 2026, the Debtor will have as much as $900,000 available to cover a down payment for the new refrigeration system.

Debtor currently budgets $40,000 per month for maintenance and repairs to the existing R22 freezer system. The installation of the ammonia/brine system would eliminate this expenditure entirely as the system will be covered by a warranty. Further, Debtor's existing freezer tenant, KC Cold Storage pays a base rent of $127,500 with an electrical reimbursement of $15,000. The reimbursed amount is not equal to the electricity used by the current system. Upon installation of the new system the freezer system will be separately metered and the tenant assumes the entire cost of the power to run the system, thereby eliminating a combined monthly expense of approximately $45,000.

## VI. FINANCING

Debtor would either seek a new loan which would pay off the existing lenders Woodmen and Anderson. Woodmen's current loan balance is approximately $1,900,000. Anderson's debt was $868,000 as of 12/31/21 and may be paid in full from the sale of the Harrisonville property (which is on the market at $1,350,000). The Plan provides that if Anderson is not paid in full from the sale of the Harrisonville property, Debtor will refinance (after 3 years) the remaining balance (if any). Debtor intends to either borrow sufficient funds to pay off the Woodmen debt ($1,900,000), Anderson debt, and finance the purchase/installation of the new freezer and electrical systems ($4,100,000) or payoff with existing funds the Woodmen debt and only finance the new systems ($4,100,000).

Leslie Reeder has had extensive contacts with institutional lenders as well as private equity firms and individuals, both in the United States and abroad. Over the past 2 years, the contacts and conversations between Ms. Reeder and the potential lenders have yielded favorable responses, with one major concern: the multitude of lawsuits and the loan guarantee of the Park Reserve debt owed to Citizens Bank. The guarantee of the Park Reserve debt was put in place by Wayne Reeder, when he had apparent (but not actual) authority to act as a manager. Further, Wayne Reeder filed a lawsuit against the Debtor and his family members in the Circuit Court of Jackson County, Missouri. That lawsuit is still pending as to the family members but the Debtor has now been dismissed.

Absent this bankruptcy the loan with Woodmen would have come due April, 2022. The Plan extends the loan until 2025. The Debtor will search for a new lender but the Plan calls for up to an additional three years with this lender in the event that the Debtor experiences difficulty obtaining replacement financing (combined with financing for the replacement of the refrigeration system and the electrical upgrades).

Thus far, the result of this bankruptcy proceeding was to substantially reduce the unsecured debts (eliminating the claim of Wayne Reeder, eliminating a substantial claim by Richard Turner, reducing the claims of CCC Capital, LLC, eliminating any potential claim by

8

Kline Van, Ian and Danielle Young, Ashley Morgan, and Empire) and as to secured creditors: reducing the interest rate on the Anderson loan, extending the Woodmen loan, and substantially reducing the Optima loan.

## VII. INCOME NECESSARY TO FUND PLAN AND REFINANCE LOANS

The Debtor currently has close to 300,000 square feet of unleased space. Debtor has spent the past 30 months renovating unleased space and areas, and the previously unusable space is now in leasable condition. Debtor's current rates for leased space average $0.40 cents per square foot with substantially higher rates for warehouse space. The Debtor's prices are very competitive prices for the Kansas City area. In the Kansas City area, warehouse available space is at its lowest inventory in years due to current economic conditions, placing the Debtor in an ideal position to easily lease up these new areas.

Since Leslie Reeder took over management (30 months ago), the gross monthly rent has increased from $246,167 (April, 2020) to $385,780 (July, 2022). When fully leased, these areas will generate an increase in income of approximately $120,000 per month for leased as dry space and up to $250,000 per month if leased as warehouse space. Debtor estimates an absorption period of approximately 6 to 12 months to lease the entire 300,000 square feet now available. Debtor has launched an aggressive marketing program that is enjoying tremendous success.

As for future development, Debtor has over 500,000 square feet of undeveloped, mined space that can easily be repurposed for agricultural and botanical tenants, and in excess of 1,000,000 square feet of mined, undeveloped area for future expansion into warehouse space or that could be reopened for mining purposes as the demand for rock and gravel is extremely high due to the prevailing construction market.

Debtor has complete confidence in its ability to reduce expenses, substantially increase revenues and to create new revenue streams in order to secure new financing and to move forward into a new era of success and prosperity for its business.

## VIII. PARTY INTERESTED IN PURCHASING PROPERTIES OF DEBTOR (INCLUDES CAVES AND HARRISONVILLE SENIOR CARE CENTER, LLC)

Just prior to the Debtor filing its last amended Plan, it received an inquiry from Tim Wahl and his counsel indicating an interest in purchasing the cave property and the Harrisonville Senior Care Center property for $4,750,000. Mr. Wahl provided an unsigned term sheet reflecting this interest. Mr. Wahl filed a pleading with the Court to indicate his interest. Debtor was hesitant as the offer was the same figure as the Proof of Claim that Wayne Reeder had filed. As Debtor believed that Wayne Reeder had made threats that he was going to end up with the cave property, Debtor was suspicious of this offer. Moreover, Kurt Carlson, who is a close friend of Mr. Wahl's, is also a business associate and close friend of Wayne Reeder.

Debtor's counsel investigated Mr. Wahl and believes that he may have the financial

where-with-all to purchase these properties. Before the last confirmation hearing, Mr. Wahl filed a second pleading in this case indicating that he may be able to increase his offer to as much as $5,750,000. The Debtor believes that the second pleading, and the representations made in that pleading to increase the purchase price, were a result of Mr. Wahl learning of the Debtor's position that a sale at $4,750,000 would not yield sufficient funds to pay the unsecured class *any* dividend. If increased to $5,750,000, Debtor believes, based upon the Debtor's CPA's advice, the tax rate on the profit of the sale is a 21% corporate federal rate (the 15% capital gain rate does not apply) and 6% state tax rate, for an aggregate tax amount of 27%.

The projected sale of the Debtor's properties based upon a $5,750,000 sale price, would result as follows:

```
Sale Price…………………………………..$5,750,000
Less 3 mortgage balances (estimated)………..-$3,150,000
Less Ford vehicle loans……………………..... $    32,000
Less Class 13 taxes……………………………$   520,596
Less Citizens estimated deficiency……………$1,000,000
Less US Trustee fees…………………………..$   460,000 (8% of quarterly distributions)
Less income taxes for taxable year 2022
Due to Weld Wheel sale……..……………….....$   300,000
Less additional income taxes for taxable year 2023
Due to sale of the Debtor's properties…………$   127,000 (this does not include tax for regular
                                                            operation of business)
Less final accounting/legal fees ($75,000)…….$    75,000


Resulting Balance……………………………….$    85,404

Amounts owed to Class 16 taxes……….………$    33,593
General unsecured nonpriority claims of
Class 14……………………………………….. $   380,901
Federal tax penalties not yet assessed
Estimated by CBIZ  (add to Class 16)            $   169,315
```

At a sale price of $5,750,000, the Class 14 and Class 16 (unsecured non-priority debts, including the estimated federal tax penalties) would realize a 14.6% distribution. If Anderson's (Class 2) claim is paid in part, there may be additional funds for Classes 14 and 16; however, the Anderson claim would need to be reduced to $369,400 in order for the Classes 14 and 16 to be paid 100%.

The Debtor has revised its Plan of Reorganization to pay Class 14 **in full** within 30 days of the Effective Date and to pay Class 16 over 5 years. Clearly, the treatment for these Classes 14 and 16 is much more favorable than the possible sale at $5,750,000.

Moreover, two other factors must be taken into account:

(a) As a result of Mr. Wahl's request for further information, he has received (after signing a non-disclosure agreement) hundreds of pages of documents and financial information in order for him to perform his due diligence before making an offer to the Debtor. Despite the Court setting August 5, 2022 as a deadline for filing the Plan and Disclosure Statement, Debtor has not received a written offer from Mr. Wahl.

(b) More importantly, Debtor's sole shareholder desires to retain the cave property and business and believes that by paying the unsecured non-priority creditors in full, the Debtor has satisfied all possible objections to the Fourth Amended Plan of Reorganization. Clearly, the current Fourth Amended Plan of Reorganization is in the best interest of the estate and of the creditors.

## VIII. HISTORICAL DATA

The Debtor provides as **Exhibit A** a detailed chart of its income and expenses for the fiscal years (6/1/17-5/31/21) of 2017, 2018, 2019 and 2020. The 2020 fiscal year runs from 6/1/20-5/31/21. The 2021 fiscal year has recently ended. Also, **Exhibit A** includes Balance Sheets and Income Statements for fiscal years ending 5/31/21, and 5/31/22. These recent Balance Sheets and Income Statements covers the first eight (8) months of operation after the filing of the bankruptcy. Balance Sheets and Income Statements for 6/18-4/19, 6/19-5/20 are available upon request from Debtor's counsel.

## IX. THE CONFIRMATION PROCESS

Approval of the Plan requires that it be confirmed by the Court. Confirmation can be achieved in one of two ways - either (i) all classes of Claims or Interests entitled to vote have accepted the Plan by the requisite majorities, or (ii) the Court determines that the Plan is fair and equitable with respect to those Classes that have rejected the Plan, and that confirmation will be in the best interests of creditors.

A. <u>Classification of Claims and Eligibility to Vote.</u> For voting purposes, all Claims and Interests will be grouped into Classes where members of each such Class will hold substantially similar Claims or Interests. All persons with an impaired Claim are eligible to vote provided that they are determined to have an Allowed Claim or Interest. A Class is "impaired" if, under the Plan, its legal, equitable or contractual rights are in any way modified other than by curing defaults or payment in full on the Effective Date. Claims that are not impaired are presumed to have accepted the Plan and may not vote.

B. <u>Confirmation by Acceptance.</u> A Plan will be confirmed if it is accepted by all Classes entitled to vote. A Class will have accepted the Plan if votes representing at least two thirds of amount and one half in number of the Allowed Claims voting in that Class have voted to accept the Plan. If any creditor in an otherwise accepting Class have voted against the Plan, the

Court must determine that each holder of a Claim or Interest in that Class will receive property, as of the Effective Date, having a value that is not less than what such holder would receive if the Debtor was liquidated under Chapter 7 on that date.

      C.      <u>Confirmation Without Acceptance by All Classes</u>.  If the Plan is not accepted by all impaired Classes, the Court may nonetheless confirm the Plan if (i) at least one impaired Class has accepted the Plan, without counting votes by insiders, and (ii) the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired Class that has rejected the Plan.

      D.      <u>Balloting</u>. This Disclosure Statement will be mailed to all creditors and equity holders along with the Plan, a ballot and an order containing instructions, setting certain deadlines, and setting a hearing on confirmation. Only those ballots timely filed will be counted.

      E.      <u>Confirmation</u>. At the hearing on confirmation the Court will determine whether the requisite number of votes have been received for confirmation under the acceptance method or, if the Plan is not accepted by all Classes, then whether the Plan should be confirmed under the non-acceptance method.  The Debtor reserves the right to seek confirmation under the non-acceptance method if less than all Classes vote to accept the Plan. The effect of confirmation generally is to discharge the Debtor from any and all liabilities that arose prior to confirmation, except as provided in the Plan.

## X. DISCLOSURES OF COMPENSATION

      A.      Krigel & Krigel, P.C., the attorneys for the Debtor, were paid an initial retainer of $35,000.  Additional sums of $25,000 were paid 1/18/22, 2/7/22, 2/28/22 and 4/12/22, and payment of $15,000 on 6/13/22 and $30,000 on 7/17/22. Portions of these sums have been paid to the firm per the Court's prior order to pay monthly. The remainder of the retainer is presently held in the firm's trust account.

      B.      Leslie Reeder presently acts as CEO and is paid $3,000 every two weeks. She works full-time at the cave facility and works an average of 70 hours per week.  In addition, Leslie Reeder receives a reimbursed living expense of $8,000/month (rent $3000/mo, utilities, gas, food, etc. and expenses to maintain her apartment in Kansas and her residence in Thailand while living in Kansas City).

      Sammy Jo Reeder, the sole shareholder, works remotely from her home from 10-20 hours per week.  She reviews and approves all of Debtor's business decisions and reviews all correspondence (including email) relative to Debtor's business decisions. She is updated daily on business activities; litigation matters and matters relating to the subsidiaries of the Debtor. She previously earned $3,000 every two weeks and has agreed to reduce her salary to $1,625 every two weeks.

      Stacy Reeder Robinson also works remotely from her home from 10-15 hours per

week. She similarly reviews and approves all of Debtor's business decisions and reviews all correspondence (including email) relative to Debtor's business decisions. She is updated daily on business activities; litigation matters and matters relating to the subsidiaries of the Debtor. She previously earned $1,500 every two weeks and has agreed to reduce her salary to $375 every two weeks.

    C.    The Debtor has paid and is current with its U.S. Trustee Quarterly Fees.

## XI. THE CHAPTER 11 PLAN

    A.    <u>Terms of the Chapter 11 Plan</u>. The Chapter 11 Plan provides for payment to all creditors. See paragraphs 2.1 through 2.18 and paragraphs 4.1 through 4.19 of the Fourth Amended Plan of Reorganization for details.

    B.    <u>Treatment of Claims and Interests</u>. The Debtor's Plan of Reorganization is incorporated into this Disclosure Statement. Creditors and parties in interest are referred to the Plan for a discussion of the treatment of each Class under the Plan.

    B.    <u>Means for Execution and Implementation of the Plan</u>. The Debtor's gross sales should produce sufficient funds to create a positive cash flow for its on-going operations. The Debtor believes that it can pay all debts that come due post-petition as well as pay the Plan payments as set forth in the Plan of Reorganization. See Projections for 2022 through 2027 attached as **Exhibit B** to this Disclosure Statement. **Exhibit B** projections are based, in part, upon the historical data provided in **Exhibit A** and the current gross income and operating expenses.

    In addition to gross sales which will support the operation of the debtor's business and pay the Plan payments for the first three years, Debtor will seek financing for any unpaid secured balance then due and for improvements for the refrigeration and electrical system upgrades.

    D.    <u>Executory Contracts and Unexpired Leases</u>. The Debtor will assume the leases set out in the classes of claims. All remaining executory contracts will be assumed. All unexpired leases with other current tenants will be assumed.

## XII. CONSEQUENCES OF DENIAL OF CONFIRMATION

    If the Debtor's Plan or any amended Plan is not confirmed, the case may be converted to a case under Chapter 7 or it may be dismissed. If converted, a trustee would be appointed to liquidate the Debtor's assets and distribute the proceeds to creditors. Based upon the analysis of assets, liabilities, and the tax consequences, there is no possibility that general unsecured non-priority creditors would receive as much as they are being offered in this Plan. This is based, to a large extent, to the addition of the Citizens' deficiency claim should the Debtor's properties be sold at liquidation by the chapter 7 trustee or if the Debtor is forced to sell to a third party.

## XIII. LIQUIDATION ANALYSIS

The Debtor has prepared a liquidation analysis of its assets. This analysis is attached as **Exhibit C** to this Disclosure Statement. The Debtor is not sure of the value of the real estate as it has not had recent appraisals prepared. It is using the figure that the interested party (Tim Wahl) used in his most recent pleading (that he would offer up to $5,750,000).

The Debtor believes that under the best scenario, liquidation would realize significantly less for the unsecured creditors than the Fourth Amended Plan of Reorganization proposes (100% within 30 days of the Effective Date for Class 14 and 100%of the tax penalties (Class 16) over the 5 years of the Plan. The Debtor's Plan proposes to pay the unsecured non-priority creditors that are listed in Class 14 and Class 16 payment of 100% of their approved claims. Thus, it is extremely unlikely that the unsecured creditors would receive as much if the assets were liquidated on the Effective Date of the Plan.

INTERSTATE UNDERGROUND
WAREHOUSE AND INDUSTRIAL
PARK, INC.

Date   August 5, 2022

/s/   *Leslie Reeder*
Leslie Reeder, CEO

KRIGEL & KRIGEL, P.C.

/s/ *Erlene W. Krigel*
Erlene W. Krigel,   No. 29416
4520 Main Street Suite 700
Kansas City, Missouri 64111
Telephone: (816) 756-5800
Facsimile: (816) 756-1999
ATTORNEYS FOR DEBTOR